**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS, PINE BLUFF DIVISION**

JUN 3 0 2015

JAMES W. McCORMACK, CLERK
By: _____ ZBu _____
DEP CLERK

| | |
|---|---|
| Tina JIMERSON, ADC #704449 | Case Number _____ |
| Petitioner, | 5:15 - CU -208 - B5m - JTK |
| v. | **PETITION UNDER 28 U.S.C.** |
| Wendy KELLEY, Director, | **§ 2254 FOR WRIT OF HABEAS** |
| Arkansas Department of Correction, | **CORPUS BY A PERSON IN** |
| | **STATE CUSTODY** |
| Respondent. | |

Case number of State Court
Conviction: Dallas County CR-91-10

**This case assigned to District Judge** _Miller_
**and to Magistrate Judge** _Kearney_

## PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging: **Dallas County Circuit Court, Fordyce, Arkansas.**
    (b) Criminal docket or case number: **CR-91-10.**

2.  (a) Date of the judgment of conviction: **August 19, 1992.**
    (b) Date of sentencing: **August 19, 1992.**

3.  Length of sentence: **Life.**

4.  In this case, were you convicted on more than one count or of more than one crime? **Yes.**

5.  Identify all crimes of which you were convicted and sentenced in this case: **First Degree Murder, Aggravated Robbery.**

6.  (a) What was your plea? **Not guilty.**
    (b) If you went to trial, what kind of trial did you have? **Jury trial.**

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing? **Yes.**

8.  Did you appeal from the judgment of conviction? **Yes.**

9.  If you did appeal, answer the following:
    (a) Name of court: **Supreme Court of Arkansas.**
    (b) Docket or case number (if you know): **CR 93-189.**

speak to Vaughn in the county jail for the express purpose of obtaining a confession from him. State further failed to disclose that the informant secretly recorded his conversations with Vaughn, that the tape was in the possession of law enforcement officials, and that pending charges against the informant in an unrelated criminal case were dropped because he obtained a confession from Vaughn. The State failed to disclose that Vaughn told the informant that the woman who drove the car to the offense was a girlfriend of one of the male offenders, which was significant because Ms. Jimerson was not a girlfriend of any of her codefendants. The State failed to disclose that the informant had discussed the death penalty with Vaughn, which was significant because at trial, Vaughn recanted his confession and testified that he had falsely confessed out of fear of getting the death penalty. (See Exhibits 1, 2, and 6.)

The above information was exculpatory. On April 26, 2015, Ms. Jimerson's trial attorney, William M. Howard, signed a statement confirming that the prosecution never disclosed this information to him. (See Exhibit 3.)

**(b) Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue? **No.**

(2) If you did not raise this issue in your direct appeal, state why:

Because the State suppressed the evidence in question and neither Ms. Jimerson nor her trial attorney knew about it, Ms. Jimerson was unable to raise the issue in her direct appeal. The suppressed evidence only came to light when, in the course of Ms. Jimerson's current counsel's investigation into this matter, a law enforcement official, former Dallas County Sheriff Donny Ford, happened to disclose the facts detailed above. The informant's version was confirmed on July 11, 2014, through an interview with the informant, who executed an affidavit on that date. Ms. Jimerson's current counsel was not able to confirm from the trial attorney that this evidence was suppressed at the time of trial until April 26, 2015, when the attorney reviewed the relevant documents and signed a statement confirming that the evidence in question had not been disclosed to him prior to trial. No exercise of due diligence on Ms. Jimerson's part could have revealed the existence of the informant or the circumstances of the recording at the time of trial or appeal.

**Ground Two:** Ms. Jimerson was denied due process of law under the United States Constitution where police, acting in bad faith, destroyed evidence that could have exculpated her. (*Arizona v. Youngblood.*)

**(a) Supporting facts:**

As stated in Ground 1, Charlie Vaughn's identification of Ms. Jimerson as having driven the other offenders to the crime scene was the State's primary evidence linking Ms. Jimerson to the crime. Not only was the secret recording of the informant's jailhouse conversations with Vaughn suppressed, but investigators destroyed it in bad faith. Former Dallas County Sheriff Donny Ford, who worked in the sheriff's office at the time of the homicide investigation, has revealed that the recording of the conversations between the informant and Vaughn no longer exists. (See Exhibit 2.)

(c) Result: **Affirmed.**
(d) Date of result (if you know): **January 10, 1994.**
(e) Citation to the case (if you know): *Jimerson v. State*, **869 S.W.2d 9 (Ark. 1994).**
(f) Grounds raised: **Failure to sever trial, failure to exclude testimony of Michael Early, insufficient evidence, erroneous admission of testimony by Donald Smith.**
(g) Did you seek further review by a higher state court? **N/A.**
If yes, answer the following:
      (1) Name of court:
      (2) Docket or case number (if you know):
      (3) Result:
      (4) Date of result (if you know):
      (5) Citation to the case (if you know):
      (6) Grounds raised:
(h) Did you file a petition for certiorari in the United States Supreme Court? **No.**

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? **No.**

11.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.
    **(1) Violation of due process rights under *Brady v. Maryland.***
    **(2) Violation of due process rights under *Youngblood v. Arizona.***

**Ground One:** Ms. Jimerson was denied due process of law under the United States Constitution where police were aware of exculpatory or impeaching evidence but neither the police nor the prosecution disclosed this evidence to Ms. Jimerson or to her attorney prior to trial. (*Brady v. Maryland.*)

(a) Supporting Facts:

This case arises out of the sexual assault of an elderly woman whose battered body was found in the trunk of her car on the morning of September 22, 1988, at her home in Fordyce, Arkansas. Reginald Early, John Brown, and Charlie Vaughn were arrested on March 16, 1990, and charged with the crime. Tina Jimerson was not arrested until March 25, 1991. Vaughn pleaded guilty, also on March 25, 1991. Ms. Jimerson and her other two codefendants were tried together by a jury. After a hung jury on April 27, 1992, all three were convicted on August 19, 1992, and sentenced to life in prison.

Before Ms. Jimerson's arrest, law enforcement officials obtained a confession from Vaughn on March 24, 1991, and he pleaded guilty the following day. Based on this evidence, and on the same day as Vaughn's guilty plea, the State arrested Ms. Jimerson. Mr. Vaughn recanted his confession at Ms. Jimerson's trial, but the State read Vaughn's testimony from his plea hearing into evidence, and Vaughn's recanted allegation that Ms. Jimerson drove the offenders to the crime scene was the State's primary evidence linking Ms. Jimerson to the crime.

The State failed to disclose to Ms. Jimerson or her attorney, however, that law enforcement officials obtained Vaughn's initial confession by sending an informant named Ronnie Prescott to

The recording of the jailhouse conversations between Vaughn and the informant was potentially exculpatory evidence, and it was destroyed in bad faith.

The tape was potentially useful to Ms. Jimerson's defense at trial, and potentially exculpatory, for several reasons. Vaughn's statement to the informant was the first direct accusation by anyone that Ms. Jimerson was involved in the offense. Based on the recollections of Donny Ford (formerly of the Dallas County Sheriff's office), the informant was on a mission to obtain a confession from Vaughn and discussed the death penalty with Vaughn; this could have corroborated Vaughn's testimony at trial that he pleaded guilty out of fear of the death penalty. According to the informant, Vaughn said that the girlfriend of one of the men who committed the murder had driven them there. Because Ms. Jimerson has never been romantically involved with any of her codefendants, this could have suggested that she was misidentified by Vaughn. (See Exhibits 1 and 2.)

Because the informant was briefed ahead of time about facts of the homicide, it is possible that the recording would have demonstrated that the informant provided some of these details to Vaughn during their jailhouse conversations – such as the detail that the defendants were driven to the crime scene by a woman, or the identity of the driver. (See Exhibit 2.)

In addition, the tape could have revealed that the informant used coercive tactics to elicit Vaughn's confession. The informant recalled that he sensed that Vaughn was afraid during their conversations about the case. Donny Ford acknowledged that the informant discussed the death penalty and other potential punishments with Vaughn. (See Exhibits 1 and 2.)

This potentially useful information was destroyed in bad faith. Because Vaughn had been charged with murder and had counsel at the time police sent an undercover informant to extract a confession from him, the use of this informant violated Vaughn's Sixth Amendment right to counsel. Donny Ford was apparently aware of this, stating that he believed the tape could not be used at trial because the informant had been acting as an agent for the police. (See Exhibit 2.)

Not only did law enforcement officials suppress and destroy the tape, but they took steps to conceal that the informant, Ronnie Prescott, had purposefully elicited a confession from Vaughn and had recorded their conversations. Although apparently not disclosed to trial counsel before trial, a handwritten statement drafted by then-Fordyce Police Chief Ronnie Poole – and signed by the informant Ronnie Prescott – describes Vaughn's confession in a way that misleadingly suggested that that it was Vaughn's idea to discuss the murder with Prescott, and entirely omitting the fact that Prescott was working with the police and had recorded the conversations. (See Exhibit 4.) Also, the official memorandum in the Arkansas State Police file regarding Prescott not only omits those same facts, but indeed entirely fails to mention the substance of what Prescott told police. (See Exhibit 5.) In addition, at the conclusion of Vaughn's guilty plea hearing, the judge asked the attorneys and law enforcement agents in the courtroom about any other statements Vaughn may have made, and none of them mentioned the recorded jailhouse conversations with Prescott. (See Exhibit 6.) Finally, as stated previously, none of this information about the agreement with the informant or the recorded jailhouse conversations was disclosed to Ms. Jimerson's counsel. (See Exhibit 3.)

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue? **No.**

(2) If you did not raise this issue in your direct appeal, state why: **Please see explanation from Ground One above.**

12.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in the petition? **No.**

13.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? **No.**

14.    Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:
(a) At preliminary hearing:
**Tracey F. Bagwell**
**2042 N. Buckley Dr.**
**Fayetteville, AR 72701**

(b) At arraignment and plea: **Tracey F. Bagwell (as above).**

(c) At trial:
**William M. Howard**
**P.O. Box 6487**
**Pine Bluff, AR 71611**

(d) At sentencing: **William M. Howard (as above).**

(e) On appeal: **William M. Howard (as above).**

(f) In any post-conviction proceeding: **N/A**

(g) On appeal from any ruling against you in a post-conviction proceeding: **N/A**

15.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging. **No.**

16.    If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.
**Please see above. The facts that are the basis of the claims herein did not become known to Ms. Jimerson until 2014 and 2015. The affidavit from the informant, Ronnie Prescott, confirming the existence and circumstances of the secret recording, was executed on July 11, 2014. The statement from Ms. Jimerson's trial attorney, William M. Howard, demonstrating that this evidence was not disclosed to the defense before trial, was signed on April 26, 2015.**

WHEREFORE, petitioner asks the Court grant the following relief:

1.     Issue a writ of habeas corpus ordering that Tina Jimerson be brought before the Court to be discharged from her unconstitutional confinement and relieved of her unconstitutional conviction and sentence;

2.     Order Respondent to produce the records of the state court proceedings together with any responsive pleadings;

3.     Grant Tina Jimerson, upon request, the authority to obtain discovery and subpoenas for witnesses and documents necessary for an evidentiary hearing;

4.     Order an evidentiary on Tina Jimerson's claims; and

5.     Grant such other relief as may be just and appropriate.

                                        Respectfully Submitted,
                                        TINA JIMERSON


                                        by Karen L. Daniel, attorney for Petitioner

KAREN L. DANIEL
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern University School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576
Illinois Attorney No. 6180156

6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

Tina JIMERSON, #704449

                  Petitioner,

v.

