IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

TINA JIMERSON
ADC #704449                                                          PETITIONER

5:15-cv-00208 BSM-JTK

WENDY KELLEY, *Director*,
Arkansas Department of Correction                                    RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDATIONS
## INSTRUCTIONS

The following recommended disposition has been sent to United States District Court Chief Judge Brian S. Miller. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendations and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## DISPOSITION

Petitioner Tina Jimerson, an inmate of the Arkansas Department of Correction ("ADC"), filed this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on June 30, 2015. Jimerson claims that recently discovered evidence shows that the police and prosecution failed to disclose exculpatory or impeaching evidence to her or her attorney prior to her trial and that the police subsequently destroyed that evidence in bad faith. Jimerson also brings a freestanding claim of actual innocence based on the recent confession of a co-defendant who claims he committed the crimes alone. For the following reasons, the Court recommends her claims be denied.

## I.    PROCEDURAL HISTORY

On September 22, 1988, Mrytle Holmes's beaten and stabbed body was found in the trunk of her car outside her home in Fordyce, Arkansas. *Brown v. State*, 315 Ark. 466,

2

468 (1994).  On March 16, 1990, Charlie Vaughn, John Brown, Jr., and Reginald Early were each charged with her capital murder, in Dallas County Circuit Court.  (R. 1)[1]  On March 25, 1991, Vaughn pleaded guilty to first-degree murder and was sentenced to life in prison.  (R. 1036)[2]  His guilty plea implicated co-defendants Brown and Early as well as a third co-defendant, Tina Jimerson (collectively, the "Defendants").  *Id.*; *Brown v. State*, 315 Ark. at 468.  Jimerson was then charged with capital murder as an accomplice on March 27, 1991.  *Brown v. State,* 315 Ark. at 468.  Over Jimerson's objection, the cases against the Defendants were consolidated for trial purposes.  *Id.*  The jury trial on capital murder charges ended in a mistrial.  *Id.*  The felony informations were subsequently amended to charge each of the three co-defendants with first-degree murder and aggravated robbery.  *Id.*  Jimerson pled not guilty and testified in her own defense.  (Doc. No. 15-1)  All three co-defendants were found guilty by a jury on both charges, and each was sentenced to life in prison on both charges.  *Brown v. State*, 315 Ark. at 468.  A judgment was entered on August 19, 1992.  (Doc. Nos. 7-2, 15-1 at 1)  Jimerson and Early's appeal of the judgment was consolidated with Brown's appeal.  *Brown v. State*, 315 Ark. at 468.  In 1994, the Arkansas Supreme Court affirmed the defendants' convictions.  *Id.* at 472.  Jimerson did not file a petition for certiorari in the United States Supreme Court, and did

---

[1] Citations to the Record on Appeal, Respondent's Exhibit 11, appear as "R. __".  Citations to the evidentiary hearing appear as "Tr. __".

[2] The Arkansas Supreme Court incorrectly stated that the defendants were charged on March 16, 1991, and that Charlie Vaughn pleaded guilty a week and a half later on March 25, 1991.  *Brown v. State*, 315 Ark. at 468.  In fact, they were charged on March 16, 1990; Vaughn pleaded guilty a year and a week later on March 25, 1991.  (R. 1, 1036)

not file any other petitions, applications, or motions challenging her conviction until she filed this habeas petition on June 30, 2015.  (Doc. No. 15-1 at 2)

Jimerson's petition for habeas relief asserts that her due process rights were violated based on allegations that the police and prosecution failed to disclose exculpatory or impeaching evidence to her or her attorney prior to her trial and that the police subsequently destroyed that evidence in bad faith.  (Doc. No. 1 at 2-3; Doc. No. 15-1 at 2)  Jimerson relies on *Brady v. Maryland*, 373 U.S. 83 (1963) and *Arizona v. Youngblood*, 488 U.S. 51 (1988).  *Id.*  On January 26, 2016, Ms. Jimerson moved to amend her habeas petition to add a freestanding claim of actual innocence under the Eighth and Fourteenth Amendments of the Constitution, after co-defendant Early confessed to robbing, raping, and killing Ms. Holmes and avowed that he committed the crimes alone.  (Doc. No. 15) The Court granted Jimerson's motion to amend her petition and set an evidentiary hearing to address Jimerson's due diligence in bringing her petition and her claim of actual innocence.  (Doc. No. 16)

The evidentiary hearing took place on June 15, 2016 (Doc. No. 50), and the parties subsequently filed their post-hearing briefs.  (Doc. Nos. 58 & 59)  Based on the evidence submitted at the hearing and the post-hearing briefs of the parties, it is the undersigned's recommendation that the writ of habeas corpus be denied.

## II.    FACTS

### The Crime and Its Investigation

On Thursday morning, September 22, 1988, Ms. Holmes's brother and brother-in-law went to the Fordyce Police Department to report that they could not find her.  (R. 669)

Chief of Police Ronnie Poole found her house in disarray.  (R. 670) He found blood on the carpet and couch and a broken knife on the floor of the living room.  (R. 670) He found the bedroom in disarray with a lot of blood on the door frame and bed; he found another bedroom undisturbed and went through the kitchen where he found a utensil drawer open and a knife on the counter above it.  (R. 670-671)  After checking the utility room and back yard, he came through the kitchen again and noticed a "drag-trail" of blood that led from the master bedroom, through the kitchen and utility room, to the carport and Ms. Holmes's car.  (R. 671-72) At that point, Poole called Lieutenant Jerry Bradshaw with the Arkansas State Police and Sergeant James Bell with the Fordyce Police Department for assistance. (R. 672) After arrival, they videotaped the crime scene in the house.  *Id.*  In the master bedroom, police found the head of the bed covered in blood, a broken pot on the floor, and another knife on the floor.  (R. 670, 725, 750-52)  They noticed blood on the car, retrieved Ms. Holmes's car keys from her brother, and found Ms. Holmes's body in the trunk of her car.  (R. 672-673) Holmes had multiple wounds, and her throat had been cut.  (R. 824) It was later determined that she had been raped.  (Pet. Exhs. 14, 15)

The police found no signs of forced entry on the doors or windows of Ms. Holmes's house.  (R. 679, 817-18) The state police found only one identifiable fingerprint at the crime scene.  (R. 708) It belonged to Ms. Holmes's brother, Grady Brown.  *Id.*  He was initially a suspect and took a polygraph with inconclusive results, but he was ultimately cleared as a suspect.  (R. 772-773) The hairs on or near Ms. Holmes may have been hers (R. 880), and the police collected no hairs in the pubic combing.  (R. 891) Donald Smith

from the Arkansas Crime Lab testified that finding no hairs on a rape victim was not unusual.  (R. 891)

On January 22, 1990, the new Fordyce Chief of Police, William R. Stage, wrote the circuit judge to explain the delay in moving the case forward. (R. 445) Chief Stage explained that he was appointed in October 1989, and he learned of the Holmes murder case soon after.  Stage noted that the Fordyce Police Department lacked an investigator sophisticated enough to handle all phases of the Holmes murder, that the department was "totally dependent" on the Arkansas State Police for its expertise, and that he had hired an "experienced investigator" to correct the situation.  *Id.*  After meeting with the state police and the prosecuting attorney, a consensus was reached that, although the investigation had focused on three suspects, there was insufficient evidence to charge anyone or to ask for a grand jury hearing.  *Id.*  Chief Stage assured the Judge of the renewed interest of his department in the case with the new investigator spending approximately seventy-five (75%) percent of his workday on the investigation. *Id.* at 446.  He also noted that the prosecutor and his staff would be periodically contacted and kept apprised of developments in the investigation.  *Id.*

On March 16, 1990, the State charged Vaughn, Early, and Brown with capital murder, alleging that they had acted together in committing rape and robbery, and in the course of those crimes, had caused the death of Ms. Holmes under circumstances manifesting extreme indifference to the value of human life.  (R. 1)

<u>Charlie Vaughn's Confession</u>

Leading up to the arrest of Brown, Early, and Vaughn, Vaughn was interrogated on multiple occasions.  On February 27, 1989, Vaughn was interviewed by Lieutenant Jerry Bradshaw and a private investigator, Michael Joe "Mike" Earley.[3]  (Doc. No. 15-1 at 75)[4] Vaughn stated he knew nothing about the Myrtle Holmes murder and claimed he was doing yard work for Frank Henderson on the day of the murder.  *Id.*  On April 19, 1989, Vaughn was interviewed by an investigator named G.G. Godwin and Mike Earley and again claimed to know nothing about the Holmes murder.  *Id.* at 76.  He claimed he was not associated with Early or Brown.  *Id.*  Vaughn was interviewed again on August 7, 1989, and February 5, 1990, but refused to answer questions or make a statement.  *Id.* at 77-78. Vaughn was arrested on April 30, 1990, and refused to make a statement.  (Doc. No. 15-1 at 81-83)  On July 5, 1990, he wrote a lawyer and stated he knew nothing about the crime. (Doc. No. 15-1 at 70)