James BANKS, Warden,

                  Respondent.

Case Number _____

**VERIFICATION OF PETITION**

     I, Tina Jimerson, declare under penalty of perjury that the foregoing **PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY** is true and correct.

*Tina Jimerson*
TINA JIMERSON

Executed on *June 19,* _____, 2015 at Newport, Arkansas.

## LIST OF ATTACHED EXHIBITS

Exhibit 1     Affidavit of Ronnie Prescott (July 11, 2014)

Exhibit 2     Affidavit of Greg Stimis (April 17, 2015)

Exhibit 3     Affidavit of William M. Howard (April 26, 2015)

Exhibit 4     Handwritten statement signed by Ronnie Prescott (March 24, 1991)

Exhibit 5     Arkansas State Police report of interview of Ronnie Prescott (March 25, 1991)

Exhibit 6     Testimony of Charles Vaughn at Tina Jimerson's trial, including guilty plea transcript (August 18, 1992)

Exhibit 1

STATE OF SOUTH CAROLINA   )
                          )   SS
COUNTY OF _EDGEFIELD_     )

### AFFIDAVIT OF RONNIE PRESCOTT

I, Ronnie Prescott, being duly sworn, do state on oath under penalty of perjury that the following facts are true to the best of my knowledge:

1. I am 52 years old. I am currently a federal prison inmate at FCI Edgefield, inmate number 24641-077. I understand that this affidavit may be filed in court.

2. I am making this statement of my own free will. I have not been threatened in any way or promised anything in connection with the making of this statement.

3. In *or around* March of 1991, the sheriff of Dallas County, Arkansas, drove me from Texas, where I had just been released from the Texas Department of the Corrections, to Fordyce, where I had a criminal charge pending. *Also in the car was a member of the drug task force.*

4. On the way, the sheriff told me about a murder of a woman in Fordyce, and that suspects in the murder were in the jail in Fordyce. The sheriff told me that if I would do what he asked, my pending charge would be dismissed, *and I would have immunity.* I agreed to do it. *What the sheriff asked me to do was to get the guy to talk about the murder.*

5. In the jail I spoke with one suspect (I don't remember his name) who was in the same *cell* of the jail as me. I never spoke to *or saw* the other suspects, who were not in the same *cell*. *The suspect I spoke with was a young African-American man.*

-1-

6.      The sheriff gave me a pocket tape recorder, and at his direction I recorded my

conversations with the guy in my ~~area~~ cell who was the suspect.  I had multiple conversations with

the suspect and I believe I recorded all of them.  The suspect did not know I was recording him.

During the conversation the suspect told me details
about the murder.  I sensed that the suspect
was afraid.  He said that the girlfriend of
one of the guys who had committed the murder
had driven them there and had driven them away.
He did not say that she knew there was going to be a murder.

7.      After ~~you~~ these conversations, I gave the recordings to the sheriff.  I never heard

the recordings, other than the sheriff play a short portion to see
if he could hear.  The sheriff looked surprised to hear that a
woman was mentioned.

8.      After making these recordings, I ~~bonded out of~~ left the jail in Fordyce and went back
the next day
(I think)

to my home in Daisy, Arkansas.  The pending charge against me was later dismissed.  My

understanding was that the dismissal was because of what I had done in Fordyce.

9.      I don't remember whether I signed a
statement at the jail but I did not handwrite
one out.



10.     I never heard from the sheriff again about the guy I talked to or about the murder.

*any attorneys for the murder suspects* *RP*

I never told ~~anyone~~ about this until I spoke on the phone with attorney Karen Daniel in June of

2014, and then met with Attorneys Karen Daniel and Karen Thompson on July 11, 2014.


_____
[name]   Ronnie Prescott


SUBSCRIBED AND SWORN TO BEFORE ME
this 11th day of July, 2014.

_____
NOTARY PUBLIC


*8/1/22*


-3-

*RP*

Exhibit 2

## AFFIDAVIT OF GREGORY A. STIMIS

I, Gregory A. Stimis, being duly sworn, hereby declare and state as follows:

1.  I am over the age of 18 and fully competent to make this affidavit. This affidavit is based on my personal knowledge, except where expressly noted otherwise. I understand that this affidavit may be filed in court.

2.  I am the owner of Greg Stimis Investigations, a private investigation firm located in Little Rock, Arkansas. I am experienced and licensed in the State of Arkansas as a private investigator.

3.  In 2013, I was retained by attorney Karen Thompson of the Innocence Project in New York City and attorney Karen Daniel to conduct an investigation relating to the arrest and conviction of four individuals: Reginald Early, John Brown, Charlie Vaughn, and Tina Jimerson. I understand that these four individuals were convicted of the September 1998 murder of Myrtle Holmes in Dallas County, Arkansas.

4.  As part of the investigation, I conducted an in-person interview with Donny Ford on January 7, 2014 at the Dallas County Sheriff's Office in Fordyce, Arkansas. On that date, Mr. Ford was the sheriff of Dallas County, Arkansas.

5.  When I arrived at the Dallas County Sheriff's office, I identified myself to the receptionist and asked to speak to Mr. Ford. The receptionist conferred with Mr. Ford and told me that Mr. Ford would very much like to speak with me.

6.  Mr. Ford told me that while he was not yet sheriff of Dallas County at the time of Myrtle Holmes's death and the early investigation into that crime, he became sheriff shortly thereafter.

1

7.    Mr. Ford stated that during the investigation into the murder of Myrtle Holmes, he gained information from a jailhouse informant. Mr. Ford described the informant to me as a "meth cooker," but he was unable to tell me the man's identity.

8.    Mr. Ford told me that the informant was a suspect in an unrelated criminal investigation, whom Mr. Ford and another law enforcement official had picked up in Texas and driven back to the Dallas County Jail. According to Mr. Ford, the informant asked Mr. Ford during that drive if there was anything he could do to improve his own situation.

9.    Mr. Ford said that he told the informant that if he wanted to better his situation, he could try to obtain incriminating information from Mr. Vaughn, Mr. Early, and Mr. Brown, who were all in custody at the Dallas County Jail.

10.   Based on my investigation, I believe that this conversation took place in  March 1991. At that time, per Mr. Ford, Ms. Jimerson had not yet been identified as a suspect in Myrtle Holmes' death, and there was very little evidence against Mr. Vaughn, Mr. Early, or Mr. Brown.

11.   Mr. Ford stated that after he brought the informant back to the Dallas County Jail, the informant came to Mr. Ford to say that Mr. Vaughn had admitted to killing Myrtle Holmes. Mr. Ford added that Mr. Vaughn had provided the informant with details previously only known to the offenders, and possibly to law enforcement investigators.

12.   Mr. Ford then told me that he arranged for the informant to be fitted with a secret recording device, and that he sent the informant back to the jail to record conversations with Mr. Vaughn.

13.   Mr. Ford acknowledged that the informant discussed the death penalty and other potential punishments with Mr. Vaughn.

14.     Mr. Ford said that subsequent to the informant giving him the recording, Mr. Vaughn asked to speak to Mr. Ford and said that he wanted to confess. Mr. Ford told me that he summoned several other individuals—including Mr. Vaughn's attorney—and that Mr. Vaughn made both an oral and a recorded confession in their presence.

15.     According to Mr. Ford, the recording of the conversation between the informant and Mr. Vaughn no longer exists.

16.     Mr. Ford said that he believed the tape could not be used at trial because the informant had been acting as an agent for the police.

17.     I contacted Mr. Ford by telephone on January 16, 2014 to find out if he could identify the informant. Mr. Ford told me that he would review his records and advise me if he was able to make an identification.

18.     During our conversation of January 7, 2014, Mr. Ford told me that he believed Ms. Jimerson "shouldn't be in the penitentiary," and that she should have received a sentence of probation instead of incarceration.

19.     On April 1, 2015, I had a telephone conversation with Ronnie Poole, who was the chief of police in Fordyce at the time of the Myrtle Holmes homicide and an investigator for the Thirteenth Judicial District Drug Task Force in March 1991. At the time of our telephone conversation, Mr. Poole was an instructor at the Arkansas Law Enforcement Training Academy.

20.     I identified myself to Mr. Poole, and I told him I was working for Ms. Daniel and Ms. Thompson to investigate the use of an informant in Ms. Jimerson's case. Mr. Poole recalled the informant, and, without further prompting by me, referred to the informant by name as Ronnie Prescott.

3

21.     Mr. Poole further recalled that he had been in the vehicle with Mr. Prescott and Mr. Ford

        when Mr. Prescott had been driven from Texas to Fordyce in March 1991.

22.     Mr. Poole agreed to have an in-person meeting with me to discuss the case further. At

        Mr. Poole's request, I sent him several documents that had been provided to me by Ms.

        Daniel, including Mr. Prescott's signed affidavit.

23.     After Mr. Poole received these documents, he sent me an email informing me that he no

        longer wished to meet with me. A true and accurate copy of Mr. Poole's email is attached

        to this affidavit as Exhibit A.

Under penalty of perjury, I affirm that the foregoing is true and correct.

_____
Gregory A. Stimis

Subscribed and sworn to before me this _17th_ day of _April_, 2015.

County of Pulaski, State of Arkansas.

_____
Notary Public

My commission expires _6/12/17_

Exhibit 3

## STATEMENT OF WILLIAM McNOVA HOWARD

I, William McNova Howard, hereby state as follows:

   I am an attorney licensed to practice law in the State of Arkansas.  I represented both Tina Jimerson and her codefendant, Reginald Early, in *State v. Early, Brown, and Jimerson*, Dallas County Circuit Court Nos. CR-19909-16, 19909-17, and 1991-10, at their 1992 trials for the murder of Myrtle Holmes.  During the course of my representation of Tina Jimerson, I did not learn at any point that law enforcement officials commissioned or encouraged a jailhouse informant, Ronnie Prescott, to question my client's codefendant, Charlie Vaughn, in or around March 1991. I also did not learn at any point that a tape recording of such a conversation existed, or that Ronnie Prescott received a favorable outcome on a pending criminal charge in exchange for his assistance in obtaining a statement from Charlie Vaughn.