On March 24, 1991, Charlie Vaughn confessed to the robbery, rape, and murder of Ms. Holmes in a statement made at the Dallas County Jail to Sheriff Donny Ford, Robert Remet (Vaughn's attorney), and Lieutenant Bradshaw.  (R. 1053; Doc. No. 15-1 at 84) The next day, he pleaded guilty to murder in the first degree in accordance with a plea agreement with the State.  (R. 1036, 1039)  In exchange for his plea, the State reduced the

---

[3] Earley's name is spelled Earlie or Early in the state court record; he spelled his name E-a-r-l-e-y at the evidentiary hearing.  (Tr. 181)

[4] Pages 9-220 of Doc. No. 15-1, the exhibits to Jimerson's Amended Petition, were introduced into evidence at the evidentiary hearing as Petitioner's Exhibit 21.  References to that exhibit are referred to herein by the ECF document number and its page numbers.

charge from capital murder, which carried a penalty of death or life without parole, to first-degree murder, which carried a penalty of not less than 10 nor more than 40 years or life. (R. 1039)

Vaughn told Dallas County Circuit Judge John M. Graves that Jimerson, Brown, and Early picked him up on the night of the murder because "they wanted to do a robbery." (R. 1042) He said they were looking for the house where Mrs. Myrtle Holmes stayed. (R. 1043) He could not remember the name of the street where she lived. *Id.* He also said that none of them knew her, and it was just the house at which they stopped. (R. 1044) Vaughn said that Jimerson drove the vehicle. (R. 1043) According to Vaughn, when they got there, it was around midnight, and Brown went in through a window and let him and Early in through the door. *Id.* Vaughn said that, once they were inside, they began searching for money and found some. (R. 1044) He said that Ms. Holmes woke up, and Brown started beating the side of her head. (R. 1045) He first said Brown used a pipe but then said it was a cooking skillet. (R. 1045-46) He said that Brown then raped Ms. Holmes after which Early raped her. (R. 1046) They then removed her oxygen mask and moved her to the couch where Vaughn raped her. (R. 1046-47) Vaughn's statements were not clear as to whether Ms. Holmes was conscious or unconscious at the time. (R. 1047) After Vaughn raped Ms. Holmes, Brown killed her; then he and Brown put her body in the trunk of her car. (R. 1048) Vaughn said that he left. (R. 1049) When asked where the others went, he assumed they left with Jimerson, who had been outside the whole time sitting in the car. *Id.* He thought she probably saw them put the body in the trunk. *Id.* Judge Graves accepted Vaughn's plea and sentenced him to life in prison. (R. 1051)

8

<u>Jimerson's Charge and Pre-Trial Discovery</u>

Jimerson was subsequently charged with capital murder on March 27, 1991.  (R. 5) Jimerson was represented by William McNova Howard, Jr., who also represented Early. Prior to trial, Howard filed motions for discovery for both Jimerson and Early and specifically requested information concerning informants and whether any informants had requested or were offered immunity, leniency, sentence or charge concessions, or other inducements.  (R. 94-97, 105-106) Howard also specifically requested video and audio recordings of the confession of a co-defendant.  (R. 105-106) Further, Howard requested "any material or information within [the prosecuting attorney's] knowledge, possession or control, or in the hands of any law enforcement agency, that could negate the guilt of the defendant of the offense charge or could reduce the punishment therefore."  (R. 105-106) In response, then-Deputy Prosecuting Attorney Robin F. Wynne responded that the informant referred to as "Sam" was Taura Bryant, and that the only recordings were of conversations with Kenny and Lee Parsons and video of the crime scene.  (R. 152-157) Wynne also responded that the State had no knowledge of any informant whose information had led to an arrest, and that the State had made "no offers of immunity, leniency, sentence or charge concessions, or other inducements to any [c]o-[d]efendant, potential witness or informant other than the offer made to Charlie Vaughn."  *Id.* at 157.

<u>The Trials</u>

After a mistrial in April 1992 on capital murder charges, the defendants were retried in August 1992 on charges of first-degree murder and aggravated robbery.  (R. 388, 510) The rape allegations were dropped.  (R. 393)  In the first trial, Dr. Robert Cotton had

testified regarding deoxyribonucleic acid (DNA) evidence collected on vaginal swabs taken from Ms. Holmes.  (Doc. No. 15-1 at 109, 122)  That DNA was compared to DNA in blood samples collected from Vaughn, Early, and Brown.  *Id.* at 122-123, 125.  Both Vaughn and Brown were excluded as contributors to the DNA found in the vaginal swabs. *Id.* at 144, 148.  Early could not be excluded as the contributor.  *Id.* at 145.  DNA evidence was not introduced in the second trial.

With no direct evidence to link the Defendants to the crime, the prosecution relied on witnesses who placed the Defendants together near Ms. Holmes's residence on the night of the murder.  The prosecution's theory was that the Defendants and Vaughn were at a party at Levi Grandy's house on the night of the murder and left around 10:30 or 11 p.m. when they then went to Lorraine and Ellis Tidwell's home.  There, Vaughn allegedly asked for an advance on his wages.  The prosecution believed that Jimerson then drove them to Ms. Holmes's residence where they robbed, raped, and killed her.  The prosecution then surmised that the three men took off to Shannon Manning's house and that Jimerson then picked them up again and took them to the Parsons home where Brown changed clothes.

The Defendants maintained they were not together on that night.  Jimerson said she was at home after 9 p.m., and Early claimed to be drunk on a street corner until 3 a.m. Brown did not testify.  Vaughn recanted his confession, and he repeatedly testified he had "nothing to say."  (R. 1024)  Vaughn testified he did not know defendants and had only seen them once before in court.  (R. 1027-1029)  He quit high school in the ninth grade, was in special education, and could not write.  (R. 1073)  Vaughn recalled pleading guilty but said he was only "going by what y'all said" and later clarified that by "y'all" he meant

his attorney Robert Remet.   (R. 1057, 1060, 1065) Vaughn said that Remet and an investigator named Butch Godwin scared him with the death penalty.  (R. 1076-1077)

Taura Bryant testified that she saw Jimerson, Brown, Early, and Vaughn the night before  Ms. Holmes's murder at a party at Levi Grandy's house, which is about a half mile from Ms. Holmes's house.  (R. 963, 985) She said they first arrived together between 4:30 and 5:30 p.m. and stayed 30-45 minutes drinking.  (R. 964) They left but returned in a different vehicle (a truck) about 9:00 or 9:30 p.m. and stayed approximately 15 minutes. (R. 965) Bryant said they returned later in a third vehicle at approximately 10:30 p.m. and stayed until 11:00 or 11:15 p.m.  (R. 966) Bryant said she saw them all together again the next day after lunch at Grandy's home where they stayed for a few minutes. (R. 966-967) She saw them again later that day at the home of a person called Piggott, where she overhead Vaughn saying that either Early or Brown (she could not remember which) had stolen a ring and some money from an old lady.  (R. 968) She said that Tina was crying and telling them to "shut up."  *Id.*  She also stated that she heard Vaughn say the woman was as big as an ocean and he could fit a light pole up her.  *Id.*   Bryant also thought she saw blood on either Early's or Brown's pants the day after the murder, but could not remember which.  (R. 983) She further acknowledged on cross-examination that a prior statement she gave investigator Mike Earley was inconsistent with respect to several details such as the blood on the pants; where the defendants were located at Piggott's home when the statements were made; whether she saw them on a Tuesday or a Wednesday night; and the appearance of the car they were in.  (R. 977- 983)

Ellis Tidwell testified that, at the time of the murder, he had a welding shop and worked on cars.  (R. 845) Charlie Vaughn worked for him as needed and was paid by the day.  (R. 848) Tidwell said that Vaughn was at work on September 21, 1988.  (R. 849) Tidwell testified that Vaughn came to his mother's house that night, between 10:30 and 11:30 p.m., while he and his mother were watching Miami Vice after the 10 o'clock news, and asked for a cash advance so that he could travel to Princeton, Arkansas to visit his sick mother.  (R. 849) Tidwell said that Vaughn introduced him to Brown, whom he did not know.  *Id.*  He said they were "wild-eyed" and may have been drunk.  (R. 850) Tidwell identified Brown in the courtroom.  (R. 851, 860) Tidwell's mother, Lorraine Tidwell, confirmed the visit by Vaughn and another person she did not know on that night while they were watching Miami Vice.  (R. 870-871) Tidwell testified that, the next day, Vaughn returned by himself to ask for an advance on his wages.  (R. 853) Tidwell thought he acted strange.  *Id.*  Tidwell and his mother initially told private investigator Mike Earley about the visits from Vaughn, but they did not tell police until Tidwell was working in the jail and overheard Ronnie Poole talking about the investigation approximately three years later. (R. 865)  Between the time of the murder and this date, Tidwell had been convicted on a drug charge, was sentenced to 20 years, then was released to Sheriff Ford's custody under Act 309 to work on police cars.  (R. 863-865)