William Howard J.                    4/26/15

William McNova Howard, Esq.          Date

Exhibit 4 –

RONNIE Edwand PrescoTT – D.O.B. 4-4-62
Rt. 1 BoX 112 C
OKALONA, AR
Employed: owner/oper. T P - TANS U

I have been in the Huntsville Unit
of the Texas Dept. of Corrections for
approximately six months. Friday Mar.
22, 1991, was my last day there. Dallas
County, Ark. Authorities had a detainer
for me and the Dallas Co. Shuilf
picked me up on Friday.

I was returned to Ark. where I
was placed in the Dallas County
Jail late Friday afternoon. Late
Friday night, an inmate by the name
of Charlie Vaughn, came into my cell.
We began to talk and I asked him
what he was in for, and he told
me murder, and that he was afraid
of a jury trial because he thought
they would give him the death
penalty. Vaughn was reluctant to
tell me much about the incident
He gave me bits and pieces of the
incident.

68-575-88

On Saturday at approx 10 A.M. March 23, 1991, Vaughn woke me up and wanted to talk to me once again about the incident. Vaughn appeared convinced that he could trust me after the Sheriff & I had some words.

Vaughn began telling me about the night the old lady was murdered in Foaye. He told me that he, John Brown, Reggie & Tina who was driving the car they were in drove over to the ladies house. Everyone got out, but Tina. Brown was the first one in the house & let Vaughn & Reggie in.

Vaughn told me that Brown began to hit the old lady and was beating her all over the house. When they got into the house the woman was in bed and had some type of oxygen mask on. Vaughn told me they hit her with "all kinds of stuff". Vaughn told me that John Brown raped her first & then Reggie. After that John got a knife and began stabbing & cutting her.

After they were sure she was dead

John and Reggie picked her up and took her to the car under the carport and put her in the trunk.

John Brown and Reggie left with Tina in her car and Vaughn left walking.

Ronnie Prescott

3/29/91

3:45 P.M.

Witnessed: Lt. Jerry Bradshaw

Form. File 13th D.T.F.

68-575-88  — Bradshaw

Exhibit 5

```
┌─────────────────────────┐
│ TYPED     P.C. 3/27/91  │
│ INDEXED                 │
│ LOGGED                  │
│ PROOFED   ___ 3/29/91   │
│ QUAL. CON.              │
│ COPIED    MP 4/1        │
│ FILED     ANU4-3        │
└─────────────────────────┘
```

## CRIMINAL INVESTIGATION DIVISION

**ASP-3-A**

DATE:                 MARCH 25, 1991
DICTATED BY:          LT. JERRY BRADSHAW
DATE TYPED:           MARCH 27, 1991
COPIES TO:            LT. BRADSHAW (2)
                      SGT. MCANALLY

### INTERVIEW OF WITNESS

RONNIE EDWARD PRESCOTT
W/M.

OKALONA, AR
EMPLOYED:  OWNER/OPERATOR OF TI-TANS U

RONNIE EDWARD PRESCOTT was interviewed on Sunday, March 24, 1991, by this
agent at the Dallas County jail.  Present during the interview was RONNIE
POOLE with the Thirteenth Judicial Drug Task Force, Sheriff DONNIE FORD,
and Attorney BOB REMITT of Star City.

A handwritten statement was taken from RONNIE EDWARD PRESCOTT by this
agent and signed by PRESCOTT in the presence of this agent and will be
made a permanent part of this investigative file.

FILE NUMBER:  68-575-88                    CRIME: CAPITAL MURDER

Exhibit 6

503.

1    **CHARLIE VAUGHN:**   I really ain't got too much

2    nothing to say.

3          **THE COURT:**   Well, okay, but what you say will

4    be truthful, whatever it is?

5          **CHARLIE VAUGHN:**   Yeah.

6          **THE COURT:**   Okay.

7          **MR. TOM WYNNE:**   May I proceed, your Honor?

8          **THE COURT:**   Yes, sir.

9    **DIRECT EXAMINATION OF CHARLIE VAUGHN BY TOM WYNNE:**

10   Q.   Would you state your name for the Court, please?

11   A.   Charlie Vaughn.

12   Q.   You've got to speak up, Mr. Vaughn.

13   A.   My name's Charlie Vaughn.

14   Q.   And where do you reside, Mr. Vaughn, where do you live?

15   A.   Fordyce, Arkansas.

16   Q.   And are you presently incarcerated in the Arkansas

17   Department of Corrections?

18   A.   Yeah.

19   Q.   And for what reason are you there in the Arkansas

20   Department of Corrections?

21   A.   Well, for this so-called -- this murder.

22   Q.   Have you been convicted of a prior felony?   Have you

23   been convicted of something?

24   A.   Yeah.

25   Q.   What was that?   What was the charge?

504.

1   A.   First degree murder.

2   Q.   And first degree murder of whom?   Who was the victim?

3   Who was murdered?

4   A.   Can't remember.

5   Q.   You don't remember the name?

6   A.   (Shakes head negatively.)

7   Q.   Okay.  And do you recall when you were convicted?

8   A.   (Shakes head negatively.)

9   Q.   Do you recall how you were convicted?

10  A.   I didn't know what I was doing.

11  O.   Let me ask you this Mr. Vaughn:  How old are you?

12  A.   Twenty-five.

13  O.   How far did you go in school?

14  A.   Quit about in the ninth.

15  O.   And do you recall where you were on or about September

16  of 1988, during that month?   Do you recall where you were

17  then?

18  A.   I can't remember.

19  O.   Pardon me?

20  A.   I can't remember it's been so long.

21  O.   Do you recall where you were in the year of 1988?

22  A.   (Shakes head negatively.)

23  O.   Do you recall where you were living?

24  A.   Yeah. I know where I was living.

25  O.   You were alive in 1988, were you not?

505.

1   A.   Yeah.

2   Q.   Do you recall where you were living?

3   A.   I wouldn't be here now if I wasn't living then.

4   Q.   Where were you living in 1988, Mr. Vaughn?

5   A.   Greenville.

6   Q.   In  Greenville?    That's  Fordyce,  Arkansas,  is  that

7   correct?

8   A.   Yeah.

9   Q.   Were you living there in September of 1988?

10  A.   Yeah.

11  Q.   Back  in  1988  did  you  know  a  person  by  the  name  of

12  Reginald Early?

13  A.   (Shakes head negatively.)

14  Q.   Didn't know him at all?

15  A.   No.

16  Q.   Did you know a person by the name of Tina Jimerson?

17  A.   (Shakes head negatively.)

18  Q.   You didn't know her at all?

19  A.   (Shakes head negatively.)

20  Q.   Did you know a person by the name of John Brown?

21  A.   No.

22  Q.   You didn't know him at all?

23  A.   (Shakes head negatively.)

24  Q.   Do you know Reginald Early today?

25  A.   (Shakes head negatively.)

506.

1  Q.   Do you know Tina Jimerson today?

2  A.   (Shakes head negatively.)  No.

3  Q.   Do you know John Brown today?

4  A.   No.

5  Q.   So you can't identify any of these people sitting up

6  here today in the courtroom, any of them?  Do you recognize

7  this gentlemen?

8  A.   (Shakes head negatively.)

9  Q.   Ever seen him before?

10 A.   Yeah, I've seen him before but I don't know him.

11 Q.   Okay, you don't know him but you've seen him?  Do you

12 recall where you've seen him before?

13 A.   I've seen him right here in the courtroom.

14 Q.   Okay.  Prior to today, have you seen him before?

15 A.   I've seen him right in the courtroom.

16 Q.   Okay.  But prior to today, Mr. Vaughn, have you ever

17 seen him before to your knowledge?

18 A.   Yeah, now, I see him now.

19         **MR. TOM WYNNE:**  Your Honor, could you ask the

20         defendant, I mean the witness, to answer the

21         question?  Let me --

22 **MR. TOM WYNNE:**  (Continuing)

23 Q.   Prior to today, not today, not counting today, before

24 today, have you ever seen this man before?

25 A.   I said I see him now.

507.

1  Q.  But never before?

2  A.  (Shakes head negatively.)

3  Q.  Do you recall seeing him in the courtroom about three or

4 four months ago?

5  A.  Yeah.

6  Q.  Okay.

7  A.  And now I see him.

8  Q.  So those two times are the only times you've ever even

9 seen Reginald Early, is that correct?

10  A.  Yes, sir.

11  Q.  And how about the young lady sitting here, Tina

12 Jimerson.  Have you ever seen her before today?

13  A.  Yeah, last time in the courtroom.

14  Q.  Okay.  And prior to that time you'd never even seen her

15 before?

16  A.  (Shakes head negatively.)

17  Q.  Mr. Brown sitting over here between two gentlemen with

18 their suits on, have you ever seen him prior to today?

19  A.  Last time in the courtroom and now.

20  Q.  Okay.  And prior to that time, these two times, did you

21 ever see him before?

22  A.  No.

23  Q.  Do you know a gentleman by the name of Ellis Tidwell?

24  A.  Yeah, I know him, I used to work for him.

25  Q.  Okay.  Do you know a young lady by the name of Taura

508.

1  Bryant?

2  A.   Nope.

3  Q.   Do you know anyone in Fordyce by the name of Levi

4  Grandy?

5  A.   (Shakes head negatively.)

6  Q.   Have you ever been at Levi Grandy's house?

7  A.   Nope.

8  Q.   Okay.  Have you ever -- were you, on or about September

9  the 21st with Reginald Early?

10  A.   No.

11  Q.   Did you see him that day?

12  A.   No, sir.

13  Q.   The 21st or 22nd of September?

14  A.   (Shakes head negatively.)

15  Q.   You did not see him, were not with him?

16  A.   Nope.

17  Q.   Did you see Tina Jimerson on or about September the

18  21st, 1988 or September the 22nd, 1988?

19  A.   (Shakes head negatively.)  No.

20  Q.   Didn't see her?

21  A.   (Shakes head negatively.)

22  Q.   Were you with her?

23  A.   (Shakes head negatively.)

24  Q.   How about John Brown, did you see him on or about the

25  21st of September, 1988, or September the 22nd?

509.

1   A.   Nope.

2   Q.   Were you with him on or about either one of those dates,

3   or both of those dates?