Mike Earley, a private investigator who investigated Ms. Holmes's murder, testified that, around midnight the night before Ms. Holmes's body was found, he went out onto his front porch to smoke a cigarette and saw Early and two other black men cross the road and enter Shannon Manning's house.  (R. 909-10)  He identified Early based on his limp and

said he saw his face.  *Id.*  Earley said he told Bradshaw about seeing the men that night. (R. 918) He also confirmed that he had spoken to Ellis and Lorraine Tidwell sometime in 1988 and had reported that conversation to Lieutenant Bradshaw at that time.  (R. 923) Earley also conducted a ground search near Ms. Holmes's house four or five days after her murder and found a key in the pea gravel next to the road.  (R. 912-913) He asked Ms. Holmes's brother, Grady Brown, if he could test the key.  *Id.*  The key worked, and Earley gave it to Lieutenant Bradshaw.  *Id.*

Brothers Lee and Kenny Parsons testified that Tina Jimerson drove Early, Vaughn, and Brown to their house the night before they learned of Ms. Holmes's murder.  (R. 933, 947) They each explained that they lived together at that time, and Brown had stayed with them for some time before the murder (although their accounts differed as to the length of time Brown stayed with them).  (R. 930, 946) They both testified that, when Brown arrived around midnight, he was wearing blue warm-ups that appeared to have blood stains along the right side. They testified that Brown went into the home and changed clothes.  (R. 934, 949) Kenny Parsons testified that he went out to the vehicle (a cream colored car) when they pulled up and asked Brown what had happened.  Brown said he had been in a fight with Sonny Tidwell.  (R. 948-949) Kenny said that Vaughn and Early walked down the track, and that he and Brown walked "up town" to drink more after Brown had changed his clothes.  (R. 949) Kenny testified that obtaining liquor "up town" would not be a problem after midnight.  (R. 955) Lee and Kenny both testified that they later washed the clothes and wore them.  (R. 937, 952)  Lee testified that he did not tell police sooner about seeing Brown with bloody clothes that night because he did not want to get involved.  (R.

13

937) Kenny admitted that he initially told the police he knew nothing when interviewed in 1988 but later told police about it in 1991 after he became a "trusty" at the jail.  (R. 953-954)

Patsy Harris, the Municipal Court Clerk in Fordyce, testified that she saw Brown on September 22, 1988, in court.  (R. 956-957) She testified he was there to testify in a case in which he alleged he had been stabbed by Sonny Tidwell.  (R. 959)  She said he wore his shirt open, and she noticed that he had a scar or wound on the right side of his chest that had not healed over yet.  (R. 958)

Darrell Jenkins testified that he had known Early since they were in school together in Fordyce and that they were friends.  (R. 988)  Jenkins said that he was hanging out with Early and a couple of other guys – Reggie Sherman and Rabbit Jimerson – a few days after Ms. Holmes's murder, and Early said that he had killed Ms. Holmes by hitting her over the head with pots and pans and by stabbing her.  (R. 989-990, 1005) Jenkins said that Early said he went in through the front door and found Ms. Holmes in her bedroom.  (R. 990) Jenkins testified that Early also told him that he put Ms. Holmes's body in her trunk but the car would not start.  (R. 991)  Jenkins said that Early claimed to have taken some money but did not tell him how much; Jenkins thought it was probably about $800 because he saw Early with it while gambling.  (R. 991-992) Jenkins said he did not tell police what Early told him, but he talked to Mike Earley about it and was later asked about it by prosecutor Robin Wynne.  (R. 1001).  Jenkins acknowledged that he was previously convicted of robbery in 1984 or 1985.  (R. 991-992)

Early testified in his own defense. He acknowledged that he previously broke into a store and pleaded guilty. (R. 1127) He testified that the week of Ms. Holmes's murder, he had returned home from Detroit where he had been living. (R. 1128) He spent most of the week drinking. (R. 1136) He said that, on that Wednesday night, he was picked up and released by the police, went to a club, and ended up drunk and asleep under a stop sign at the intersection of Sixth Street and Brown Street. (R. 1145-1146). He said he went home about 3 a.m., went to his grandmother's funeral the next day, and then went to his cousin Shannon Manning's house. (R. 1143) Early said he went back to Detroit, and when he came back in March, he was picked up on a parole violation and sent back to prison. (R. 1138) Early said he did not know Brown in 1988, that he had known Jimerson as a child but had not seen her for more than 10 years, and that he had known Vaughn all his life. (R. 1135-1136)

Benny Cox testified that he had been with Jimerson on Tuesday, September 21, 1988, and that he loaned her his car for a short time that night. (R. 1086, 1089) Cox was sure that they were together on Tuesday and not Wednesday because Tuesday was his day off and he would have been at work on Wednesday. (R. 1089) Jimerson confirmed she had been with Cox on Tuesday night and that she drove Cox's car. (R. 1116-1117) She did not recall driving it without Cox there, but did remember Vaughn got in the car wanting to go to a party. *Id.* Jimerson acknowledged that she had previously told police she was with Cox the night before she learned of Ms. Holmes's murder. (R. 1126) Jimerson's father, Ed Jimerson, testified that he was with his daughter on Wednesday night and on the following Thursday morning when they heard news of Ms. Holmes's murder. (R. 1090)

He said she came in around 9 p.m. and he went to bed at 11 p.m. *Id.* He could not confirm whether she was with Cox on Tuesday night. (R. 1095)

Jimerson reported being raped to Bill Setterman in 1989, and that he told her "You better be glad they didn't do you like they did Myrtle Holmes." (R. 1106) She said she did not tell him that people were talking about her being involved, but when asked, she told him she had once given Brown a ride to the South side of Fordyce and dropped him off a couple of blocks behind the police station. (R. 1109) Jimerson testified she had given Brown a ride in June or July but not September. (R. 1113) Setterman confirmed that he interviewed Jimerson in connection with an alleged rape while working with the Calhoun County Sheriff's Department in 1989. (R. 1010) He said that, when he brought up the Holmes murder, Jimerson became nervous and said that people were talking about her being involved. (R. 1010-1011)

Jimerson testified that she was later questioned by Ronnie Poole and polygraphed in 1990 regarding the murder, and questioned again in 1991 by Larry Case. (R. 1104) She said Case offered her money and bribes to lie about Brown and Early. (R. 1105) She testified she knew of Vaughn (R. 1108), and she knew Brown but was not friends with him (R. 1110). She testified she was not with Early, Brown or Vaughn the night Ms. Holmes was murdered. (R. 1108)

<u>Jimerson's Post-Trial Efforts</u>

At the evidentiary hearing, Jimerson stated that she appealed the verdict to the state court through her attorney William Howard. (Tr. 144) She said she later filed something with the Innocence Project in 1999 that she updated in 2005. (Tr. 139) She also testified

she was in contact for year with a woman named Elizabeth Greenberg at the Innocence Project.  (Tr. 142)  She stated she paid attorney R.S. McCullough $8,000 to file a habeas petition, but he did nothing and was subsequently disbarred.  (Tr. 140-141)  Jimerson said she filed clemency petitions in 2000 and 2006.  (Tr. 145-147)  She said her brother Dwight wrote numerous organizations on her behalf.  (Tr. 144-145)  She did not bring any copies of her filings or correspondence to court. (Tr. 139-147)

Private Investigator, Greg Stimis

Greg Stimis is a private investigator who was hired to work on Jimerson's case in October 2013.  (Tr. 100)  He testified that, on January 7, 2014, he went to Fordyce to find the case file.  While in Fordyce, Stimis met with Sheriff Ford.  (Tr. 101-103)  Ford unexpectedly told him about an informant.  (Tr. 104)  Specifically, Ford told him that, while he was transporting a prisoner from Texas to Arkansas on an unrelated case, the prisoner asked if he could do anything to help his situation.  Ford told him he could get some information from Early, Brown or Vaughn who were in jail. (Tr. 105)  Ford said that the prisoner was able to get a confession from Vaughn, so he sent the prisoner back into the cell with a recorder, and Vaughn confessed again on tape.  *Id.*  Ford said the informant talked about the death penalty with Vaughn.  *Id.*  Stimis contacted Ford again to get the name of the informant, but Ford did not respond to emails.  (Tr. 106)

Stimis also spoke to Ronnie Poole in April 2015 to obtain the case file.  (Tr. 107) Poole told him the informant was Ronnie Prescott and that Poole had been in the car with Ford and Prescott when they discussed the possibility of Prescott obtaining information.