4   A.   I run by myself.

5   Q.   You were by yourself?

6   A.   I said I run by myself.

7   Q.   You run by yourself?

8   A.   I don't run with nobody.

9   Q.   Okay.   Don't have any friends?

10   A.   (Shakes head negatively.)

11   Q.   Don't know anybody?

12   A.   Stay to myself.

13   Q.   Okay.   Were you at a party, or were you at the house of

14   Levi Grandy or his family on or about September the 21st or

15   the 22nd of 1988?

16           MR.  HOWARD:    Your  Honor,  I  object,  that

17       question's been asked and answered once before.   He

18       indicated that he didn't even know Levi Grandy five

19       minutes ago.

20           THE COURT:   All right.   The Court recognizes

21       that the witness is obviously hostile and the Court

22       will  permit  leeway  in  the  examination  of  this

23       witness.

24           MR. TOM WYNNE:   Thank you, your Honor.

25   MR. TOM WYNNE:   (Continuing)

510.

1   Q.   Were you at the house of Levi Grandy --

2   A.   No.

3   Q.   -- on or about the 21st of September of '88, or 22nd of

4   '88?

5   A.   No.

6   Q.   Did you see, or were you with, a Taura Bryant on or

7   about the 21st of September of '88 or the 22nd of '88?

8   A.   I don't know her.

9   Q.   Okay.

10  A.   Do you recall seeing Ellis Tidwell on or about the 21st

11  day of September or 22nd day of September, 1988?

12  A.   Nope.

13  Q.   Have you ever heard the name Myrtle Holmes?

14  A.   (Shakes head negatively.)

15  Q.   Never heard the name Myrtle Holmes?

16  A.   I don't know her.

17  Q.   Ever heard that name, Myrtle Holmes?

18  A.   (Shakes head negatively.)

19  Q.   Didn't hear the name Myrtle Holmes when we were in court

20  the last time in April?

21  A.   I remember you -- hearing you say it.

22  Q.   Okay.  But prior to that time you had never heard the

23  name of Myrtle Holmes?

24  A.   (Shakes head negatively.)

25  Q.   You don't recall when a lady by the name of Myrtle

511.

1  Holmes was found dead back in September of '88?  Does that

2  ring a bell with you at all?

3  A.   (Shakes head negatively.)

4  Q.   Okay.  Mr. Vaughn, did you at any time in 1988, or at

5  any time, enter the home of a lady by the name of Myrtle

6  Holmes on the south side of Arkansas?

7  A.   Nope.

8  Q.   Did you at any time in September of 1988 have anything

9  to do with the murder of Myrtle Holmes on the south side here

10  in Fordyce in 1988?

11  A.   No, I didn't.

12         MR. TOM WYNNE:  Your Honor, at this time I

13         would ask State's Exhibit Number 58, which is a

14         transcript of the proceedings of a plea of guilty

15         before this Court on March the 25th, 1991, which is

16         styled: State of Arkansas versus Charlie Vaughn,

17         Criminal Case Number 90-18, transcript of the

18         proceedings that day in which Mr. Vaughn plead, in

19         this particular case, it is marked State's Exhibit

20         Number 58, and I would ask at this time that it be

21         introduced into evidence and that the Court permit

22         me to read it to the jury?

23         THE COURT:  Any objections?

24         MR. MURPHY:  No objections.

25         MR. HOWARD:  No objections.

512.

1    **THE COURT:**   All   right.   There   being   no
2    objections, let it be introduced.
3    **MR.   TOM   WYNNE:**    Your   Honor,   it   has   been
4    marked and --
5    **THE COURT:**   Let me see you just a minute.
6    ATTORNEYS AT BENCH OUT OF THE HEARING OF THE JURY:
7    **THE COURT:** Is this the one that was introduced
8    last time?
9    **MR. TOM WYNNE:** That's the one we introduced
10   last time, yes, sir.
11   **MR. MURPHY:** Your Honor, I want it read in its
12   entirety.
13   **MR. TOM WYNNE:** Sure.
14   **THE COURT:** It'll take two of you to read it.
15   **MR. MURPHY:** Not just the -- I want everything
16   --
17   **MR. TOM WYNNE:** I will read the entire --
18   **THE COURT:** Matter of fact, you can help if
19   you would like.
20   **MR. MURPHY:** No, sir.
21   **MR. TOM WYNNE:** Your Honor, I think I would
22   prefer to do it by myself if that's all right.
23   **THE COURT:** Okay.
24   **MR. MURPHY:** It comes off better --
25   **THE COURT:** There's more than two roles to

513.

play anyway --

MR. HOWARD: He and Robin did it last time.

MR. TOM WYNNE: We would prefer --

MR. MURPHY: I have no objection.

MR. TOM WYNNE: It's the same transcript.

THE COURT: I think you have to lay a foundation before you read it.

MR. MURPHY: We don't object to it.

THE COURT: Go ahead, it's not objected to, you may read it.

IN OPEN COURT:

THE COURT: All right. It's State's -- what exhibit number again, please, sir?

COURT REPORTER: Fifty-eight.

THE COURT: All right. It may be introduced. Without objection you may read it to the jury.

WHEREUPON, State's Exhibit Number 58 was introduced into evidence, marked for identification and is provided herewith. Exhibit following:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE CIRCUIT COURT OF DALLAS COUNTY, ARKANSAS

FIRST DIVISION

STATE OF ARKANSAS                                    PLAINTIFF

VS.   CR  90-18  Capital Murder

CHARLIE VAUGHN                                       DEFENDANT

_____

PROCEEDINGS OF PLEA OF GUILTY BEFORE HONORABLE JOHN M.

GRAVES, JUDGE, ON MARCH 25, 1991.

APEPARANCES:

Robin Wynne                  For the State of Arkansas
Deputy Prosecuting Attorney
Fordyce, Arkansas

Robert P. Remet              For the Defendant
Attorney at Law
Star City, Arkansas

1      THE COURT:   This is case CR 90-18, State versus Charlie
2  Vaughn.   Mr. Vaughn, you are charged with the offense of
3  capital murder.   You appeared before the Court on April 19,
4  1990.   I advised you of the charges, the penalty, your
5  constitutional rights.   You told me you would retain an
6  attorney.   I entered a plea of not guilty for you.   On June
7  25, you appeared back in the court.   You had not retained an
8  attorney.   I appointed Mr. Oglesby to represent you until you
9  had retained counsel.

10     Mr. Oglesby filed a number of motions and the case was
11 set for trial in December.   On November 26, I granted a motion
12 for a continuance at the defendant's request and in December
13 Mr. Oglesby filed a motion to withdraw, and on January 28, I
14 guess by agreement of you and Mr. Oglesby, I permitted him to
15 withdraw, and you concurred in that withdrawal and you
16 concurred in the appointment of Mr. Remet to represent you.

17     A motion for mental examination was filed and that motion
18 is still pending, isn't it?   I granted that.   The examination
19 was completed?

20     DEFENDANT:   Yes, sir.

21     THE COURT:   Who examined you, Mr. Vaughn?

22     DEFENDANT:   Some guy in El Dorado.

23     THE COURT:   In El Dorado?

24     DEFENDANT:   Yes, sir.

25     THE COURT:   Who?   Doctor Frazier?   Was that Doctor

3

1  Frazier?

2      DEFENDANT:  I think so.  Peal.  Doctor Peal.

3      THE COURT:  You don't know whether it was Doctor Frazier

4  and Doctor Peal,  Probably talked to both of them?

5      DEFENDANT:  No, it was just one, sir.

6      THE COURT:  All right and this case is set for trial on

7  April 15, and I am advised now that you have entered into a

8  plea agreement with the State.  Now is all that correct to your

9  knowledge?

10     DEFENDANT:  (Nods).

11     THE COURT:  Can you think of anything I've left out?

12     DEFENDANT:  No, sir.

13     MR. REMET:  Is that about right?

14     DEFENDANT:  (Nods affirmatively).

15     THE COURT:  Did you read and understand this plea

16  agreement?

17     DEFENDANT:  Yes, sir, I do.

18     THE COURT: Did you sign it voluntarily?

19     DEFENDANT:  Yes, sir.

20     THE COURT:  Did you note that I didn't sign it,  I'm not

21  a part of it, I'm not bound by it?

22     DEFENDANT:  Yes, sir.

23     THE COURT:  Do you also understand if you enter a plea

24  of guilty that you give up all those rights you have to remain

25  silent?

! 4

1    DEFENDANT:  Yes, sir.

2    THE  COURT:  And  to  be  confronted  by  the  witnesses  that

3  the State has against you and a trial by jury?

4    DEFENDANT:  Yes, sir.

5    THE  COURT:  You've  entered  into  this  plea  agreement  and

6  the plea agreement I see does contemplate that in exchange for

7  the  State  reducing  the  charge  from  capital  murder,  which

8  carries  a  penalty  of  death  or  life  without  parole,  that  in

9  exchange  for  that,  that  you  intend  to  enter  a  plea  of  guilty

10 to  murder  in  the  first  degree,  which  carries  a  penalty  of  not

11 less than 10 nor more than 40 years or life.

12    DEFENDANT:  (Nods affirmatively).

13    THE  COURT:  Is  that  what  you  have  negotiated  with  the

14 State?

15    DEFENDANT:  Yes, sir.  Yes, sir.

16    THE COURT:  Okay.  Would you raise your hand and be sworn?

17    RPEORTER'S  NOTE:  At  this  point  the  defendant  is  properly

18 and duly sworn.

19    THE  COURT:  Now  have  you  talked  with  Mr.  Remet  about

20 entering this plea?

21    DEFENDANT:  Yes, I have, sir.

22    THE  COURT:  Are  you  satisfied  with  his  services  and

23 advice?

24    DEFENDANT:  Yes, sir.

25    THE COURT:  Do you have any complaints about him at all?

5

1    DEFENDANT:  No, sir.

2    THE COURT:  Do you feel the actions he's taken in your

3 case have been in your best interests?

4    DEFENDANT:  Yes, sir.

5    THE COURT:  Do you feel he's done a good job and has been

6 effective?

7    DEFENDANT:  Yes, sir.

8    THE COURT:  To the charge then of -- and the State's

9 motion to amend the charge to murder in the first degree would

10 be granted based on the defendant entering a plea of guilty

11 as set out in this plea agreement -- to the charge that on or

12 about the 21st day of September, 1988, in Dallas County,

13 Arkansas, that you did unlawfully, acting together with John

14 Brown and Reginald Early, cause the death of Myrtle Holmes?

15 In what manner, Mr. Prosecutor?

16    MR. WYNNE:  Judge, the death occurred through being hit

17 over the head with a pipe and also by being stabbed numerous

18 times and also her throat cut.