17

(Tr. 109)  Stimis acknowledged that he had already received the case file in February 2014. (Tr. 111)

Jail Informant, Ronnie Prescott

Prescott testified that, in March 1991, Sheriff Ford and Ronnie Poole picked him up in Hunstville, Texas and drove them all back to the Dallas County jail in Fordyce, Arkansas.  (Tr. 8-9)  Prescott was facing drug charges in Dallas County.  (Tr. 9)  He said that Ford told him that the pending charges could go away if he would help them get information about a brutal murder of an elderly person.  (Tr. 10)  Prescott agreed to do so. *Id.*  At the jail, Ford gave him a tape recorder and put him in a cell with a young black man. (Tr. 11-12)  Prescott testified he was in the cell with the man four or five days and had three or four conversations with him.  (Tr. 13)  Prescott could not recall whether he brought up the death penalty with the man but said he could have.  (Tr. 33)  Prescott stopped recording him when he said there was a fourth person involved; he got Sheriff Ford's attention and gave him the recorder.  (Tr. 15)  Prescott was handed Petitioner's Exhibit 7, a statement signed by him, and although he recognized his signature, he could not recall signing it.  (Tr. 17)  Prescott further testified he did not write the statement, did not read the statement, and would not have been able to read the statement at that time.  (Tr. 26-27) Prescott said he believed the charges against him were dropped as a result of the information he obtained.  (Tr. 18)  He testified to that effect in the trial of Bill Keeling.[5] (Tr. 20, Petitioner's Exhibit 8)

_____

[5] In Dallas County Circuit Court Case No. CR90-35, *State of Arkansas v. Randy Bill Keeling* (charges: conspiracy to manufacture controlled substance and felon in possession of firearm) Ronnie Prescott testified on August 15, 1991, that  he was arrested in Arkansas for his participation in a

<u>Chief of Police, Ronnie Poole</u>

Ronnie Poole testified he remembered Ronnie Prescott.  (Tr. 169)  He recalled that he and Ford picked up Prescott in Texas in 1991 so he could testify in a methamphetamine investigation, and that Prescott subsequently recorded Vaughn talking about the murder. *Id.*  He had been told the recording would have no evidentiary value.  (Tr. 170)

<u>Dallas County Sheriff, Donny Ford</u>

Donny Ford, former Dallas County Sheriff, testified that he was not sheriff in 1988 when Ms. Holmes was murdered.  (Tr. 81)  He was elected sheriff in 1990 and took office in 1991.  *Id.* At that time, Early, Brown, and Vaughn had been charged with Ms. Holmes's murder.  (Tr. 81-82)  Ford confirmed that Prescott entered the Dallas County Jail in March 1991.  (Tr. 82)  Ford denied telling Prescott about the murder on the way back from Texas. (Tr. 89)  Ford said that he only told Prescott to tell the truth about the Bill Keeling investigation in order to help himself on pending drug charges.  (Tr. 89)  Ford said that Prescott told him that Vaughn was talking about a murder that happened in Fordyce, so he then sent Prescott in with the tape recorder and told him to record any statements made. (Tr. 82, 90)  Ford also testified he knew no details regarding the murder himself and did not believe Vaughn or Prescott could have learned any details.  (Tr. 93)

Ford believes he called the prosecutor and told him about giving the tape recorder to Prescott but did not tell the prosecutor that he got the recorder back from Prescott.  (Tr.

---

conspiracy on April 15, 1990, in a case involving Keeling and another man.  Prescott testified that, when the sheriff and Ronnie Poole came to pick him up from the penitentiary in Texas for extradition to Arkansas, Sheriff Ford "asked me if I could assist him in a brutal murder that happened a few years back by some gentlemen of an elderly lady, and I told him if I could, I would in exchange for helping me . . . And I got him all the information he needed . . . …. (Petitioner's Exhibit 8 at 21)

84-85)  Ford said that, the same day, Vaughn asked to speak to him, and he told Vaughn that he had to call his attorney.  (Tr. 85, 91, 99)  Ford then called then-prosecutor Tom Wynne and Vaughn's attorney Remet and told them that Vaughn wanted to make a plea. (Tr. 85, 91)  The prosecutor had told him they could not use a recording, and he does not recall what happened to it, but he did not intentionally destroy it.  (Tr. 86, 92)  Ford said he never discussed the recording with an attorney for Jimerson.  (Tr. 86)  Ford testified he did not know of Jimerson until Vaughn confessed.   (Tr. 88)  Ford did not remember speaking to Stimis in 2014.  (Tr. 97)

### Jimerson's Trial Attorney, William Howard

At the evidentiary hearing, attorney Howard confirmed that he had requested information about informants during discovery and did not receive any information indicating there had been an informant.  (Tr. 112-116)  Jimerson testified she learned of the informant in June 2015 from her lawyer.  (Tr. 128)

### Reginald Early's Confession

Early testified that he was born and raised in Fordyce.  (Tr. 35)  He testified that he knew of Jimerson because she lived in the same neighborhood as his grandmother but that they were not friends.  (Tr. 36)  Before their trial in 1992, he had not seen Jimerson since he was ten or eleven years old.  *Id.*  Early testified he had never seen John Brown in his life before the trial.  *Id.* He said he knew Vaughn because they had grown up in the same section of town, but they were not friends.  (Tr. 37)

Although Early was raised in Fordyce, he moved to Detroit, Michigan around February of 1988. (Tr. 35, 37)  He said he had been released from jail on the condition that he leave town and not come back except for a family emergency. (Tr. 38)  He came back to Fordyce in September for his grandmother's funeral and was there on September 21, 1988. *Id.*  He said that, on that day, he "drunk from day to dark." (Tr. 38)  He said he had been drinking uptown with Clarence ("Pig") Pope, and after their last trip to the liquor store before it closed at 10 p.m., he and Pope started walking towards the area of town where Early lived. (Tr. 39)  Early said he then decided to go over to his cousin Shannon Manning's house. (Tr. 40)  Early testified he was just roaming around the area, when he saw a white house and remembered the woman that lived there had called the police on him one day earlier in the year. (Tr. 41)  He said he had been kicking down election signs and "being a menace," prompting her to call the police. *Id.*  He said he decided to "cause her some mischief" and intended at that moment "to go over there and break in her car . . . probably steal a radio out of it, speakers, whatever." *Id.*  Early said he was in the carport and saw that the door to the house was ajar, so he walked closer to listen and went in after hearing nothing. (Tr. 42)  He explained this was not the first place he had broken into in Fordyce; he had broken into the pool hall, the Wynne Law Firm, the courthouse, Otasco, and Western Auto, among others. *Id.*

Early testified he walked into the kitchen then walked through a den or living room. (Tr. 43)  He said he saw a bedroom to the right and a person in the bed, whom he thought was asleep. (Tr. 44)  He walked to another bedroom and found no one there. *Id.*  He went back to the bedroom and woke Ms. Holmes. (Tr. 44)  He asked her if she had any money,

21

and she said she did not.  *Id.*  He went through her purse and found none, but later found money in a dresser.  (Tr. 44-45, 47)  While he was going through the dresser, Ms. Holmes tried to run, and he chased and tackled her on the couch in the den/living room area.  (Tr. 45)  He was mad that she ran so he took her back to her bedroom and told her to get in bed. (Tr. 47)  While he was searching her drawers, she got up again and began hitting him in the head with a pot that was sitting on a table in the room.  (Tr. 47)  He then grabbed her and slammed her to the floor.  (Tr. 48)  He then began hitting her in the face.  *Id.*  He then raped her.  *Id.*  He saw a garment hanging over a mirror and wrapped it around her legs and forced her underneath the bed.  *Id.*   He then went to look out a window to see if anyone was walking by.  He found Ms. Holmes crawling out from under her bed, and he tackled her again.  (Tr. 49-50)  He explained that he went to the kitchen, grabbed a handful of knives, and returned to the bedroom where he cut Holmes's throat.  (Tr. 51-52)  He was unable to sever her throat, and she was still alive.  (Tr. 52)  While she was screaming, he took another knife and began stabbing her in the back.  *Id.*  He said he yanked the telephone cord out of the wall.  (Tr. 53)  Holmes was still alive, so he dragged her back through the bedroom and kitchen and stopped at the door to the carport.  *Id.*  He found her car keys but was unable to start the car.  *Id.*  He then put her in the trunk while she was still alive.  (Tr. 54)  Early went back in the house and wiped everything he remembered touching with a piece of garment to remove his fingerprints.  *Id.*  He also wiped off the car ignition, door handle, and steering wheel of the car.  (Tr. 54-55)  He said he got no blood on him.  (Tr. 75)

Early testified that, after he left Ms. Holmes's house, he headed towards his cousin Shanning Manning's home.  (Tr. 55)  He was taking the keys off the ring when a bat or something flew at him, and the key came out of his hand and landed in the dirt.  Not wanting to leave any footprints, he left the key there and threw the other keys and the key ring into the woods.  (Tr. 56)  He briefly encountered a man he knew as Darrell Jenkins but did not say much.  (Tr. 55)

Early did not tell anyone he had raped and murdered Ms. Holmes until November 2015.  (Tr. 57)  Early said that he had initially asked his attorney to work out a plea deal, but when his attorney told him that he was being charged along with Vaughn, Brown, and Jimerson, he decided to take his chances because he knew they had not been there.  (Tr. 65-66)  He wrote every legal organization he learned of to try to find an attorney for 27 years.  (Tr. 66)  He said that he would always say that he knew something that he would only tell if he was represented by counsel.  (Tr. 66-67)  He completed a form for the Innocence Project on January 3, 2005, on behalf of Vaughn and stated "I'm telling you that as a fact.  How do I know?  I can only tell you that under attorney-client privilege.  But, nevertheless, Charlie Vaughn, Tina Jimerson and John Brown are innocent."  (Tr. 67-68)  Early maintained he was innocent of the crime he was convicted of, which was being an accomplice, noting instead that he could not be an accomplice to a crime he committed himself.  (Tr. 79)  He thinks the Innocence Project began working with him in 2012.  (Tr. 68)

Early said he meant to tell someone about this for ten or fifteen years, but whenever he spoke to his attorney, there were other people in the room or he was on the phone.  (Tr.