19    THE COURT:  That on that date the State alleges that you,

20 acting with Reginald Early and John Brown, that you did commit

21 or attempt to commit a felony in the course of and in the

22 furtherance of the commission of that felony, or in immediate

23 flight therefrom, that you or one of the accomplices caused

24 the death of Myrtle Holmes, under circumstances manifesting

25 extreme indifference to the value of human life, and the

6

1   felonies that were involved were one of either rape or robbery.

2   To that charge, how do you plead, guilty or not guilty?

3       DEFENDANT:  To robbery?

4       THE COURT:  Not to robbery.

5       MR.  REMET:   Did  you  understand  the  question  the  Judge

6   asked you?

7       DEFENDANT:  Yes.

8       MR.  REMET:   Then  acting  alone  or  in  --  together  with  an

9   accomplice  did  you  cause  the  death  of  the  victim?   Do  you

10  understand that?

11      DEFENDANT: (Nods affirmatively).

12      MR. REMET:  Well answer the Judge's --

13      THE COURT:   In furtherance of the commission of a felony,

14  whether it be robbery, which I assume was committed, or rape,

15  which was also committed?

16      MR. WYNNE:  Yes, your Honor.

17      THE COURT:  By one or more of the three?

18      MR. WYNNE:  Yes, your Honor.

19      MR. REMET:  Yes, your Honor.

20      THE COURT:   To that charge, how do you plead, guilty or

21  not guilty?

22      DEFENDNAT:   Guilty.

23      THE COURT:  And are you pleading guilty because you are

24  guilty and for no other reason?

25      DEFENDANT:  Yes, sir.

7

1      THE COURT:  Is this plea of your own free will?

2      DEFENDANT: Yes, sir.

3      THE COURT:  Have you had any alcohol or drugs today?

4      DEFENDANT:  No, sir.

5      THE  COURT:  Do  you  understand  fully  what  you  are  doing

6  here today?

7      DEFENDANT:  Yes, sir.

8      THE  COURT:  All  right.  Tell  me  what  you  did.  Just  tell

9  me from the beginning.

10      DEFENDANT:  Okay.

11      THE  COURT:  Speak  slow  and  loud.  This  lady  has  to  take

12  it down and I have to hear it.

13      DEFENDANT:  I was up town that night you know and Teen --

14      REPORTER:  And what?

15      DEFENDANT:  Teen -- Teen Jamerson and they picked me up

16  and said they was fixing to go.  They wanted to do a robbery.

17      THE COURT:  Now who all are they?

18      DEFENDANT:  Teen, John.

19      THE COURT:  Teen, John Brown and Reginald?

20      DEFENDANT:  Yes, sir.

21      THE COURT:  They picked you up.

22      DEFENDANT:  All right.  So we went -- we went to the house

23  over there where they were looking -- looking for Mrs. Myrtle

24  Holmes stay.

25      THE COURT: Did you know Mrs. Holmes?

8

 1    DEFENDANT:  No, I didn't know her.

 2    THE COURT:  Had you ever known her before?

 3    DEFENDANT:  No, sir.

 4    THE COURT:  Okay.  All right.

 5    DEFENDANT:  They just --

 6    THE COURT:  Where was that house?

 7    DEFENDANT:  Somewhere, I can't think where.

 8    MR. REMET:  Do you remember the name of the street?

 9    DEFENDANT:  No, I can't remember the name.  I don't
10  remember the name of the street, sir.

11    THE COURT:  Okay.  When you got there, before you got
12  there, who wanted to commit the robbery?

13    DEFENDANT:  John Brown.

14    THE COURT:  John Brown.

15    DEFENDANT:  Okay.  I thought that's all he was going to
16  do.

17    THE COURT:  All of you did decide to do it then, is that
18  right?

19    DEFENDANT:  Yes, sir.

20    THE COURT:  Then what -- what happened from there?

21    DEFENDANT:  Well, and John went through the window, got
22  in through the window.  He let us in in the door.

23    THE COURT:  Who was driving the vehicle?

24    DEFENDANT:  Tina.

25    THE COURT:  You drove then to this woman's house?

9

1      DEFENDANT:  Yeah.

2      THE COURT:  Who knew Mrs. Holmes?  Which one of you knew

3 Mrs. Holmes?

4      DEFENDANT:  I don't think nobody knows her.  He just said

5 they were gonna (sic) go rob some -- gonna rob somebody, pull

6 a robbery.

7      THE COURT:  None of them knew Mrs. Holmes?  How did you

8 pick the house that you were going to rob?

9      DEFENDANT:  That's the house they went to.  They just --

10 the house they stopped at.

11      THE COURT:  Just the house they stopped at?

12      DEFENDANT:  Yes, sir.

13      THE COURT:  All right.  Go ahead.  And then what happened?

14 Brown went through the window you say?

15      DEFENDANT:  Yes.

16      THE COURT:  He opened the door?

17      DEFENDANT:  Yeah, and let us in.

18      THE COURT:  Who is "us"?

19      DEFENDANT:  Me and Reginald.

20      THE COURT:  Tina?  Where was Tina?

21      DEFENDANT:  She stayed in the car.

22      THE COURT:  Okay.

23      DEFENDANT:  And so -- got in the -- searching the house

24 and we found some money and --

25      THE COURT:  What time of day or night was this?

10

1     DEFENDANT:  About twelve-thirty, midnight.

2     THE COURT:  About midnight?

3     DEFENDANT:  Somewhere.  And we found the money.  So John

4  Brown -- you know, he went to beating on the side of her head

5  and stuff.

6     THE COURT:  When did you find her? Did you wake her up

7  when you went in the house?

8     DEFENDANT:  Yeah, he woke her up.  She woke up.

9     THE COURT:  She woke up?

10    DEFENDANT:  Yes, sir.

11    THE COURT:  And then what happened when she woke up?  Did

12  you ask her for money or anything or what happened?

13    DEFENDANT:  Just went   through the house and we found the

14  money and John beat her on the head and then you know he asked

15  her ---

16    THE COURT:  What did he beat her on the head with?

17    DEFENDANT: With a pipe.

18    THE COURT:  A pipe?

19    DEFENDANT:  Bottom of skillet.

20    THE COURT:  Skillet?  Some kind of pan?  Is that what you

21  mean?

22    DEFENDANT:  Yeah.

23    THE COURT:  A --

24    DEFENDANT:  It just -- was a skillet, sir.

25    THE COURT:  I'm not trying to put words in your mouth.

11

1  I'm just trying to find out what happened.

2      DEFENDANT:  It just was a skillet.

3      MR. REMET:  A skillet used for cooking type skillet?

4      DEFENDANT:  (Nods affirmatively).

5      THE COURT:  All right then.  What happened?

6      DEFENDANT:   Then so John had sex with her.

7      THE COURT:  Okay.  Right there in the bed where she was?

8      DEFENDANT:  Yes, sir.

9      THE COURT:  Okay. After he beat her over the head with

10 the skillet?

11     DEFENDANT:  Yeah -- sir.

12     THE COURT:  Then what happened?

13     DEFENDANT:  Then after he got through, Reginald -- and

14 then I did.

15     THE COURT:  Reginald had sex with her?

16     DEFENDANT:  Yes, and we moved and took her to the couch.

17     THE COURT:  Took her to the couch?

18     DEFENDANT:  Yeah, that's when I had sex with her.

19     THE COURT:  You had sex with her on the couch?

20     DEFENDANT:  Yes, sir.

21     THE COURT:  Okay and why would you move her from the bed

22 to the couch out of curiosity?  Any particular reason?

23     DEFENDANT:  Brown took the  -- took the deal off.

24     THE COURT:  Okay.

25     DEFENDANT:  And then after that --

12

1      THE COURT:  The deal being what?

2      DEFENDANT:  Then after that --

3      MR. REMET:  What was the deal that he took off her face?

4      DEFENDANT:  Oxygen.  Breathing oxygen.

5      THE COURT:  She had an oxygen mask on?

6      DEFENDANT:  Yes, sir.

7      THE COURT:  All right.  Then what happened?

8      DEFENDANT:  And then I moved her to the couch and I got

9  through.  That's when John -- John told me to kill her.  He

10  started stabbing her.

11      THE COURT: John started stabbing her?

12      DEFENDANT:  He's the one killed her.

13      THE COURT:  Was she conscious when she was taken to the

14  couch?  Was she conscious?

15      DEFENDANT:  I think so.

16      THE COURT:  When you had sex with her?

17      DEFENDANT:  Yes, sir, I think so.  She was unconscious.

18      THE COURT:  You think she was unconscious?

19      DEFENDANT:  Yes, sir.

20      THE COURT:  Was she conscious or unconscious when Reginald

21  had sex with her?

22      DEFENDANT:  I think so, sir.

23      THE COURT:  Were you all standing there watching it at

24  the time?

25      DEFENDANT:  Yes, sir.

13

1    THE COURT:  You had the money and she didn't know you.
2  What was the reason for killing her?

3    DEFENDANT:  Brown -- Brown killed her.

4    THE COURT:  Okay.  Brown killed her.  Any particular
5  reason?

6    DEFENDANT:  I don't know you know, he just killed her.
7  He just killed her, sir.

8    THE COURT:  Did she know -- did she know you?

9    DEFENDANT:  No, sir.

10   THE COURT:  Did she know John Brown?

11   DEFENDANT:  No, sir.  I don't think she knowed none of
12  us.

13   THE COURT:  You don't think she knew Reginald Early?

14   DEFENDANT:  No, sir.

15   THE COURT:  Okay then after that what did you do with the
16  body?

17   DEFENDANT:  Me and John took it, put it in the trunk of
18  her car.

19   THE COURT:  Put it in the trunk of her car?

20   DEFENDANT:  Yes.

21   THE COURT:  Go ahead.

22   DEFENDANT:  Then after that, sir, I ran.

23   THE COURT:  You ran?

24   DEFENDANT:  Yes, sir.

25   THE COURT:  Where did Reginald go?

1    DEFENDANT:  I guess they left after I did you know, Teen --

2    'cause Teen was still there all that time.  She was just

3    sitting in the car.

4    THE COURT:  Okay.  In other words she stayed outside all

5    the time?

6    DEFENDANT:  Yes, sir.

7    THE COURT:  Did she see you put the body in the car?

8    DEFENDANT:  Most likely she did.  She was there.

9    THE COURT:  You don't know, but you never did discuss it

10   after that?

11   DEFENDANT:  No,sir.

12   THE COURT:  Have you talked to Tina since then?

13   DEFENDANT:  No,  sir.

14   THE COURT:  Haven't talked to her at all since then?

15   DEFENDANT:  No,sir.

16   THE COURT:  Have you talked with Reginald and John Brown

17   about it?