58)  He said his attorneys at the Innocence Project were preparing to file a motion on his

behalf to have the DNA retested, and he did not want them to spend more money on that.

*Id.*  He knew that his DNA would match.  (Tr. 77-78)  Once he got the motion, he called

his attorney, and when he reached her, he told her that he had raped and killed Ms. Holmes.

(Tr. 60)  He then said he wanted to speak to his mother.  (Tr. 62)  The next time his attorney

came to see him, he signed an affidavit on December 21, 2015, describing how he had

raped and murdered Ms. Holmes.  (Tr. 62-63)  Jimerson testified that she learned of Early's

confession in January 2016, when her lawyer sent her the affidavit.  As a result of Early's

confession, Jimerson's counsel filed a Motion to Amend/Correct Petition for Writ of

Habeas Corpus on January 26, 2016, to add a free-standing claim of actual innocence.

(Doc. No. 15)

   Other Evidentiary Hearing Testimony

   *A.  Private Investigator Mike Earley*

   Private Investigator Mike Earley testified that he had known Ms. Holmes personally

and had been asked by her family to investigate the murder.  (Tr. 182)  He said he began

his investigation four or five months after her death.  (Tr. 189)  Investigator Earley agreed

to handle the investigation for $5,000 of the $7,500 reward offered.  (Tr. 183)  He

confirmed that he collected the reward.  (Tr. 196)  Earley testified that he used informants,

Taura Bryant and Darrell Jenkins, to help him in the investigation.  (Tr. 183)  Both Bryant

and Jenkins are now deceased.[6]  (Tr. 184)  Investigator Earley also said that he had talked

---

[6] At trial, Investigator Earley said he started investigating on his own 4-5 days after the murder and that is when he found Myrtle Holmes's car key; his connection to Bryant and Jenkins was not disclosed at trial, and he was not asked nor did he testify at trial that Vaughn had made an admission.

to Vaughn during the investigation at either the Dallas County Jail or Fordyce Jail and asked Vaughn about the crime scene. (Tr. 188)  According to Investigator Earley, Vaughn admitted to being involved. (Tr. 188)

### B.  Petitioner Tina Jimerson

Jimerson testified that, at the time of the murder, she knew Brown socially and that she knew Early and Vaughn but did not consider them friends. (Tr. 126)  She explained that Early's half-brother's father is married to her sister, but she does not consider him a relative. (Tr. 126)  She again testified that she told Setterman she had given Brown a ride, but it was not in September of 1988, but rather, earlier that year--in June or July. (Tr. 136)

### C.  Co-defendant John Brown, Jr.

Brown testified that he was never at the Parsons' home with Jimerson or Early; that he did not know Levi Grandy; and that he had not been to a party at Grandy's house. (Tr. 153)  He claimed he was never in the same room with his co-defendants and Vaughn. (Tr. 154)  He said that he knew of Early but had never hung out with him.  He was not friends with Vaughn but knew of him. (Tr. 154-155)

### D.  Co-defendant Charlie Vaughn

Vaughn testified at the evidentiary hearing and said he "overdid my time." (Tr. 157-158)  He said he did not commit the crime but pled guilty because he was "real young" then. (Tr. 158)  He explained that he did not believe he would do a life sentence when he pled guilty. (Tr. 160)  He also testified that he quit school in the tenth grade and had been in regular and special education classes. (Tr. 161)  It was apparent during the evidentiary

hearing that Vaughn was illiterate, as he could not read exhibits he was asked to read during the hearing.  (Tr. 162)

## III.    STANDARD OF REVIEW

A district court has jurisdiction to entertain a petition for a writ of habeas corpus on behalf of a prisoner in custody pursuant to a state court judgment.  28 U.S.C. § 2254(a). The only issue the district court may consider is whether a prisoner is in custody "in violation of the Constitution or laws or treaties of the United States."  *Id.*

A prisoner must file the petition for a writ of habeas corpus within one year after the state court judgment "became final by the conclusion of direct review or the expiration of the time for seeking such review" unless one of the statutory exceptions apply.  28 U.S.C. § 2244(d)(1)(B)-(D) (explaining that the limitations period will be tolled in situations where the state impeded relief, new constitutional rights were created by the Supreme Court, or newly discovered facts underpin the claim).  While a properly filed application for State post-conviction relief or other collateral review is pending, the time "shall not be counted toward any period of limitation under this subsection."  *Id.* at (d)(2).  If a prisoner was convicted before the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), the prisoner had until April 24, 1997, to file a habeas petition.  *Ford v. Bowersox*, 178 F.3d 522, 523 (8th Cir. 1999).

Even when the statutory exceptions do not apply to a petitioner's claim, the statute of limitations for filing a petition for a writ of habeas corpus can be tolled for equitable reasons.  *Holland v. Florida*, 560 U.S. 631, 645 (2010).  A "petitioner is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and

(2) that some extraordinary circumstance stood in his way' and prevented timely filing."

*Id.* at 549 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

A tenable actual innocence claim is not barred by the statute of limitations. *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013). The Supreme Court has yet to determine whether a freestanding actual innocence claim would render unconstitutional a conviction and sentence that is otherwise free of constitutional error. *Dansby v. Hobbs*, 766 F.3d 809, 816 (8th Cir. 2014). The Court has established, however, that if such a claim were recognized, the threshold would be "extraordinarily high," *id.*, and "rare," *McQuiggin v. Perkins*, 133 S.Ct. at 1928. To prove actual innocence, a petitioner would have to prove that, in light of new evidence, "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 133 S.Ct. at 1928 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). Evidence is new only if it was unknown to petitioner at the time of the trial; due diligence would not have uncovered the evidence; the evidence is material; and the emergence of the new evidence would probably have led to an acquittal. *United States v. Baker*, 479 F.3d 574, 577 (8th Cir. 2007). The new evidence must be "reliable" and not available at trial through the exercise of due diligence. *Schlup v. Delo*, 513 U.S. at 324; *McQuiggin v. Perkins*, 133 S.Ct. at 1935.

## IV.   ANALYSIS

Ms. Jimerson asserts three grounds for relief in her amended petition for a writ of habeas corpus. Those claims are that: (1) she was denied due process of law under the United States Constitution where police were aware of exculpatory or impeaching evidence but neither the police nor the prosecution disclosed evidence to her or to her attorney prior

to trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) she was denied due process of the law under the United States Constitution where police, acting in bad faith, destroyed evidence that could have exculpated her, in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1988); and (3) in light of newly discovered compelling evidence of her actual innocence that was unavailable at the time of trial and could not have been discovered before December 2015 with the exercise of due diligence, her continued incarceration violates the Eighth and Fourteenth Amendments to the United States Constitution.  (Doc. No. 15-1, Amended Petition for Writ of Habeas Corpus)

### A. Timeliness and Due Diligence

Respondent argues that Jimerson's petition should be dismissed as time barred.  As noted, under Title 28 U.S.C. § 2244(d)(1), habeas petitioners have one year from the latest of four triggering events to file an application for habeas relief in federal court. 28 U.S.C. § 2244(d)(1).  Two of these triggering events are relevant here.  First, AEDPA's limitations period may start to run from the date on which the relevant "judgment became final by the conclusion of direct review or [at] the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  Second, the limitations period may start to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2241(d)(1)(D).  Under either event, the limitations period is tolled while properly filed applications for state post-conviction relief or other collateral review with respect to the pertinent judgment or claim are pending. 28 U.S.C. § 2244(d)(2).  Petitioners, like Jimerson, whose convictions were final before the effective date of the AEDPA—April 24, 1996—has one year from that date, or until

April 24, 1997, to file a federal habeas petition.  *See Moore v. United States*, 173 F.3d 1131, 1135-36 (8th Cir. 1999).

Because Jimerson's conviction became final before the AEDPA's effective date, she had until April 24, 1997, to file her petition absent any state post-conviction relief or other collateral review.  Jimerson admittedly did not seek further review after direct appeal until she filed this federal habeas petition on June 30, 2015.  (Doc. No. 15-1, at 2) Therefore, the petition is untimely as Respondent contends unless an exception applies. Respondent avers that the exception found in section 2244(d)(1)(D) does not help Jimerson because she has not demonstrated, through the exercise of due diligence, that she could not have discovered the facts earlier.  (Doc. No. 7, at 5)  Petitioner asserts that her claims are not time barred because the facts underlying her claims were not known to her until recently.  (Doc. No. 14, at 5)