18   DEFENDANT:  (Shakes head negatively).  Unh-unh.  That

19   night after I ran I had left town.  I went to Bearden.

20   THE COURT:  You left town and went where?

21   DEFENDANT:  Bearden, Arkansas.

22   THE COURT:  Bearden, Arkansas?

23   DEFENDANT:  Yeah, I was in Bearden.

24   MR. WYNNE:  Judge, could the defendant tell us --

25   MR. REMET:  Your Honor, that's it.

15

1    MR. WYNNE:  Judge, Mr. Vaughn has alluded to the fact that
2    Tina Jimerson was driving the vehicle.  Does he know whose
3    vehicle it was and what kind of vehicle it was?
4         THE COURT:  Do you know whose it was?
5         DEFENDANT:  No, sir.  I don't know whose car it was, sir.
6         THE COURT:  Do I understand you -- have you given the
7    police a statement about this, Charlie?  Have you told them
8    what happened?
9         DEFENDANT:  Yes, sir.  I have.
10        THE COURT:  And what you told them was the truth?
11        DEFENDANT:  I wrote a statement you know, a statement.
12        THE COURT:  Wrote a statement?
13        DEFENDANT:  I wrote a statement and stated everything.
14        THE COURT:  All that you said here today is the truth?
15        DEFENDANT:  Yes, sir.
16        THE COURT:  Complete truth?
17        DEFENDANT:  Yes, sir.
18        THE COURT:  So help you, God?
19        DEFENDANT:  Yes, sir.
20        THE COURT:  Is what you told the police different?
21        DEFENDANT:  Well, it's a little story.
22        THE COURT:  Can you tell me basically what the differences
23    are?  It's hard to tell sometimes the same story.
24        DEFENDANT:  Yes, sir.
25        THE COURT:  More than once with everything being exactly

16

1   the  same  in  detail,  but  do  you  know  right  offhand  what  the

2   differences might be?

3       DEFENDANT:  No, sir. Not quite.

4       THE  COURT:   Is there any doubt in your mind that you and

5   John Brown and Reginald Early went to the home of Myrtle Holmes

6   with the intent to rob the resident of that house?

7       DEFENDANT:  Yes, sir.

8       THE  COURT:   Any doubt in your mind?   That's what you did

9   say?

10      DEFENDANT:   That's  what  we  supposed  to  had  went  and  did

11  was rob.

12      THE  COURT:   Then  while  you  were  in  the  house  all  three

13  of you had forced sexual intercourse with Mrs. Holmes.

14      DEFENDANT:  Yes, sir.

15      THE COURT:  And that you did rob Mrs. Holmes?

16      DEFENDANT:  Yes, sir.

17      THE COURT:  Do you have anything?

18      MR. WYNNE:  I don't believe so, your Honor.

19      THE  COURT:  All  right.  Mr. Vaughn, I'm going to accept

20  your  plea.   I'm  going  to  accept  the  motion  of  the  State  to

21  reduce  the  charge  to  murder  in  the  first  degree.   I'm  going

22  to accept the plea agreement that you've entered into with the

23  State.   It  is  the  judgment  of  the  Court  that  you  are  guilty

24  of  the  offense  of  murder  in  the  first  degree.   It  is  the

25  sentence of the Court that you be sentenced to the term of life

1   in the Arkansas Department of Corrections.  Now you're advised
2   that there are two other people to be tried in this case.  You
3   are advised that you will be returned to testify.

4       DEFENDANT:  Yes, sir.

5       THE COURT:  You are advised that you will have to testify.
6   In the event you should refuse to testify, the statement you
7   made here today will be admissible in evidence at that time.

8       DEFENDANT:  (Nods affirmatively).

9       THE COURT:  Do you have any questions?

10      DEFENDANT:  No, sir.

11      THE COURT:  Anything you don't understand?  Anything you
12  want to ask me?

13      DEFENDANT:  No, sir.  I don't have no questions, sir.

14      THE COURT:  How long have you been in jail?

15      DEFENDANT:  Five months.

16      THE COURT:  Five months.  Now at this time I am going to
17  go ahead and give you credit for the five months, the five
18  months credit on a life sentence means nothing.  But at some
19  point in time, I'm sure that some governor somewhere down the
20  road will reduce the sentence or commute it to a term of years.

21      DEFENDANT:  Yes, sir.

22      THE COURT:  If he does, then that five months will mean
23  something to you.

24      DEFENDANT:  Yes, sir.

25      THE COURT:  You will be given credit for five  months of

18

1  pretrial incarceration.

2      SHERIFF DONNIE FORD:   Yesterday when we interviewed Mr.

3  Vaughn, Bob came over yesterday at one o'clock and stayed with

4  us until I guess five or five thirty 'til we got through.

5      THE COURT:   Okay.   Go ahead for the record and tell me,

6  Mr. Prosecutor, was he here during the period of time --

7      MR. WYNNE:   For the record, your Honor, I called Mr. Remet

8  yesterday morning, Sunday morning, about 8:30 and asked him

9  if he could come over to have a conference with Mr. Vaughn and

10 with the sheriff.   I believe the State investigator was called

11 and they called me when Mr. Remet was here and indicated to

12 me that Mr. Vaughn was willing to make a statement to the

13 investigator and also to the sheriff's department.

14     THE COURT:   Who was that investigator?

15     MR. WYNNE:   Jerry Bradshaw.   And   inidcated   that   after

16 they'd gotten the statement that I requested Mr. Remet called

17 me, too, and indicated that his client had given a statement

18 willingly and also for the sheriff to call and to present to

19 me that statement.

20     THE COURT:   Has that statement been transcribed?

21     MR. WYNNE:   That statement has not been transcribed.   It's

22 my understanding that there was also a video made yesterday

23 of a statement and the statement will be transcribed as well.

24     MR. REMET:   The videotape was simultaneously recorded on

25 a regular recorder as well.

1                                                                  19

1     THE COURT:  Is there any other statement?  Have you made

2  any other statements other than --

3     DEFENDANT:  No, sir.

4     THE COURT:  -- other than yesterday?

5     DEFENDANT:  No, sir.  That's all.  Just the one from

6  yesterday.

7     SHERIFF:  Your Honor, I might add that I told Charlie

8  today on the way up to tell you the truth, that it did not make

9  any difference on his part, to go ahead and tell you the full

10  truth exactly what happened.

11     THE COURT:  That's what you've done?

12     DEFENDANT:  I've told the truth.

13     MR. WYNNE:  Judge, we might add the prosecutor and myself

14  talked to Mr. Remet and Charlie Vaughn during the noon hour

15  and the statement that he's given the Court is the same

16  statement that he gave us during the noon hour.

17     THE COURT:  That was another statement?

18     MR. REMET:  It was the statement that was given to me,

19  and the deputy prosecutor.

20     MR. WYNNE:  Just a verbal statement during the noon hour

21  with Mr. Remet present, also the sheriff and that statement

22  he gave to us verbally is the same statement that he has now

23  given to the Court.

24     THE COURT:  Is that correct?

25     DEFENDANT:  Yes, sir.

20

1     MR. REMET:  May I, Judge.  When I was called yesterday at

2  8:30 or so, I was informed that my client had apparently made

3  a statement and they wanted me to come down and talk with him

4  to see if in fact he had made a statement, just what he wanted

5  to make, and whatever statement he wanted to make to me, and

6  I determined that he apparently  did   give   a   statement

7  voluntarily to the people downstairs, and that he wanted to

8  repeat the statement in my presence and that's when we arranged

9  for the videotape and tape recording.

10     THE COURT:  Mr. Vaughn, do you have any questions?

11     DEFENDANT:  No, sir.

12     THE COURT:  Anything you don't understand?  Anything you

13  want to ask me?

14     DEFENDANT:  No, sir.

15     THE COURT:  All right, sir, then you will be remanded then

16  to the custody of the sheriff for transportation to the

17  Department of Corrections.

18     Good luck.  Mr. Remet is awarded 350 dollars and 50

19  dollars expenses.

20  END OF PROCEEDINGS

21

22

23

24

25

21

CERTIFICATE OF REPORTER

I, Marian G. Schmidt, official reporter of the Thirteenth Judicial District, First Division, of the State of Arkansas, of which Dallas County is a part, do hereby certify that the above and foregoing 20 pages of typewriting constitute and are a true, correct and complete transcription of the proceedings of plea of guilty before Honorable John M. Graves, Judge, on March 25, 1991, State of Arkansas versus Charlie Vaughn, CR 90-18, on the charge of capital murder.

WITNESS MY HAND as such official reporter on this the 19 day of November, 1991.

Official Reporter
Certificate No. 133

Cost of Transcript
$65.10

MARIAN G. SCHMIDT
Official Court Reporter
822 Partee Drive
Magnolia, Arkansas 71753

1056

534.

1    **MR. TOM WYNNE:**   Prior to my reading that to

2    the jury, your Honor, I would like to ask Mr.

3    Vaughn --

4    **MR. TOM WYNNE:**   (Continuing)

5    Q.   Mr. Vaughn, do you recall being in this courtroom on

6    March the 25th of 1991?

7    A.   Yeah, I remember being in here.

8    Q.   And do you recall what you did that day on March the

9    25th, 1991?

10   A.   (Nods affirmatively.)   I was just going by what y'all

11   said.

12   Q.   Tell us what you did that day, do you remember?

13   A.   I can't exactly remember.   I was just going by what

14   y'all was saying.

15   Q.   Do you recall why you were in court?

16   A.   I was just going by what y'all said.

17   Q.   Do you recall being charged with the offense of murder?

18   A.   They charged me when I was already in the penitentiary.

19   I had a two year sentence and they came down there and

20   charged me with that.

21   Q.   Do you recall being charged in Criminal Case Number 90-

22   18 in this courtroom?  Do you recall being charged with that?

23   A.   (Nods affirmatively.)

24   Q.   And did you in fact plead guilty to the charge of first

25   degree murder in this matter?

535.

1  A.   Yes, sir, y'all put words in my mouth.

2  Q.   And do you recall who that was, the murder that you were

3  accused of murdering?   Who -- do you recall the person you

4  were accused of murdering?  Does the name Myrtle Holmes sound

5  familiar?

6  A.   Yeah, because you were putting words in my mouth.

7  Q.   Does that sound familiar, Myrtle Holmes?

8  A.   I don't know her.  I told you I don't know her.

9  Q.   Did you plead guilty to --

10 A.   Yeah, but I don't --

11 A.   -- murder in the first degree?

12 A.   -- know her.

13 Q.   Okay, thank you.

14         **MR. TOM WYNNE:**  Now, your Honor, if I may, I'd

15      like to read the transcript at this time.