For the factual predicate provision of 2244(d)(1)(D) to apply, a petitioner must use due diligence.  The "test of due diligence under section 2244(d)(1)(D) is objective, not subjective."  *Wood v. Spencer*, 487 F.3d 1, 5 (1st Cir. 2007).  Section 2244 does not require "the maximum feasible diligence but only 'due, or reasonable diligence.'" *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004) (citing *Wims v. United States*, 225 F.3d 186, 190 n.4 (2d Cir. 2000)).  As the United States Supreme Court has explained, "diligence can be shown by prompt action on the part of the petitioner as soon as he is in a position to realize" that he should act.  *Johnson v. United States*, 544 U.S. 295, 308 (2005); *see also Penn v. Norris*¸ 2007 WL 914208, at *3 (E.D. Ark. Mar. 22, 2007) ("Due diligence requires that 1) the defendant be unaware of the fact at the time of trial; 2) he could not have, in the exercise

of due diligence, presented the fact at trial; or 3) upon discovering the fact, did not delay bringing the petition."); *Wilson v. Beard*, 426 F.3d 653, 662 (3d Cir. 2005) (held petitioner had not failed to act with due diligence to learn of the factual predicate for his claim when he did not personally learn of the prosecutor's allegedly unlawful actions until his attorney notified him in prison); *see e.g., Small v. Miller*, 2003 WL 22801332, at *2 (S.D.N.Y. Nov. 25, 2003) (holding that the limitations period under AEDPA began to run after the petitioner's investigator interviewed the person who found the victim and the petitioner's trial attorney informed the petitioner that they had never received the police report regarding this person).   The Tenth Circuit Court of Appeals determined that the "due diligence" requirement should be considered in light of a habeas petitioner's confinement in prison and any special restrictions that incarceration might impose on such a person. *See Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir. 2000).   The timeliness calculation under § 2244(d)(1)(D) requires "claim-by-claim consideration," meaning that, if applicable, the provision would not make this habeas petition timely as to *all* claims raised, but only as to the claims based solely on the newly discovered facts." *Gillum v. Norris*, 2007 WL 1442683 (E.D. Ark., May 16, 2007) (citing *Pace v. DiGuglielmo*, 544 U.S. at 416 n.6 (2005)) (emphasis in original).   Thus, the Court must consider each of the "factual predicates" identified by petitioner in support of her argument for the application of section 2244(d)(1)(D).

Under section 2244(d)(1)(D), the "factual predicate of claims are the 'vital facts underlying those claims.'" *Martin v. Fayram*, 849 F.3d 691, 696 (8th Cir. 2017) (citing *Earl v. Fabian*, 556 F.3d 717, 725 (8th Cir. 2009) (quoting *McAleese v. Brennan*, 483 F.3d

206, 214 (3rd Cir. 2007)).  "The facts vital to a habeas claim are those without which the claim would necessarily be dismissed under Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts (requiring a district judge to dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petition is not entitled to relief") or Rule 12(b)(6) of the Federal Rules of Civil Procedure (allowing for dismissal of a civil complaint where the plaintiff has "fail[ed] to state a claim upon which relief can be granted")."  *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012).

"Knowledge of the 'vital facts' of a claim may be distinct from knowledge of their 'legal significance,' *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000), or from evidence used to support the claim, *see Earl*, 556 F.3d at 726."  *Martin v. Fayram*, 849 F.3d at 696. There is admittedly some "tension" as to when the factual predicate has ripened.  The Sixth Circuit has acknowledged the tension between AEPDA's requirement that a petition contain enough factual plausibility and its requirements, under Section 2244(d)(1)(D), that a petition be filed within one year of discovering vital facts that support a claim.  In *Jefferson v. United States*, 730 F.3d 537, 547 (6th Cir. 2013), the Sixth Circuit recognized, but declined to interpret, the legal quandary as to when the statute of limitations starts to run, noting that "[w]ithout a clear standard, it is likely that when a prisoner spends a tremendous amount of time establishing the validity of the facts, a court may find that the initial piece of uncorroborated information would be deemed a 'factual predicate' to start the statute-of-limitations period; if, however, a prisoner instead chooses to submit an application with the same piece of 'raw' information, it may fail the fact pleading requirement."  *Jefferson v. United States*, 730 F.3d at 547-48.  This situation can "create a

trap that renders litigation of a successful claim effectively impossible." *Id.*; *see also Bing v. United States*, 2014 WL 4206193, at *3 n.2 (M.D. Fla., August 25, 2014) (trap potentially created where "the vital facts may be insufficient by themselves to satisfy the fact-pleading requirement"). A district court in Michigan has held, however, that "it is the actual or putative knowledge of the pertinent facts of a claim that starts the clock running on the date on which the factual predicate of the claim could have been discovered through due diligence, and the running of the limitations period does not await the collection of evidence which supports the facts, including supporting affidavits." *Redmond v. Jackson*, 295 F.Supp.2d 767, 772 (E.D. Mich. 2003).

Similarly, according to the Fifth Circuit Court of Appeals, Section 2244(d)(1)(D) does not apply to those who "sleep on their rights." *Fisher v. Johnson*, 174 F.3d 710, 715 & n.14 (5th Cir. 1999). Nor does Section 2244(d)(1)(D) "convey a statutory right to an extended delay. . . while a habeas petitioner gathers every possible scrap of evidence that might, by negative implication, support his claim." *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998); *see also In Re Young*, 789 F.3d 518, 528 n.3 (5th Cir. 2015) (Section 2244(d)(1)(D) runs from "the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim"); *Blackman v. Stephens*, 2016 WL 777695 (N.D. Tex., Jan. 19, 2016) ("Under Section 2244(d)(1)(D), the applicable date is the date on which vital facts are first discovered, not when evidence to support those facts is first acquired."). Thus, "[i]f new information is discovered that merely supports or strengthens a claim that could have been properly stated without the discovery, that information is not a 'factual predicate' for

purposes of triggering the statute of limitations under § 2244(d)(1)(D)." *Rivas v. Fischer*,

687 F.3d at 535.

### *Factual predicate supporting Brady and Youngblood claims*

The applicable timeline related to the factual predicate for these claims is as follows:

- 2013 - Jimerson's habeas counsel began working on Jimerson's case.

- January 7, 2014, hired private investigator Stimis traveled to Fordyce and noticed that Donny Ford, the sheriff of Dallas County at the time of Jimerson's trial, was still in office.  Stimis asked to speak with Ford, and Ford agreed.  During the conversation with Ford, Stimis learned of an informant in the Holmes murder investigation.  According to Stimis, Ford mentioned that the informant was given a recording device to record conversations with co-defendant Vaughn.  Ford did not provide the name of the informant, but he did relay to Stimis that the recordings no longer existed, having been either destroyed or lost.  Ford indicated to Stimis that he thought the recorded conversations could not be used at trial.

- January 27, 2014, Stimis submitted a Freedom of Information Act (FOIA) request to the Arkansas State Police (ASP) for their files on the Holmes investigation.

- February 18, 2014, the ASP provided Stimis with the file that contained over 210 pages of redacted documents.  Included in the file was a one-page report stating that police had interviewed a man named Ronnie Edward Prescott on March 24, 1991.  The report identified Prescott, not as an inmate, but as the owner/operator of "TP-Tans U."  (Doc. No. 44, Joint Stipulation 1)  There was no indication from the report as to where the interview took place, what the interview was about, or what Prescott's relation was to the case.  It indicated that a handwritten statement was taken from Prescott and was to be made part of the file.  The statement was not included in the documents received as part of the FOIA request.

- June 2014, Jimerson's counsel located Prescott and reached him by phone at a federal prison in South Carolina.

- July 11, 2014, counsel traveled to the prison to meet Prescott, who executed an affidavit outlining his recollection of his participation in the Holmes investigation.

- January 7, 2015, Jimerson's counsel met with Captain Steven Coppinger at ASP Headquarters. (Doc. No. 44, Joint Stipulation 2) It was there, and for the first time, that counsel saw a handwritten statement bearing Prescott's signature, dated March 24, 1991, and co-signed by Ronnie Poole and ASP Lieutenant Jerry Bradshaw, who is now deceased. The statement did not reference that Prescott recorded any conversations with co-defendant Vaughn. At the evidentiary hearing, Prescott did not recall signing the statement but acknowledged he may have done so. (Tr. 16-17) Prescott noted that, in 1991, he would not have been able to read that statement and that he could barely make out the writing on the day of the evidentiary hearing. (Tr. 27)

- April 1, 2015, Stimis contacted Poole to find out more about the informant. While Poole recalled being in the car with Ford and Prescott on Prescott's transport from Texas, he did not meet with or discuss anything further with Stimis. (Tr. 109-110)

- April 26, 2015, Jimerson's trial counsel, William Howard signed a statement confirming that he knew nothing about a jailhouse informant or tape recorded conversations.

- June 20, 2015, after receipt of this affidavit, Jimerson's habeas counsel filed her federal petition for writ of habeas corpus on this day.

Jimerson contends that she filed her federal habeas petition within one year of when the necessary facts to establish her claims were, or could have been, discovered by her through the exercise of due diligence. (Doc. No. 59 at 31) Jimerson attests that she had no reason to suspect that an informant played any role in the Holmes investigation or that an informant had spoken to co-defendant Vaughn. Her trial counsel twice asked for disclosure of any informants or offers/inducements made to any informants, and the prosecution stated there were none. (Doc. No. 15-1 at 86-99) Specifically, then deputy prosecuting attorney Robin F. Wynne provided: "State of Arkansas has no knowledge of any informant who led to or assisted in making the arrest in this matter. Reference has

34

been made to a person identified as "Sam", but Defendant's attorney has already been advised that "Sam" is one and the same person as Taura Bryant;" "State of Arkansas had made no offers of immunity, leniency, sentence or charge concessions, or other inducements that have been made to any Co-Defendant, potential witness or informant other than the offer made to Co-Defendant Charlie Vaughn above." *Id.* at 97-98. Jimerson also argues that it appears the tape recordings never made it to the prosecutor's file and that, even with the prosecutor's open-file policy, trial counsel was not required to examine the file after the prosecution's response to discovery told counsel there was no informant or tape recordings. Further, Jimerson claims, even if the prosecutor's file had contained the ASP report about an interview with Prescott, the report did not explain who he was, why the police had interviewed him, that co-defendant Vaughn was secretly tape recorded, or that Prescott's pending charges were dismissed in exchange for his assistance in the Holmes investigation. Jimerson argues that, in order to comply with the habeas rules and withstand summary dismissal, she needed to allege facts in her petition that supported all elements of her claims. According to Jimerson, those necessary facts were not garnered until she determined on April 26, 2015, that her trial counsel knew nothing about an informant or any tape recordings.