16         This document, your Honor, is Exhibit Number

17      58, ladies and gentlemen of the jury and is styled:

18      In the Circuit Court of Dallas County, Arkansas,

19      First   Division;   State   of   Arkansas,   Plaintiff,

20      versus  Charlie  Vaughn,  Defendant;  Case  Number  CR

21      90-18, Capital Murder.

22         Proceedings  of  Plea  of  Guilty  Before  the

23      Honorable John M. Graves, Judge, on March the 25th,

24      1991.

25         **COURT   REPORTER'S   NOTE:**       Transcript   of

536.

1       proceedings of plea of guilty was read to the jury

2       by Mr. Wynne, which transcript is State's Exhibit

3       Number 58 in this record.

4    MR. TOM WYNNE:   (Continuing)

5    Q.   Mr. Vaughn, do you remember being in court on March the

6    25th, 1991?

7    A.   Yeah.  Hey, let me ask you, ask you this.

8    Q.   We'll get to that next.  Do you remember being in court

9    on March the 25th, 1991?

10   A.   Yeah.

11   Q.   Is that an accurate transcript of what transpired that

12   day?  Did you say those things that I read you said?

13   A.   Yeah, something that y'all had put in my mouth.

14   Q.   Well, tell me this, Mr. Vaughn, how did you know in such

15   detail what had gone on in there that night?

16   A.   Let me ask you a question?

17   Q.   No, I'm asking the questions.  You answer it and then

18   you can ask your lawyer questions later on, but just answer

19   my question.  How did you know in such detail what allegedly

20   went on that night over at Myrtle Holmes' house?

21   A.   I didn't know what was going on over there.

22   Q.   You didn't know what was going on?

23   A.   No.

24   Q.   Why did you in there say the names of Tina Jimerson,

25   Reginald Early, John Brown, people who here today you said

537.

1   you didn't even know?

2   A.   I don't know, I was saying what y'all were saying.

3   Q.   When you say "y'all" who do you mean "y'all?"

4   A.   The lawyer I had.

5   Q.   Did you or did you not say these things in court that

6   day?

7   A.   Yeah.  I was going by what he had told me to say.

8   Q.   Did you hear the Judge ask you if you were telling the

9   truth?

10  A.   I was going by what that lawyer told me.

11  Q.   But I'm asking --

12           MR. MURPHY:   Your Honor, please, I object, let

13       him answer the question.

14           THE COURT:   Let him answer the question.   I

15       thought he did, but give him an opportunity to

16       answer.

17  MR. TOM WYNNE:   (Continuing)

18  Q.   Go ahead.  Mr. Vaughn, say what you'd like to say.

19  A.   When you was reading that you said I wrote a statement.

20  I cannot write a statement, I can't write.

21  Q.   Did you write a statement?

22  A.   Nope.  I can't write.

23  Q.   Did you tell the Court that day that you did write a

24  statement?

25  A.   Naw, I didn't say that.

538.

1   Q.    This is all --

2   A.    I can't write.  How can I write a statement?

3   Q.    Did you say that -- you heard me read the statement, did

4   you not?

5   A.    Well, you said I wrote a statement.

6   Q.    Let me ask you --

7   A.    I didn't write no statement.

8   Q.    Did you hear me read this transcript just then in court?

9   Did you hear me read it just then?

10   A.    That's what I wondered, see, I can't write.   I didn't

11   write no statement.

12   Q.    Did you, Mr. Vaughn, hear me just then read this

13   statement?

14   A.    Yeah, I heard you read it.

15   Q.    Did you say the things that this transcript says you

16   said on March the 25th, 1991?

17   A.    Yeah, but that lawyer was there.

18   Q.    And did you know that when you stood up here and said

19   those things that the Court would ask you whether you were

20   telling the truth or not?  Did you know that?

21   A.    I wasn't telling the truth, I was going by what he was

22   telling me.

23   Q.    Did you hear the Court ask you if you were telling the

24   truth?

25   A.    Can't remember.

539.

1   Q.   You can't remember?

2   A.   No.

3   Q.   So, basically, what you're saying is that everything you

4   said that day, that had you having anything to do with the

5   murder of Myrtle Holmes is a lie?

6   A.   Yes, sir.

7   Q.   Every single thing?

8   A.   (Nods affirmatively.)

9   Q.   And you don't know Reginald Early?

10  A.   (Shakes head negatively.)

11  Q.   Do you know a man by the name of Jessie James Terry?

12  A.   Yeah, I know of him.

13  Q.   Is Mr. Terry in fact serving in the Arkansas Department

14  of Corrections right now?

15  A.   Yeah, I guess.

16  Q.   Do you know him over there?

17  A.   I'm at the max.

18  Q.   But do you know Jessie James Terry?

19  A.   I know of him.

20  Q.   Have you had any conversations with Jessie James Terry

21  about this matter?

22  A.   No.

23  Q.   Do you know that Jessie James Terry is the uncle of

24  Reginald Early?

25  A.   I didn't know that.

540.

1   Q.   Mr. Vaughn, have you, as recently as the last 48 hours,
2   talked to Donnie Ford about trying to cut a deal with respect
3   to your testimony here today?
4   A.   No.
5   Q.   Hadn't made any statements to the sheriff at all --
6   A.   (Shakes head negatively.)
7   Q.   -- about getting any relief on your sentence over there
8   if you testify truthfully today?
9   A.   (Shakes head negatively.)
10  Q.   You've not talked to Donnie Ford?
11  A.   (Shakes head negatively.)
12  Q.   Have you even talked with him since you've been back to
13  Fordyce?  Have you talked to the sheriff?
14  A.   Can't exactly remember.
15  Q.   You can't remember the last 48 hours whether or not
16  you've talked with the sheriff?
17  A.   (Shakes head negatively.)
18  Q.   Do you recall at any time back in 1988 or any time going
19  to the house of Ellis Tidwell, your employer, and you
20  acknowledge that you remember him, do you not?
21  A.   Yeah, I used to work for him.
22  Q.   Do you recall at any time going to his house and being
23  with either John Brown or Reginald Early or any of these
24  three and borrowing money?
25  A.   No, sir.

541.

1   Q.   Did you ever go to his house at night and borrow money
2   from Ellis Tidwell?

3   A.   No.

4   Q.   You never did in 1988 and no other time?

5   A.   (Shakes head negatively.)

6   Q.   Have you ever borrowed money from Ellis Tidwell?

7   A.   Yeah, in the daytime when I used to work for him.

8   Q.   Do you know where Ellis lives?

9   A.   Yeah, I know where he stay at.

10  Q.   When you borrowed money from him did you ever go to his
11  house to borrow the money?

12  A.   Yeah.

13  Q.   Do you recall ever having anyone with you when you went
14  to borrow money from his house?

15  A.   By myself.

16  Q.   Any time that you borrowed money you were always by
17  yourself?

18            MR. HOWARD:   Your  Honor,  I  think  the
19            question's been asked and answered two or three
20            times.

21            THE COURT:   Overruled.   It's proper.   Go
22            ahead.

23  MR. TOM WYNNE:   (Continuing)

24  Q.   Mr. Vaughn, have you had any conversations with Mr.
25  William Howard the defense attorney?

MARIAN G. SCHMIDT
Official Court Reporter
822 Partee Drive
Magnolia, Arkansas 71753

542.

1   A.   Yeah, he came -- he came to Cummins to talk to me.

2   Q.   And how many conversations have you had with Mr. Howard?

3   A.   Like one time.

4   Q.   And have you at any time told Mr. Howard that you would

5   change your testimony in this matter?

6   A.   I don't exactly remember.

7   Q.   You don't exactly remember?

8   A.   (Shakes head negatively.)

9   Q.   Could you have and just simply forgotten?

10  A.   Can't exactly remember.

11  Q.   But would you agree that what you are saying today is

12  totally the opposite, more than totally the opposite, of what

13  you said in these proceedings back on March the 25th, 1991?

14  Isn't it?   Isn't what you're saying today, isn't it totally

15  the opposite of what you said back in March of 1991?

16  A.   (Shakes head negatively.)

17  Q.   It's different, isn't it?

18  A.   Man, like I told you, man, the lawyer was putting words

19  in my mouth, man.   I didn't know nothing about -- I don't

20  know nothing about this murder, man.

21  Q.   Okay.   So everything you said on March the 25th, 1991,

22  your lawyer -- are you talking about Mr. Remet, are you

23  talking about Robin Wynne, are you talking about --

24  A.   Talking about Remet.

25  Q.   Talking about Mr. Remet?

543.

1  A.   Yeah.

2  Q.   And Mr. Remet -- everything you said that day Mr. Remet

3  put it in your mouth?

4  A.   Yeah.

5  Q.   Okay.   And is there any particular reason, Mr. Vaughn,

6  that you would let your lawyer put those words in your mouth

7  to plead guilty and receive a life sentence?   Why would you

8  do that?   Why didn't you just say I'm gonna tell the truth, I

9  don't know any of these three and don't know Myrtle Holmes

10  and stick with that.   Why didn't you do that?

11  A.   He had me all confused me like.

12  Q.   Who had you all confused?

13  A.   My lawyer did.

14  Q.   Your lawyer, Mr. Remet -- and so you're saying Mr. Remet

15  did all of this?   Did the Court confuse you that day?   Did

16  Judge Graves --

17  A.   I was just going by what he was saying.

18  Q.   Well, I want to ask you:   Did the Court, did Judge

19  Graves -- do you remember Judge Graves being in court that

20  day, March the 25th, 1991?

21  A.   Yeah, I remember seeing him.

22  Q.   Okay.   Did he confuse you with his questions?

23  A.   I was just going by what Remet told me.

24  Q.   Did the Judge confuse you?   Yes or no?

25  A.   (Shakes head negatively.)

544.

Q.   Do you remember Mr. Robin Wynne being there that day?

A.   (Shakes head negatively.)

Q.   You don't remember him being there?   Remember the sheriff being there that day?

A.   (Shakes head negatively.)

        **MR. HOWARD:**   Your Honor, I'm gonna object to the line of questioning.   It's obvious these people were there, I don't know why he's asking does he remember if they were there, the record says they were there, so, I don't even see what he's doing.

        **THE COURT:**   I think it's proper to ask him just as long as he doesn't go over the same thing.

        **MR. HOWARD:**   Thank you.

**MR. TOM WYNNE:**   (Continuing)

Q.   Who do you remember being there that day?   Mr. Remet was there, is that correct?

A.   Yeah, I remember him.

Q.   Okay.   Well, I'll wrap this up, Mr. Vaughn, let me just ask you if you can explain to us -- now, you heard the transcript and you heard what Mr. Remet said.   Based on the transcript Mr. Remet said some things there but you said a lot more than he did, did you not?   You said a lot more that day than he --

A.   He already had talked to me, man, when I was in Star City Jail.

545.