Respondent contends that Petitioner did not act with due diligence. She avers that there is no allegation that anyone involved in the investigation deliberately hid anything from her or that they were uncooperative; thus, "had Jimerson diligently investigated her case before trial, or any time in the last twenty (20) years, she would have easily discovered the Arkansas State Police files, which, in turn, would have alerted her to the existence of

Prescott." (Doc. No. 58 at 12)  Respondent argues that, not only was the information about Prescott's involvement in Vaughn's confession available at any time after her conviction, but also that it was discoverable before trial, had trial counsel taken advantage of the prosecutor's open-file policy and reviewed the case files.  *Id.* at 13.  Moreover, Respondent contends trial counsel had ample opportunity to question Ford and any others involved in the case before trial, including Bob Remitt, Vaughn's attorney or counsel for the other co-defendants.

Alternatively, Respondent contends the factual predicate of her *Brady* and *Youngblood* claims was discovered on January 7, 2014, when Stimis spoke with Ford, yet Jimerson waited until June 20, 2015, to file her federal habeas petition. *Id.* at 11, 15. Respondent also notes that Stimis received the FOIA information in February 2014, and that the file contained the "official memorandum dated March 25, 1991, which referred to an interview with Prescott on March 24, 1991, and referred to a handwritten statement taken from Prescott." *Id.* at 12. Respondent takes the position that the dates of the affidavits have no legal significance under section 2244(d)(1)(D) because the pertinent date is that on which the facts underlying the claim were discoverable.

This case is troubling on many levels, but most of those issues are not before this Court.  Respondent's argument that the factual predicate of Petitioner's claims was discoverable before trial, had trial counsel taken advantage of the prosecutor's open-file policy and reviewed the case files, is unpersuasive.  There is no question that the prosecutor's responses to trial counsel's discovery requests in this case were misleading at best, and arguably untruthful.  The police did use an informant; tape recordings with co-

defendant Vaughn talking to the informant did exist; and the informant did have pending charges against him dropped as a result of his help with the case. It was not unreasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination.  The problem here is that the prosecutor's file, for whatever reason, did not contain the tape recordings or any information that indicated they had used an informant. So whether trial counsel reviewed the file or not, nothing was there.  Because it is presumed that prosecutors will fully "discharge their official duties," *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995), it was not unreasonable for trial counsel to rely on the prosecutor's open-file policy as fulfilling the prosecution's duty to disclose exculpatory evidence. *Strickler v. Greene*, 527 U.S. 263, 263-64 (1999).  Whether the nondisclosure was inadvertent or deliberate, under *Brady*, it has the same impact on the fairness of the proceedings.  *See id.*  Likewise, it was not counsel's job to review the prosecutor's file to determine if there had, in fact, been a misrepresentation as to these matters.

According to Stimis, the FOIA request of the ASP file initially revealed a one-page report that only indicated that there was a "witness" named Ronnie Edward Prescott. (Petitioner's Ex. 6) This document did not reveal that Prescott was an informant.  Instead, the report indicated that Prescott gave a handwritten statement that would be made a permanent part of the investigative file.   This handwritten statement, according to Petitioner, was not provided with the documents provided pursuant to the FOIA request. ASP Captain Coppinger also admitted that the redacted set of documents provided to Stimis

in response to the FOIA request did not include the handwritten statement signed by Ronnie Prescott and dated March 24, 1991.  (Doc. No. 44, Joint Stipulation 1)  It was not until Jimerson's counsel met with Captain Coppinger on January 7, 2015, that this hand-written statement, which indicated Prescott's role, was produced.  (Doc. No. 44, Joint Stipulation 2)

Both the informant information and the tape recordings were *Brady* evidence because, at a minimum, Jimerson could have challenged the veracity of the investigating officers' testimony and Vaughn's statement, which was read in open court and used against Jimerson at trial.  Whether the nondisclosure was deliberate or inadvertent, Jimerson could have used this information to cast doubt on the reliability and strength of the prosecutor's case.  Jimerson had no way of knowing that this evidence existed until Investigator Stimis spoke with Sheriff Ford.  "*Brady's* requirements of disclosure apply to 'impeachment evidence as well as exculpatory evidence,' apply even if the accused does not ask for the evidence, and apply regardless of the good faith of or even knowledge of the prosecution that police have the evidence."  *Willis v. Jones*, 329 Fed Appx. 7, at *7 (6th Cir. 2009) (quoting *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999)).[7]  *See also United States v. Pendleton*, 832 F.3d 934, 940 (8th Cir. 2016) (quoting *Brady*, 373 U.S. at 87) ("Under *Brady v. Maryland*, 'suppression by the prosecution of evidence favorable to an accused .

---

[7] In *Strickler*, the Supreme Court held that the habeas petitioner had shown cause to excuse procedural default of his *Brady* claim because, where the petitioner had no reason to believe at the time of trial that the state had withheld *Brady* evidence, the petitioner was entitled to rely on the state's duty to disclose. *Strickler*, 527 U.S. at 287.

. . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'")

The problem for Jimerson here, however, is the crucial issue of when the "factual predicate" could have been discovered through the exercise of due diligence. *See* 28 U.S.C. § 2244(d)(1)(D). Even if the documents on which Jimerson relies could have been discovered only through a review of the ASP file, the Court must determine when that file could have been obtained through the exercise of due diligence. In evaluating a petitioner's diligence, the Court must be mindful that the "statute's clear policy calls for promptness." *Johnson v. United States*, 544 U.S. 295, 311 (2005).[8] The statute does not allow for an extended delay to collect every possible piece of evidence that might support the claim. This Court is not persuaded by Jimerson's assertion that she could not have discovered the informant or tape recordings sooner. She fails to demonstrate that they could not have been discovered prior to January 7, 2014, through the exercise of due diligence. It was incumbent upon Jimerson to file her habeas petition as soon as she discovered that exculpatory information had been withheld at trial. Jimerson has not shown anything that would have prevented her from protectively filing her petition and amending it later as additional information became available. It is Jimerson's burden to demonstrate due diligence under section 2244(d)(1)(D), and she fails to satisfy this burden. Thus, the Court

---

[8] In *Johnson*, the petitioner sought a belated commencement of the limitation period to file a § 2255 motion until the date that he successfully invalidated a prior state court conviction that had been used to enhance his federal sentence. 544 U.S. at 398-301. The Supreme Court noted that the petition had not exhibited the requisite diligence where he waited over twenty-one months after his federal conviction became final before he challenged "the predicate for enhancement by filing his state habeas petition." *Id.* at 311. The Supreme Court observed that the petitioner's pro se status and "procedural ignorance" were no excuse for his "prolonged inattention." *Id.*

is unable to conclude that Jimerson could not have discovered the information earlier through the exercise of due diligence.  Moreover, even if the Court were to find due diligence, Jimerson's claims are still untimely.  Jimerson discovered the factual predicate for her claims on January 7, 2014, when Ford told Stimis about the informant and tapes. Jimerson had one year from that date to file her claims, and she did not.

### B.  Procedural default

Jimerson's claims are also procedurally defaulted. A habeas petitioner who cannot present her federal claims in state court due to untimeliness or some other state procedural hurdle meets the technical requirements for exhaustion because there are no longer any state remedies available to her. *Grass v. Reitz*, 643 F.3d 579, 584 (8th Cir. 2011) (citing *Coleman v. Thompson*, 501 U.S. 722, 732 (1991)). "However, that petitioner's procedural default may constitute an 'independent and adequate state ground' barring federal habeas relief absent a showing of either cause and prejudice or actual innocence." *Id.* (internal citations omitted). "[W]e ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.,* whether he has fairly presented his claims to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). To meet this fair presentation requirement, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845. "A failure to exhaust remedies properly in accordance with state procedure results in procedural default of the prisoner's claims." *Welch v. Lund*, 616 F.3d 756, 758 (8th Cir. 2010) (citing *O'Sullivan*, 526 U.S. at 848).

Petitioner failed to present any of her arguments for one *complete* round of review by the state courts; therefore, her claims are procedurally defaulted. To overcome this procedural default, Jimerson claims that she is actually innocent. (Doc. No. 59 at 40)  She also claims to meet the cause and prejudice standard.  *Id.* at n.5.  Review of procedurally defaulted claims by a federal court is permissible only if Jimerson is able to establish cause to excuse the default and prejudice resulting from the alleged constitutional violation. *Strickler v. Greene*, 527 U.S. 263, 282 (1999).   To excuse default, a petitioner must show both cause and actual prejudice.  *United States v. Frady*, 456 U.S. 152, 167 (1982).