1   Q.   So Mr. Remet came to the Star City Jail?

2   A.   I said I was -- when they had transferred me to the Star

3   City Jail, he was talking to me then.

4   Q.   And he told you to say all these things?

5   A.   Yeah.

6   Q.   Told you about the pots and pans?

7   A.   (Nods affirmatively.)

8   Q.   Told you about the rape?

9   A.   (Nods affirmatively.)

10  Q.   Told you the name of these three defendants?

11  A.   (Nods affirmatively.)  Told me to say everything.

12  Q.   Told you all of that and you had memorized all of that

13  and that day during this hearing you did perfectly recite

14  what Mr. Remet told you?

15  A.   He had me say it all that day.

16  Q.   He had you say it all?

17  A.   Yeah.

18  Q.   And you had it all memorized?

19  A.   (There was no response.)

20  Q.   Could you explain to us why Mr. Remet did that?

21  A.   I don't know why he did it.

22  Q.   You just don't know, huh?  Was it perhaps he wanted to

23  make that 350 dollars that the Court gave him that day?

24  A.   I believe so.

25  Q.   Mr. Vaughn, have you ever been in an automobile with

546.

1   either Tina Jimerson or a gentlemen by the name of Benny Cox?

2   A.   Nope.

3   Q.   Do you know a Benny Cox?

4   A.   I don't know no Benny Cox.

5                **MR. TOM WYNNE:**   I believe that's all I have,

6           your Honor, pass the witness.

7   **CROSS EXAMINATION OF CHARLIE VAUGHN BY MR. HOWARD:**

8   Q.   Okay.   Mr. Vaughn, the Prosecutor wants to know why you

9   came to court and plead guilty.   Let me ask you:   They didn't

10  tell you they were gonna give you lethal injection?

11  A.   I didn't know what I was doing.   I can't read, couldn't

12  write.

13  Q.   Didn't they threaten you with the death penalty?

14  A.   Yeah.

15  Q.   So you plead guilty to keep from getting killed, didn't

16  you?

17  A.   Yeah, they had me scared.   I didn't know what was going

18  on.   I didn't know nothing about the murder.

19  Q.   You didn't know anything about the murder?

20  A.   (Shakes head negatively.)

21  Q.   Now, weren't you at one time represented by a Mr.

22  Oglesby, a lawyer out of El Dorado or somewhere?   Do you

23  remember Mr. Oglesby?

24  A.   Yeah.   I think he's from Camden.

25  Q.   Okay.   Now, while you're down at the Department of

547.

1   Corrections, did they write a letter for you to Mr. Oglesby

2   telling him you didn't know anything about the murder?

3   A.    Yeah.

4   Q.    If I showed you a copy of that letter would you

5   recognize it?

6   A.    Uh-huh.

7            MR. HOWARD:   Your Honor, may I approach the

8        witness?

9            THE COURT:   Yes, sir.

10  MR. HOWARD:   (Continuing)

11  Q.    What I'm handing the witness is a letter dated July the

12  5th, 1990, and you said you can't read, is that right?

13  A.    No, I can't read.

14  Q.    Okay.   Is that your -- that squiggling there, is that

15  your name there?

16  A.    (Nods affirmatively.)

17  Q.    Okay.

18           MR. HOWARD:   Your Honor, if I be allowed to

19       read this since my client can't read?

20           THE COURT:   All right, sir.

21  MR. HOWARD:   (Continuing)

22  Q.    July the 5th, 1990, Charlie Vaughn --

23           MR. TOM WYNNE:   Your Honor, before he does

24       this, let me voir dire the witness, if I could?

25           THE COURT:   All right, sir.

548.

**VOIR DIRE OF CHARLIE VAUGHN BY MR. TOM WYNNE:**

Q.   Mr. Vaughn, can you read?

A.   I can't read at all.

Q.   Can you write?

A.   Only thing I can write is just my name there.

Q.   Well, then this particular statement that supposedly is a letter written by you on July the 5th, 1990, who wrote it?

A.   Well it was a friend of mine in the joint wrote it for me.

Q.   So you had somebody else write it and you signed it?

A.   Yeah.

Q.   How do you know what it says?

A.   He read it to me.

Q.   After you gave it to him he wrote it out and read it back to you?

A.   Yeah, 'cause I can't read.

Q.   Okay.  Who wrote it?  Who's the guy down at the joint that wrote it for you?

A.   Well, he's gone home now, I can't exactly remember his name.

Q.   You don't remember his name?

A.   (Shakes head negatively.)

         **MR. TOM WYNNE:**  That's all I have, your Honor.

**CROSS EXAMINATION BY MR. HOWARD CONTINUING:**

Q.   Okay.   July the 5th, 1990, Charlie Vaughn, ADC Number

549.

1    84104, Post Office Box 500, Grady, Arkansas.

2         "Dear Mr. Womack:  At this present time I can't afford a

3    lawyer.  I'd like to know the dates set for court.  The most

4    important thing is that I want the motion of discovery.  I do

5    want that as soon as possible.  I want you to know I have no

6    knowledge of this crime.  Looking to hear from you soon."  Do

7    you remember that?

8    A.    Yeah.

9    Q.    And you did sign your name here, is that correct?

10   A.    Yes, sir.

11             MR. HOWARD:  Your Honor, at this time I'd like

12        to move to introduce this into evidence.  Like to

13        have this marked as Defendant's Exhibit Number 1.

14             THE COURT:  Any objection?

15             MR. TOM WYNNE:  No objection, your Honor.

16             MR. HOWARD:  May I publish this to the jury,

17        your Honor?

18             THE COURT:  Yes, sir.

19             WHEREUPON, Defendant's Exhibit Number 1 was

20        introduced into evidence, marked for identification

21        and is provided herewith.  Exhibit following:

22

23

24

25

**550.**

July 5, 1990

Charlie Vaughn
ADC #84104
P.O. 500 - 0500
Grady AR. 71644

Dear Mr. Womack, At this present time I cant Afford Lawyer. I like to know the Day set for Court.

The most Important thing. Is that I want the Motion of discovery (copy) I do want that as soon as possible. I want you to know I have know knowledge of this crime, hooking to hear from you soon

Charlie Vaughn



1073

551.

**MR. HOWARD:**  (Continuing)

Q.  Okay.  Now, Charlie, you just testified that you can't read or write, is that correct?

A.  Yes, sir.

Q.  How far did you go in school?

A.  Quit in the ninth; I special education.

Q.  You were in special ed.?

A.  (Nods affirmatively.)

Q.  Guess you didn't do too good in school, is that correct?

A.  No, sir.

Q.  Okay.  Now, you testified that I came down and saw you on one occasion, is that correct?

A.  Yes, sir.

Q.  And during that conversation when I was asking you about what you confessed to what did you tell me?

A.  About the same thing, I don't know.

Q.  Several of your friends were asking you why did you confess, what did you say?

A.  I was scared and I thought I was gonna get the death penalty.

Q.  Okay.  Now, today, you're under oath again.  Now, are you telling the truth today?

A.  Yes, sir.

Q.  Okay.  I want you to go back to -- do you remember where you were on the night of September 21st, 1988?

552.

1   A.   I can't exactly remember where I was.

2   Q.   Okay.  But at some point you were charged with capital

3   felony murder --

4   A.   See, I was -- you know, I told you I had two years of

5   serving?

6   Q.   Okay.

7   A.   And they came down there and charged me with it so I

8   didn't know nothing about it.

9   Q.   Okay.  And at that point what did they tell you about

10   the charge?

11   A.   Asked me did I know anything about it and I told 'em I

12   didn't so he went on and charged me with it.

13   Q.   They charged you anyway?

14   A.   Yeah, while I was in the penitentiary; I had a two year

15   sentence.

16   Q.   Okay.  Now, you were framed and you were scared of the

17   death penalty, is that right?

18   A.   Yeah.  You know, I ain't never been charged with no

19   charges like this one before.

20   Q.   Okay.  Now, did you ever tell Mr. Wynne that you didn't

21   do it?

22   A.   Sir?

23   Q.   Did you ever tell Mr. Wynne that you didn't know

24   anything about it?

25   A.   Yeah.

553.

1   Q.   And what did he tell you when you told him that?

2   A.   He said I was lying, said I'm gonna get the death

3   penalty.  He was putting all these words in my mouth.

4   Q.   Okay.  So you're telling the Court and the jury that you

5   plead guilty to save your life, is that right?

6   A.   I didn't know what I was doing.

7   Q.   No further questions.

8           **MR. MURPHY:**  No questions, your Honor.

9           **MR. TOM WYNNE:**  Your Honor, could I just have

10         one further question?

11           **THE COURT:**  All right.

12   **REDIRECT EXAMINATION OF CHARLIE VAUGHN BY MR. TOM WYNNE:**

13   Q.   Mr. Vaughn, you said that on March the 25th of '91 when

14   you were here and plead guilty, did you -- they had you so

15   scared, they had you scared.  Who is "they," who had you

16   scared?

17   A.   Who?

18   Q.   You said that you plead guilty that day because you were

19   scared about the death penalty.  Who had scared you?

20   A.   I said my lawyer, Remet, he had put all them words in my

21   mouth, 'cause, see, I ain't never been charged with nothing

22   like this before.

23   Q.   So not only had Mr. Remet put the words in your mouth

24   he's the one that scared you about the death penalty too, is

25   that correct?

554.

1   A.   Yeah.

2               **MR. TOM WYNNE:**   I believe that's all I have,

3        your Honor.

4   **RECROSS EXAMINATION OF CHARLIE VAUGHN BY MR. HOWARD:**

5   Q.   Okay.   Mr. Vaughn, was Mr. Remet the only person who

6   scared you?   Who else talked to you about the death penalty

7   and lethal injection?

8   A.   Butch Godwin.

9   Q.   Butch Godwin?

10  A.   Investigator.   He the one that came down there and

11  charged me.

12  Q.   Okay.   Did anybody else say anything to you?   Did Mr.

13  Ronnie Poole say anything to you?

14  A.   Yeah, I think he said something about it too.

15  Q.   But to be correct, Mr. Remet wasn't the only one who

16  scared you about this death penalty was he?

17  A.   Huh-uh.

18  Q.   Some more people mentioned that to you, didn't they?

19  They talked about lethal injection, didn't they?

20  A.   Yes, sir.

21  Q.   No further questions.

22               **THE COURT:**   All right, sir, you may step down.

23        Thank you.

24        Call your next witness.

25  WITNESS EXCUSED.

*MARIAN G. SCHMIDT*
*Official Court Reporter*
*822 Partee Drive*
*Magnolia, Arkansas 71753*

107