### 1.  Cause and Prejudice

Jimerson submits that default is excusable and that she can satisfy cause because the State of Arkansas suppressed exculpatory evidence in violation of *Brady* and destroyed evidence in bad faith in violation of *Youngblood*. (Doc. No. 14, at 12)  Further, Jimerson avers that she suffered actual prejudice because the State of Arkansas withheld evidence that it obtained a co-defendant's confession through a police informant and withheld material details of the confession.  *Id.* at 13.  Jimerson believes that, had she been allowed to present the evidence about the interview between Vaughn and Prescott, the jury would have evaluated Vaughn's confession differently.  *Id.* at 14.  Jimerson states that, because Vaughn's confession was the only evidence directly tying her to the murder, the jury would have been far less likely to convict her had the State disclosed that it obtained Vaughn's confession through a jailhouse informant who talked about the death penalty with Vaughn

and received favorable treatment in exchange for eliciting Vaughn's confession. *Id.* at 14-15.

Beyond her problem in establishing "cause," Jimerson cannot show that she has suffered actual prejudice. A petitioner suffers actual prejudice from a *Brady* violation sufficient to overcome procedural default when the evidence suppressed meets the *Brady* materiality standard. *Banks v. Dretke*, 540 U.S. 668, 698 (2004). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner et al. v. United States*, ___ U.S. ____, ____ , 137 S.Ct. 1885, 1893 (June 22, 2017). Thus, the undersigned must "examine the trial record, evaluate the withheld evidence in the context of the entire record, and determine in light of that examination whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* (internal citations omitted). Having done so, the undersigned concludes that there was no such reasonable probability.

The defendants maintained that they were not together on the night of the Holmes murder. Circumstantial evidence of record, however, places Jimerson with her co-defendants on several occasions. At trial, Lee Parsons testified to seeing Jimerson with Brown, Early, and Vaughn on days surrounding the crime, although he could not pinpoint the exact day. He said Brown came to his home and seemed to be in a hurry. Lee Parsons said Brown was wearing clothes that appeared to have blood on them and that he later washed those bloody clothes and wore them. Lee's brother, Kenny Parsons, also testified

that, the night before he learned about the murder, Jimerson, Brown, Early, and Vaughn pulled up to his home in a car that Jimerson was driving and that Brown had blood on his clothes, claiming to have been in a fight.  Taura Bryant put Jimerson, Brown, and Early together at Levi Grandy's house on the evening before the murder.  Bryant placed all the defendant's together the next evening at Grandy's house, testifying that she heard Vaughn saying he had robbed Holmes.

Based on the foregoing, the undersigned cannot say that there is a reasonable probability that, had Ronnie Prescott and Vaughn's taped recordings been disclosed, the result of the proceeding would have been different.

### 2.  *Actual Innocence*

There is a difference between a "gateway claim" and a "freestanding claim" of actual innocence.  *See House v. Bell*, 547 U.S. 518 (2006).  Jimerson presents both arguments in her Brief.

#### a.  Gateway Innocence

To invoke the "fundamental miscarriage of justice" exception to showing cause and prejudice for a defaulted claim, Jimerson must "present new evidence that affirmatively demonstrates that [she] is innocent of the crime for which [she] was convicted." *Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006).  "[A] claim of 'actual innocence' is . . . a gateway through which a habeas petitioner must pass to have her otherwise barred constitutional claim considered on the merits." *Mansfield v. Dormire*, 202 F.3d 1018, 1024 (8th Cir. 2000) (internal citations omitted).  To successfully pursue a claim of actual innocence,

Jimerson must show (1) new reliable evidence not available at trial, and (2) that, "more likely than not" no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995); *see also Storey v. Roper*, 603 F.3d 507, 524 (8th Cir. 2010). "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup v. Delo*, 513 U.S. at 329. Diligence and the timing of a petition are also considered in determining whether the petitioner has made a convincing showing of actual innocence. *McQuiggin v. Perkins*, 133 S. Ct. at 1936.

Jimerson claims no reasonable juror would have found her guilty had Reginald Early's confession been available at the time of trial; likewise, she claims Vaughn's confession is incredulous, calling into question his guilty plea and his account of the murder. The "new evidence" relied upon here does not affirmatively demonstrate Jimerson's innocence. Moreover, the timing of Early's confession is questionable. Early professed his innocence up until November 2015. The Innocence Project accepted his case and filed a motion on his behalf for DNA testing. Only then did Early, instead of claiming innocence, confess and take sole responsibility for the rape and murder of Holmes. Early executed an affidavit admitting guilt on December 21, 2015. "Experience has shown, however, that such affidavits are to be treated with a degree of skepticism." *Herrera v. Collins*¸506 U.S. 390, 423 (1993) (O'Connor, J., concurring); *Hall v. Lockhart*, 806 F.2d 165, 168 (8th Cir. 1986). Taking into consideration the totality of the circumstances, the undersigned is not convinced that a reasonable, properly instructed jury would have found

Jimerson not guilty had this information been available at trial.   There was ample circumstantial evidence presented at trial that put Jimerson in the company of her co-defendants around the time of the Holmes murder.  Witnesses testified as to what they saw, who they saw, and Jimerson's reactions and statements when the Holmes murder was brought up.

> b.  Free Standing Innocence

Jimerson avers that she also has a cognizable freestanding actual innocence claim. (Doc. No. 59 at 51)   The Court assumes, without deciding, that actual innocence is a freestanding constitutional claim. The Supreme Court has stated, "we have not yet resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins,* 133 S.Ct. at 1931 (2013) (citing *Herrera v. Collins,* 506 U.S. 390, 404–05 (1993)). If such a claim were recognized, the threshold would be "extraordinarily high." *Dansby v. Hobbs,* 766 F.3d 809, 816 (8th Cir. 2014) (quoting *Herrera v. Collins*, 506 U.S. at 417 (1993)). "The threshold, if it exists, would require 'more convincing proof' than the 'gateway' standard that allows for consideration of otherwise defaulted constitutional claims upon a showing of actual innocence." *Id.* (quoting *House v. Bell,* 547 U.S. at 555).   Thus, on a freestanding claim of actual innocence, it is not sufficient that a petitioner shows even that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Schlup v. Delo*, 513 U.S. at 327.   The "extraordinarily high" threshold, if recognized, would be even higher. *House v. Bell*, 547 U.S. at 555.

Even applying the lower gateway claim burden of proof required by *Schlup*, Jimerson has failed to allege that there is newly discovered evidence sufficient to establish her innocence.  Therefore, it is fruitless to apply the higher free-standing claim discussed in *Herrera*.  Furthermore, recantations likely have a minimal impact on a reasonable juror; therefore, Early's confession does not establish that "more likely than not" that no reasonable juror would have found Jimerson guilty beyond a reasonable doubt, as required under the lesser, gateway claim of actual innocence.  Consequently, Jimerson could not establish her innocence under the higher standard required with a freestanding claim. *Dansby v. Hobbs*, 766 F.3d at 816.

### C.  Equitable Tolling

In the interest of thoroughness and fairness, the Court also considered whether equitable tolling should be applied on the present record.  Equitable tolling is available to save an untimely habeas claim "only when extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time" or when the respondent lulled the petitioner into inaction.  *Jihad v. Hvass*, 267 F.3d 803, 805 (8th Cir. 2001) (quoting *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000); *see also White v. Dingle*, 616 F.3d 844, 847 (8th Cir. 2010) ("Under the doctrine of equitable tolling, the AEDPA's statutory limitations period may be tolled if a petitioner can show that (1) he has been diligently pursuing his rights and (2) an extraordinary circumstance stood in his way.").  "[A]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000).

Here, there is nothing to suggest that Jimerson is eligible for equitable tolling. She simply was not diligent in acting to protect her right to federal habeas review. The Arkansas Supreme Court affirmed Jimerson's convictions in 1994, and she did not seek post-conviction relief in state court. Not until June 30, 2015, some twenty years later, did Jimerson file this federal habeas petition. She has not provided any reason for the lengthy delay. Unexplained delays do not evince due diligence or rare and extraordinary circumstances. *See Pace v. DiGuglielmo*, 544 U.S. at 419 (petitioner was not diligent when he waited five months after the judgment of conviction became final to file his petition); *Earl v. Fabian*, 556 F.3d 717 (8th Cir. 2009) (while petitioner alleged he did not receive notice that his judgment of conviction had become final until approximately seven months after the decision was rendered, he still had a span of approximately eight months to file his habeas petition, and thus, he was not entitled to equitable tolling).

## V.   CONCLUSION

Based on the foregoing, the undersigned recommends that the instant writ of habeas corpus be denied and dismissed with prejudice.

## VI.   CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, the Court must determine whether to issue a certificate of appealability in its final order. In § 2254 cases, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). The Court finds no issue on which Jimerson has made a substantial

showing of a denial of a constitutional right. Thus, the district court should not issue a certificate of appealability.

      IT IS SO ORDERED this 10th day of August, 2017.

                                                _____
                                                UNITED STATES MAGISTRATE JUDGE