**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**TINA JIMERSON,**                                                                    **PETITIONER**
**ADC #704449**

**VS.**                               **CASE NO. 5:15CV00208 BSM-JTK**

**WENDY KELLEY, Director,**
**Arkansas Department of Correction**                               **RESPONDENT**

**PETITIONER'S OBJECTIONS TO MAGISTRATE JUDGE'S**
**PROPOSED FINDINGS AND RECOMMENDATIONS**

Comes now the Petitioner, Tina Jimerson, by and through counsel, Karen L. Daniel and

Andrea L. Lewis of the Bluhm Legal Clinic, Northwestern Pritzker School of Law, and submits

the following Objections to the Magistrate Judge's Proposed Findings and Recommendations.

## **INTRODUCTION**

As the Magistrate Judge recognized, "This case is troubling on many levels . . . ." (Doc.

61 at 36.) Tina Jimerson reported a sexual assault to authorities in 1989, and consequently ended

up a suspect in an unrelated murder that she did not commit. (R. 1010; Tr. 130-134.) The State

filed false discovery answers and the police lost or destroyed critical evidence. (Doc. 61 at 33,

36; Tr. 130-35.) Jimerson's conviction was based on statements of a mentally challenged co-

defendant, Charlie Vaughn, which he disavowed at trial and uttered at a time when he feared the

death penalty—in part due to urging by an undisclosed informant. (Doc. 61 at 10-11, 17.)

Recently, a mentally sound co-defendant with nothing to gain, Reginald Early, admitted sole

responsibility for the crime and provided a chilling in-court confession that comports with the

physical evidence in the case, unlike Vaughn's recanted statements. (Tr. 34-79.)

The State of Arkansas has no statutory remedy for Jimerson's recently discovered due process claims or the newly discovered evidence of her innocence. Surely, this is the type of case that this Court, which is charged with ensuring that state prisoners' constitutional rights are protected, should decide on the merits. Moreover, this is the extremely rare case where a petitioner deserves relief from the federal courts based on a freestanding claim of her actual innocence. For the reasons stated herein and in her post-hearing brief (Doc. 59), Jimerson objects to the Magistrate Judge's recommendation that her petition be denied. (Doc. 61 at 47.)

In response to the Magistrate Judge's proposed findings, Jimerson now presents two additional pieces of evidence for the District Judge's consideration, both of which are discussed further below. Attached as Exhibit 1 is a declaration from her counsel attesting to the date counsel first made contact with the previously undisclosed informant in this case; the Magistrate Judge noted in his findings that the exact date was unspecified. Attached as Exhibit 2 is a copy of an article from the *Fordyce News Advocate*, dated six days after the murder. Jimerson asks that the District Judge take judicial notice of the publication of that article and its discussion of the Holmes murder, in accordance with FED. R. EVID. 201, in light of the Magistrate Judge's discussion of Vaughn's confession.

## SUMMARY OF OBJECTIONS

Jimerson objects to the following findings by the Magistrate Judge. Each objection is discussed in more detail in the Argument section below.

1.     The Magistrate Judge erred in finding that Jimerson discovered the factual predicate of her *Brady* and *Youngblood* claims on January 7, 2014. (Doc. 61 at 40.) In actuality, she did not discover the complete factual predicate of her *Youngblood* claim until January 7, 2015, and she did not discover the complete factual predicate of her *Brady* claim until April 26,

2015. The Magistrate Judge further erred in finding that Jimerson could have, through due diligence, discovered the factual predicate of her *Brady* and *Youngblood* claims at some earlier time. (Doc. 61 at 39.) Therefore, Jimerson's habeas filing on June 20, 2015 was timely. (*See infra* pp. 4-11.)

2.      The Magistrate Judge suggested erroneously that Jimerson should have "protectively" filed her habeas petition after discovering facts supporting some but not all necessary elements of her *Brady* and *Youngblood* claims. (Doc. 61 at 39.) No statutory language or case law supports such a conclusion. (*See infra* pp. 11-12.)

3.      Jimerson's claims are procedurally defaulted because Arkansas has no suitable statutory post-conviction remedy. Jimerson established cause and prejudice to excuse her procedural default, however, and she objects to the Magistrate Judge's finding to the contrary. (Doc. 61 at 42-43.) (*See infra* pp. 12-18.)

4.      The Magistrate Judge erred in finding that Jimerson did not present sufficient evidence of actual innocence under the *Schlup* gateway standard to excuse procedural default or untimeliness, where she presented a reliable third-party confession that fully exonerates her. (Doc. 61 at 43-45.) (*See infra* pp. 18-22.)

5.      The Magistrate Judge erred in finding that Jimerson failed to present enough evidence to sustain her freestanding claim of actual innocence. (Doc. 61 at 45-46.) (*See infra* pp. 22-24.)

6.      Jimerson objects to the Magistrate Judge's conclusion that equitable tolling does not apply here, where through no fault of her own she could not have filed a timely and factually sufficient petition under the Magistrate Judge's legal conclusions. (Doc. 61 at 46-47.) (*See infra* pp. 24-25.)

3

7. Should the District Court dismiss her petition, Jimerson objects to the Magistrate Judge's recommendation against a certificate of appealability, particularly where the Magistrate Judge recognized there was a *Brady* violation. (Doc. 61 at 47-48.) (*See infra* pp. 25-28.)

8. The Magistrate Judge's proposed findings relating to Jimerson's constitutional claims omit certain relevant facts and misstate others. (*See infra* pp. 28-34.)

## ARGUMENT

**I.** **Jimerson discovered the factual predicate of her *Youngblood* and *Brady* claims on January 7, 2015, and April 26, 2015, respectively, and could not have discovered the factual predicate sooner through the exercise of due diligence. Her habeas filing on June 20, 2015, was therefore timely.**

Under 28 USC § 2244(d)(1), a state prisoner must file a federal habeas petition within one year of the latest of four events, one of which is "(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." (Doc. 61 at 26, 28.)

The factual predicate of a constitutional claim under § 2244(d)(1)(D) consists of the "vital facts underlying those claims." *Earl v. Fabian*, 556 F.3d 717, 725 (8th Cir. 2009) (quoting *McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007)). In the words of the Magistrate Judge, "[t]he facts vital to a habeas claim are those without which the claim would necessarily be dismissed . . . ." (quoting *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012). (Doc. 61 at 31.)

The factual predicate that starts the § 2244(d)(1)(D) clock running must include facts suggesting the existence of *all* the elements of the constitutional claim, not just some of them. Thus, in *Hasan v. Galaza*, 254 F.3d 1150, 1154 (9th Cir. 2001), the Court of Appeals found that the district court erred in concluding that the petitioner discovered the factual predicate of his ineffective assistance of counsel claim at the time of trial. An ineffectiveness claim has two elements: unreasonable performance and resulting prejudice. *Id*. The petitioner knew at trial

4

about his attorney's failure to investigate possible jury tampering—which constituted unreasonable performance. *Id.* But the petitioner did not learn until much later the added facts a proper investigation would have revealed—which was necessary to establish prejudice. *Id.* "By looking only at the time Hasan discovered that his counsel's performance was deficient (the first prong of an ineffective assistance of counsel claim under *Strickland)*, the district court failed to consider at what point Hasan discovered (or could have discovered) that he was prejudiced as a result (the essential second prong of any such claim)." *Id.* at 1155.

Here, the Magistrate Judge made the same mistake the district court made in *Hasan*; he found that Jimerson discovered the factual predicate of her *Brady* and *Youngblood* claims on January 7, 2014. However, that was only the date on which then-Dallas County Sheriff Donny Ford unexpectedly mentioned to Jimerson's private investigator Gregory Stimis, a former Secret Service agent, that an unnamed informant had recorded jailhouse conversations with Vaughn— whose testimony resulted in Jimerson's conviction—and that the recordings no longer existed. This information suggested some of the elements of Jimerson's *Brady* and *Youngblood* claims, but not all of them. Specifically, the information Jimerson (through Stimis) learned in January 2014 did not include facts suggesting that the withheld evidence was exculpatory or material under *Brady*, or that the evidence had been destroyed in bad faith as required by *Youngblood*. Had Jimerson filed a habeas petition citing only the facts she learned in January 2014, both claims would have been subject to dismissal, as described in more detail below. Therefore, this information alone did not constitute the factual predicate of her claims.

### A.  What was the factual predicate of Jimerson's *Brady* claim and when did she become aware of it?

A *Brady* claim has three essential elements: (1) suppression by the prosecution, (2) of evidence favorable to the accused, and (3) the evidence is material to guilt or punishment. *White*

*v. Steele*, 853 F.3d 486, 490 (8th Cir. 2017). Evidence is material if there is a reasonable probability the outcome of trial would have been different had the evidence been disclosed to the defense. *Id.*

On January 27, 2014, Jimerson learned that the State (or its agent, Sheriff Ford) had suppressed information, because the State's discovery answers denied the use of an informant. (Doc. 61 at 33, 36-37.) Even so, to demonstrate completely the first *Brady* element—suppression of evidence—Jimerson still needed to ascertain from her trial counsel that he had not received this information. She obtained that confirmation on April 26, 2015, in the form of a signed statement by her trial attorney. (Doc. 61 at 34.)

Importantly, Jimerson did not learn that the evidence was favorable to her, and material, until her counsel interviewed the informant Ronnie Prescott on July 11, 2014. (Doc. 61 at 33.) Only then did she obtain the following facts about the interactions between Prescott and Sheriff Ford, and between Prescott and Vaughn: Prescott was incentivized to obtain a confession from Vaughn; Prescott knew details of the crime before speaking with Vaughn in the jail; and Prescott likely discussed the death penalty with Vaughn. (Doc. 15-1 at 10-12, admitted at evidentiary hearing as part of Petitioner's Exhibit 21[1].)

In sum, under § 2244(d)(1)(D), the one-year limitation period on Jimerson's *Brady* claim began running on **April 26, 2015**, the date on which she ascertained that *all* of the *Brady* elements had been met, including lack of disclosure to her trial attorney. Further, in no event could the one-year limitation period have begun prior to **July 11, 2014**, the date on which

---

[1] Hereafter, citations to Jimerson's evidentiary hearing exhibits will appear as "Pet. Exh. __."

Jimerson's counsel interviewed Prescott and learned the details of his account of the events in March 1991. Thus, Jimerson's petition, which was filed on **June 20, 2015**, was timely.[2]

Had Jimerson filed a petition based only on the facts she learned on January 7, 2014, it would have been dismissed. A habeas petition setting forth only the first two elements of *Brady* is subject to dismissal if there is no showing that the undisclosed evidence was material. For example, in *Collier v. Norris*, 485 F.3d 415, 422-24 (8th Cir. 2007), while the State did not contest that the petitioner had satisfied the first two prongs of the *Brady* test, the Court of Appeals affirmed dismissal of the petition because the facts of record did not support the materiality prong. *See also Clay v. Bowersox*, 367 F.3d 993, 1000 (8th Cir. 2004) (reversing district court's grant of habeas after finding the undisclosed evidence was not material).

Here, the Magistrate Judge found that the statute of limitations began to run as soon as Jimerson learned the prosecution failed to disclose the existence of an unidentified informant, who had an unspecified conversation with Vaughn and made a recording with unknown contents. (Doc. 61 at 40.) This information did not include all of the "vital facts" necessary to Jimerson's *Brady* claim; specifically, it did not establish that the suppressed evidence was favorable to Jimerson and material. Only later did Jimerson's counsel receive state police reports referencing a witness named Ronnie Prescott (with no information as to what Prescott said). And only after that did Jimerson's counsel, suspecting Prescott might be the mystery informant, interview Prescott at federal prison in South Carolina, and learn the specifics of Prescott's encounters with Ford and Vaughn. At that point, and not before, Jimerson possessed the "vital facts" establishing

---

[2] The evidence adduced at the hearing and recited in the Magistrate Judge's timeline (Doc. 61 at 33) reflects that Jimerson's counsel first made contact with Prescott, by phone, on an unspecified date in June 2014. Should this Court consider the exact date of this communication to be relevant, Jimerson's counsel states, as an officer of the court, that the conversation took place on June 24, 2014. A supporting declaration is attached to this filing as Exhibit 1.

the exculpatory-evidence and materiality prongs of the *Brady* test. Jimerson learned this

information on July 11, 2014. Even disregarding the suppression prong, Jimerson had at least

one year from that date to file her habeas petition—and she did so.

### B.  What was the factual predicate of Jimerson's *Youngblood* claim and when did she become aware of it?

The elements of a due process claim under *Arizona v. Youngblood* are: the government,

*acting in bad faith*, failed to preserve evidence potentially useful to the defendant. 488 U.S. 51,

58 (1988). Further, the evidence must have been lost or destroyed before trial. *Ferguson v.*

*Roper*, 400 F.3d 635, 638 (8th Cir. 2005).

On January 7, 2014, Jimerson learned that an informant, who she later discovered was

Prescott, recorded jailhouse conversations with Vaughn, whose statements at his 1991 guilty plea

hearing were solely responsible for her conviction. Prescott recorded these conversations using

equipment provided by Ford, who had asked Prescott to try to get Vaughn to confess. The

recordings of those conversations no longer existed. This information alone did not establish

action *in bad faith*; it suggested only that the evidence was lost or destroyed.

On January 7, 2015, however, Jimerson's counsel obtained from the ASP a handwritten

statement signed by Prescott. The statement had been withheld from a set of ASP reports

produced to investigator Stimis in February 2014 pursuant to a FOIA request. The handwritten

statement, co-signed by two police officers, purported to describe Prescott's conversations with

Vaughn. Significantly, the handwritten statement *omitted any mention of a recording or that*

*Ford had asked Prescott to attempt to elicit a confession from Vaughn*. These glaring omissions

were the first facts suggesting that the recording had been destroyed *in bad faith*. It is apparent

from the crafting of Prescott's statement—penned by a now-deceased ASP officer—that there

was a deliberate effort to hide the existence of the recording, Prescott's status as an informant, and Ford's offer of leniency in exchange for Prescott obtaining a confession from Vaughn.

Had Jimerson filed her petition in January 2014, the *Youngblood* claim would have been dismissed for failure to state facts supporting the bad-faith element of the claim. *See Tyler v. Purkett*, 413 F.3d 696, 702-03 (8th Cir. 2005) (prosecution's failure to disclose the existence of evidence, then "mysteriously" losing or destroying it, did not by itself establish bad faith; dismissal of petition affirmed).

The one-year limitation period on Jimerson's *Youngblood* claim began on **January 7, 2015**, the date on which Jimerson's counsel obtained the previously suppressed handwritten statement signed by Prescott. The Magistrate Judge's conclusion that Jimerson discovered the factual predicate of her *Youngblood* claim in January 2014 was incorrect, because Jimerson did not discover the "vital facts" supporting the bad-faith element of her *Youngblood* claim until a year later.

### C.  Jimerson could not have discovered the factual predicate of her claims sooner through the exercise of due diligence.

Without explanation, the Magistrate Judge also concluded that Jimerson could have discovered the factual predicate of her claims even before January 7, 2014, had she exercised due diligence. (Doc. 61 at 39.) Not only is this conclusion incorrect as a matter of fact and law, but it conflicts with the Magistrate Judge's earlier, correct finding that the factual predicate of her claims was *not* discoverable earlier. (Doc. 61 at 36-38.) Although the Magistrate Judge's statements on this point are lengthy, Jimerson believes it helpful to quote them here in full:

> Respondent's argument that the factual predicate of Petitioner's claims was discoverable before trial, had trial counsel taken advantage of the prosecutor's open-file policy and reviewed the case files, is unpersuasive. There is no question that the prosecutor's responses to trial counsel's discovery requests in this case were misleading at best, and arguably untruthful. The police did use an informant; tape recordings with co-defendant Vaughn talking to the informant did exist; and

the informant did have pending charges against him dropped as a result of his help with the case. It was not unreasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination. The problem here is that the prosecutor's file, for whatever reason, did not contain the tape recordings or any information that indicated they had used an informant. So whether trial counsel reviewed the file or not, nothing was there. Because it is presumed that prosecutors will fully "discharge their official duties," *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995), it was not unreasonable for trial counsel to rely on the prosecutor's open-file policy as fulfilling the prosecution's duty to disclose exculpatory evidence. *Strickler v. Greene*, 527 U.S. 263, 263-64 (1999). Whether the nondisclosure was inadvertent or deliberate, under *Brady*, it has the same impact on the fairness of the proceedings. *See id.* Likewise, it was not counsel's job to review the prosecutor's file to determine if there had, in fact, been a misrepresentation as to these matters.

(Doc. 61 at 36-37.)

Significantly, the Magistrate Judge then stated, "*Jimerson had no way of knowing that this evidence existed until Investigator Stimis spoke with Sheriff Ford.*" (Doc. 61 at 38, emphasis added.)

In other words, the Magistrate Judge appeared to conclude that Jimerson had no way of knowing about the informant and the recordings before investigator Stimis spoke with Ford in January 2014. This conclusion is correct. Stimis had a serendipitous conversation with Ford while he was in Fordyce looking for the court case file. (Tr. 101-03.) Before then, Jimerson could not have suspected that Ford had information on an undisclosed informant. Given that, one would think the Magistrate Judge would next have concluded that Jimerson's *Brady* and *Youngblood* claims could not have been discovered earlier. But he did not. Instead, the Magistrate Judge inexplicably stated, "*This Court is not persuaded by Jimerson's assertion that she could not have discovered the informant or tape recordings sooner. She fails to demonstrate that they could not have been discovered prior to January 7, 2014, through the exercise of due diligence.*" (Doc. 61 at 39, emphasis added.)

It is baffling for the Magistrate Judge first to say Jimerson was entitled to rely on the prosecution's pretrial assertions that there were no informants or recordings, then turn around and fault her for not somehow discovering this information earlier than she did. Jimerson objects to this finding by the Magistrate Judge. She could not have discovered the factual predicate of her claims sooner than she actually did through the exercise of due diligence.

## II.    No statutory or case authority required Jimerson to "protectively" file a habeas petition upon discovering facts suggesting some but not all of the necessary elements of her constitutional claims.

The Magistrate Judge said Jimerson should have filed her petition "as soon as she discovered that exculpatory information had been withheld at trial." (Doc. 61 at 39.) As explained above, such information alone was not sufficient to sustain a *Brady* claim. Jimerson also needed to establish that the withheld information was *exculpatory* and *material*, which required knowing at least something about the substance of the withheld evidence. The Magistrate Judge addressed this by stating, without citation to authority, "Jimerson has not shown anything that would have prevented her from protectively filing her petition and amending it later as additional information became available." (Doc. 61 at 39.) In other words, the Magistrate Judge suggested that Jimerson should have filed a § 2254 petition after discovering evidence supporting some, but not all, of the elements of her claims. The District Judge should reject this suggestion because it is not supported by any legal authority.

Habeas jurisprudence does urge a state prisoner to protectively file a § 2254 petition containing *a fully formed but unexhausted claim*, and then ask the federal court to stay and abey the federal proceeding until state court remedies are exhausted. *See Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005). Here, however, Jimerson has no unexhausted state remedies, as the Attorney General has recognized. (Doc. 7 at 2.) The "protective filing" jurisprudence is therefore inapplicable to this case.

11

Jimerson's one-year clock began running upon discovering the factual predicate of her *Brady* and *Youngblood* claims. *See* 28 U.S.C. § 2244(d)(1)(D). No authority required her to protectively file a § 2254 petition on mere suspicion that there *might* have been a *Brady* violation at her trial, or upon discovering facts suggesting some but not all elements of a *Youngblood* claim. *See Hasan v. Galaza*, 254 F.3d 1150, 1155 (9th Cir. 2001) (the proper "factual predicate" inquiry is when a petitioner discovered or could have discovered facts supporting *all* the elements of the constitutional claim, not just one element).

## III.   Jimerson's claims are unavoidably procedurally defaulted, but she has established cause and prejudice to excuse that default.

Jimerson could not present her federal claims to the state court because the State of Arkansas provides no statutory remedy for Jimerson to bring her post-conviction claims. Indeed, the Attorney General concedes that Jimerson has no unexhausted state remedies. (Doc. 7 at 2.) A habeas petitioner's failure to present her constitutional claims to the state court will be excused if the petitioner can show either cause and prejudice or a fundamental miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012). Jimerson has demonstrated cause and prejudice to excuse her unavoidable procedural default, and she objects to the Magistrate Judge's finding that she did not.

### A.   The suppression and destruction of evidence by the State and law enforcement establishes cause for both the *Brady* and *Youngblood* claims.

The Magistrate Judge found, without elaborating further, that Jimerson had a "problem in establishing 'cause.'" (Doc. 61 at 42.) Earlier, though, the Magistrate Judge found that "[b]oth the informant information and the tape recordings were *Brady* evidence," but were not disclosed to Jimerson as required by *Brady*. (Doc. 61 at 38.) The State's suppression of relevant evidence in violation of *Brady* is "cause" excusing a petitioner's failure to comply with a state procedural rule. *Banks v. Dretke,* 540 U.S. 668, 691 (2004).

It logically follows that destruction of evidence in violation of *Arizona v. Youngblood*—thereby preventing the petitioner's discovery of the evidence—similarly meets the "cause" requirement. The Magistrate Judge made no express findings as to Jimerson's *Youngblood* claim, but he acknowledged that the informant recordings had been destroyed or lost by government officials. (Doc. 61 at 33.) Jimerson has thus shown, and the Magistrate Judge has acknowledged, that she was unable to present her claims to the state court because the State failed to disclose, and indeed destroyed, potentially exculpatory evidence. Accordingly, the Magistrate Judge should have found that Jimerson established cause as to both her *Brady* and *Youngblood* claims.

 **B. Jimerson suffered actual prejudice because had the jury heard the informant evidence, it likely would have discounted Vaughn as a witness and found Jimerson not guilty.**

Next, the Magistrate Judge found that Jimerson did not show she suffered actual prejudice. (Doc. 42.) He noted that circumstantial evidence of record placed Jimerson with her co-defendants before and after the crime, and based solely on this evidence he discounted a reasonable probability that had the informant information and tape recordings been disclosed, the result at trial would have been different. (Doc. 61 at 42-43.) The District Judge should reject this finding, both because the testimony relied on by the Magistrate Judge was merely circumstantial and itself inconsistent with Vaughn's account, and because the new evidence Jimerson presented at her evidentiary hearing severely undermines the evidence against her at trial.

A petitioner's prejudice from a *Brady* violation turns on whether the suppressed evidence was material. *Banks v. Dretke*, 540 U.S. 668, 698 (2004). As stated previously, evidence is material if there is a "reasonable probability" the outcome of trial would have been different had the evidence been disclosed. *White v. Steele*, 853 F.3d 486, 490 (8th Cir. 2017). In other words, certainty is not required. The examination into materiality "is legally simple but factually

complex" and takes into account not just the evidence in the trial record, but also the evidence that was withheld. *Turner v. United States*, ___ U.S. ____, 137 S. Ct. 1885, 1893 (June 22, 2017). A petitioner's prejudice from a *Youngblood* violation involves an even less stringent analysis: whether the evidence was potentially *useful* to the defendant. *Youngblood*, 488 U.S. at 58.

Here, in deciding that Jimerson did not establish prejudice, the Magistrate Judge failed to fully consider how the disclosure of Prescott, his arrangement with Ford, and the tape recordings between Prescott and Vaughn, would have affected the result at trial. Instead, the Magistrate Judge concluded that, even aside from Vaughn's statements, the record contained sufficient circumstantial evidence of Jimerson's guilt. (Doc. 61 at 42.) This finding was in error, both legally and factually. *Brady* materiality is not a sufficiency of evidence test. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995); *accord Strickler v. Greene*, 527 U.S. 263, 290 (1999). Moreover, the evidence of Jimerson's guilt was razor thin, Vaughn's account contradicted the accounts of the other State witnesses, and the newly discovered evidence easily could have caused the jury to discount Vaughn's statements at his guilty plea hearing. Vaughn's statements were the only direct evidence linking Jimerson to the Holmes murder. The Magistrate Judge thus should have concluded that the informant information, *in light of* the evidence presented at trial, could have produced a different result.

> **1. Only Charlie Vaughn implicated Jimerson in the murder, and he did so under duress before recanting his allegation at trial.**

The Magistrate Judge found that the informant information would not have changed the result of trial in light of testimony alleging that Jimerson was in various places with Brown,

Vaughn, and Early on the day of and the day after the crime. (Doc. 61 at 42-43.) Putting aside that Jimerson maintains the testimony was false, it was not dispositive of her guilt and was much less damning than her implication in the crime by Vaughn's statements at the guilty plea hearing.

No witness named by the Magistrate Judge placed Jimerson at the crime scene, and none of those witnesses testified that she was involved in the murder in any way. The only person who ever connected Jimerson to the murder was Vaughn; he placed Jimerson outside the Holmes residence on the night of the murder. Vaughn recanted his guilty plea testimony at trial, but Jimerson's jury heard the transcript of the guilty plea hearing in its entirety. (R. 1033-59.) (*See also* Petitioner's post-hearing brief, Doc. 59, at 45-48 (discussing at length the shortcomings in Vaughn's confession). Without evidence to support Vaughn's assertion at trial that his guilty plea hearing testimony was false, Jimerson's jury was left to believe that Vaughn had confessed truthfully, and had told the truth when he said Jimerson was involved in the crime. Law enforcement's use of an informant, as well as the recording of the informant's conversations with Vaughn, was essential to explain why Vaughn would falsely implicate Jimerson.

If Jimerson had been able to present the audio tapes and the testimony of Ronnie Prescott at trial, the jury probably would have credited Vaughn's claims that (1) he only confessed because Prescott threatened him with the death penalty, and (2) his testimony at his guilty plea hearing was false and coerced. Without Vaughn, the police would have had no basis for arresting Jimerson in the first place. Jimerson was not arrested until March 25, 1991—one year after her co-defendants were arrested, and the same day Vaughn implicated her in the murder. (R. 675.) The first interaction she had with the police was when she went to the police to report her rape, completely unaware that she would be doubted and later accused of murder. (Tr. 131-38.)

15

**2.  The remaining witness testimony against Jimerson was so tenuous and incredible that, if presented with the informant information, a jury probably would have found Jimerson not guilty.**

As the Magistrate Judge noted, the only other evidence against Jimerson at trial was the testimony of Lee Parsons ("Lee"), Kenny Parsons ("Kenny"), and Taura Bryant. (Doc. 61 at 42-43.) It is unlikely the jury relied on this information in convicting Jimerson. In light of the informant information, this testimony appears so much more unreliable and irrelevant that had the jury heard the informant information, the result at trial would have been different.

Lee and Kenny Parsons testified that around midnight the night before they heard about Holmes's murder, Brown arrived at their house with Jimerson, Early, and Vaughn. (Doc. 61 at 13; R. 933-35, 947.) According to Kenny, Jimerson was driving. (R. 947.) Kenny testified that when they arrived, Early and Vaughn got out of the car and walked down the tracks while Jimerson stayed in the car. (Doc. 61 at 13; R. 947.) Lee, on the other hand, made no mention of anyone other than Brown exiting the car. While Lee testified that Brown entered the house, changed out of bloody clothes, and left alone (R. 936), Kenny testified that he and Brown walked uptown together to drink. (Doc. 61 at 13; R. 948-49.) Kenny never explained what happened to Jimerson when he and Brown left. As such, the Parsons' accounts were inconsistent with each other despite them allegedly seeing Jimerson and her co-defendants at the same time.

Further, neither Kenny nor Lee came forward with his story until after Jimerson's arrest, three years after the night in question. Kenny spoke to the police shortly after the crime and told them he knew nothing about the murder. (Doc. 61 at 14; R. 953-54.) Nonetheless, on March 25, 1991, after seeing Jimerson in the jail, Kenny suddenly recanted his original account and told the police a story about seeing Jimerson the night of Holmes's murder. (R. 697.) Kenny was facing charges at the time and worked at the jail as a trusty. (R. 695-96.) That same day, Lee said—also

16

for the first time—that he saw Jimerson on the night of the murder. (R. 676.) It is noteworthy that Vaughn himself never said he was at the Parsons' residence; on the contrary, he said at the guilty plea hearing that he did not leave with the others and he never spoke with them again after the crime. (R. 1048-49.) Furthermore, regardless of their suspect timing and inconsistent accounts, the Parsons brothers never placed Jimerson at the scene of the crime.

Taura Bryant told an unlikely story of all four co-defendants riding around together in three different vehicles on the night of the murder, during a party at Levi Grandy's house. (Doc. 61 at 11.) Bryant also claimed to have seen the co-defendants the next day at "Piggot's" house, where Vaughn described stealing a ring and money from an old lady while Jimerson cried "shut up." (*Id.*) Bryant's story was not corroborated by any other witness, including Vaughn. Not only did Vaughn say he never saw his co-defendants *after* the crime, but he also said that on the night of the crime, the others picked him up and they went directly to the Holmes residence. (R. 1042.) Vaughn did not describe multiple vehicles or a party at Levi Grandy's house. Again, even if Bryant's story were true, it did not implicate Jimerson in any crime.

Absent Vaughn's confession, Jimerson would not have been arrested, and the police would not have obtained statements from Lee and Kenny Parsons. Nor would the police have deemed Bryant claim of seeing Jimerson with the three men to be evidence Jimerson committed a crime with them. Indeed, Jimerson was not arrested until ten months after Bryant's interview, showing that police did not consider Bryant's statements to be sufficient evidence of Jimerson's guilt. At best, the testimony of the Parsons brothers and Bryant placed Jimerson in the presence of her co-defendants either before or after the murder, in some location where no crime took place. If the jury had known that Vaughn's confession was coerced by an informant, the jury would have found the testimony of Bryant and the Parsons not probative of Jimerson's guilt, and

the jury almost certainly would not have convicted her. Jimerson has established both cause and

prejudice. Her procedural default and any timeliness issues should be excused.

**IV.     Reginald Early's confession of guilt is powerful evidence of Jimerson's actual innocence and is sufficient to overcome procedural default and any timeliness issues.**

The Magistrate Judge found that Jimerson failed to meet the *Schlup* gateway standard,

stating that "a reasonable, properly instructed jury" would not have reached a different verdict

had Early's confession been available at the time of trial. (Doc. 61 at 44-45.) Specifically, the

Magistrate Judge found that recantations likely have a minimal impact on reasonable jurors.

(Doc. 61 at 46.) However, this was not a run-of-the-mill recantation, where a credible trial

witness later recants based on pressure, regret, or memory lapse. Here, Jimerson and the

Attorney General agree that Early's trial testimony denying guilt was false. Now, he has

confessed to the rape and murder that the State has maintained for nearly three decades he

committed. The Attorney General must concede that much of his confession is true. The rub is

that Early has exonerated Jimerson by admitting he acted alone, which is the only reason the

Attorney General is not embracing the confession. The Magistrate Judge should have found that

Early's confession, coupled with independent evidence corroborating that confession, far

outweighed Vaughn's uncorroborated and recanted statements from his guilty plea hearing, and

was sufficient to meet the *Schlup* gateway standard. Thus, it would be a fundamental miscarriage

of justice not to consider Jimerson's constitutional claims. *See Schlup v. Delo*, 513 U.S. 298, 327

(1995).

The district court must act as a factfinder to determine whether new evidence is reliable

enough to meet the *Schlup* standard. *House v. Bell*, 547 U.S. 518, 557 (2006) (Roberts, C.J.,

concurring in part and dissenting in part). In doing so, the court should observe a witness's

demeanor, examine physical evidence, and make findings about the reliability of the evidence.

*Id.* Here, the Magistrate Judge did not make findings about the overall reliability of Early's testimony. Rather, the Magistrate Judge simply said without elaboration that the *timing* of Early's confession was "questionable." (Doc. 61 at 44.) The Magistrate Judge, in assessing Early's confession, should have determined that a reasonable juror would find the testimony of Early, the sole perpetrator of the crime, persuasive evidence of Jimerson's actual innocence.

First, Early's testimony fully undermines Vaughn's disavowed guilty plea hearing testimony. Early testified at length about how he raped and killed Holmes by himself. (Doc. 61 at 21-23.) Early's account was far more detailed than that of Vaughn, who simply agreed to having committed the crime through leading questions, but did not detail the events leading up to the crime—such as why the co-defendants were together, how the crime was planned, or why they targeted Holmes. (R. 1033-1059.) Vaughn did not give any verifiable information during his guilty plea hearing that only Holmes's killer would have known; rather, Vaughn recited facts that were available to the police, and indeed to the public, within days of the crime. *See Murder Case Still Intensive, P.D. Says*, FORDYCE NEWS ADVOCATE, September 28, 1988. (Exh. 2). Vaughn's account of being picked up by the co-defendants immediately before the crime (R. 1042), of leaving town immediately after the crime, and of never discussing it with the co-defendants (R. 1049), was completely at odds with the trial testimony of State witnesses putting the four co-defendants together both before and after the crime and having them discussing the murder. Vaughn could not even remember where Holmes lived. (R. 1042.) Vaughn's confession, particularly in light of the new informant information, is incredible, as is the remainder of the State's case. The Magistrate Judge did not claim otherwise, and he did not address the discrepancies among Vaughn's account, the crime scene evidence, and the testimony of the State's other witnesses. (*See* Doc. 59 at 42-44.)

Early, on the other hand, testified to facts that can be independently corroborated. (Doc. 59 at 39-40.) Early gave details that the police could not have known, including (1) how the phone cord was ripped from the wall (R. 713; Tr. 53); (2) why knives—one broken—were strewn about the house (R. 670; Tr. 51, 55); and how Holmes's car key ended up outside where Michael Earley found it (R. 912-13; Tr. 53-54.). In addition, Early's DNA was in the victim, but Vaughn's and Brown's was not, despite Vaughn's claim that all three men raped Holmes. (Doc. 15 at 145; Tr. at 77-78; R. 1046.) Finally, Darrell Jenkins testified at Jimerson's trial that Early told him, shortly after the crime, that Early entered Holmes's house through the door, and robbed and murdered her alone. (Doc. 61 at 14; R. 1001-02.) A new jury considering Early's confession would deem it far better corroborated and more worthy of belief than Vaughn's guilty plea statements, which are uncorroborated. In short, a jury hearing all the evidence available now would likely find Jimerson not guilty.

The Magistrate Judge said, "recantations likely have a minimal impact on a reasonable juror." (Doc. 61 at 46.) As stated previously, this is not a mere recantation case. Rather, Early confessed guilt and his confession fully exonerates the other individuals convicted of this crime. A confession by the actual perpetrator "constitute[s] some evidence tending affirmatively to show" innocence. *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997). Early's guilt is indisputable; the State's case at trial rested on the theory that Early committed murder, and the Attorney General evidently maintains the position that Early is guilty. The only dispute is whether Early committed the murder alone or with others. If Early's confession that he committed the crime is to be credited, his testimony about the manner in which he committed it should receive equal weight. Further, even if this were "just" a recantation, which it is not,

credible recantations meet the *Schlup* standard. *House*, 547 U.S. at 549; *Amrine v. Bowersox*, 128 F.3d 1222, 1228 (8th Cir. 1997).

The Magistrate Judge also stated that affidavits like Early's "are to be treated with a degree of skepticism," quoting Justice O'Connor in *Herrera v. Collins*, 506 U.S. 390, 423 (1993). (Doc. 61 at 44.) Early's affidavit is nothing like those in *Herrera*. There, the petitioner presented four affidavits, which mostly contained hearsay, were inconsistent with each other, and claimed a dead man who could not be questioned was the actual perpetrator. *Herrera*, 506 U.S. at 392, 417, 423. In addition, the affidavits were presented a decade after trial, with no explanation for the delay. *Id.* at 423. Here, Early gave a first-hand account of the murder, which was consistent with the crime scene and the physical evidence collected there, and Early was subject to cross-examination at Jimerson's hearing. Early also explained his delay in confessing. Early said that he would only reveal the truth within attorney-client privilege, and he conveyed during the hearing that he waited to speak to his attorney about his guilt without others in the room. (Doc. 61 at 23-24.) His attorney was in the process of seeking post-conviction DNA testing, which Early knew would further demonstrate his guilt—and his co-defendants' innocence. It is no surprise that he finally spoke up when he did. Further, as a practical matter, Early's on-the-record admission of guilt precludes him from ever asking the court for relief from his charge and conviction. In other words, Early quite possibly has surrendered any hope, however untenable, of leaving prison during his lifetime. The timing of Early's confession makes him more credible, not less.

In *Hall v. Lockhart*, 806 F. 2d 165, 168 (8th Cir. 1986), which the Magistrate Judge also cites to support his skepticism of Early's affidavit, the petitioner's co-defendants signed affidavits saying the petitioner was innocent, but one of the same co-defendants had also testified

at trial that the petitioner was involved in the murder, and the petitioner had confessed. Here, in contrast, Early never implicated Jimerson and she never confessed; she has always maintained her innocence. Furthermore, the Eighth Circuit in *Hall* stated, "recantation by convicted co-defendants . . . should be supported, where possible, by additional and independent evidence." *Id.* Early's confession, unlike the affidavits in *Hall*, is supported by independent evidence, including DNA evidence. Both *Herrera* and *Hall* are inapposite to determining Early's reliability.

Early gave a credible confession that fully exonerated Jimerson. Early has no ties to Jimerson, and by his own admission he "cares nothing" for her. (Tr. 36-37; Pet. Exh. 11 at ¶ 34.) He had nothing to gain by taking responsibility for the murder. Had Early confessed to being the sole perpetrator at Jimerson's trial, the jury would have believed him, and the State's remaining evidence against her would have crumbled. Thus, Jimerson meets the *Schlup* gateway standard of actual innocence.

**V.    Early's confession, when compared against the trial evidence, renders this case extraordinary enough to warrant habeas relief based on a freestanding claim of actual innocence.**

The Magistrate Judge declined to analyze Jimerson's freestanding innocence claim. After erroneously finding Jimerson had no cognizable "gateway claim," he determined as a matter of course that Jimerson could not prove her actual innocence claim. (Doc. 61 at 46.) It is true that, assuming a freestanding constitutional claim of innocence exists, the standard is higher than for the *Schlup* gateway standard. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993). In addition to the preceding discussions of why Jimerson meets the *Schlup* standard, and why she meets the "prejudice" prong of the cause-and-prejudice exception to procedural default, here are just a few

of the reasons why Early's confession constitutes extraordinary evidence of actual innocence requiring that Jimerson be either retried or freed from prison:

- Early's highly detailed confession is believable on its face and consistent with the only significant physical evidence in the case: DNA testing on vaginal swabs from the victim, which included Early but excluded Vaughn and Brown. Given that Vaughn claimed all three men raped Holmes, this is a strong point in favor of Early's confession over Vaughn's recanted guilty plea statements.

- Early has no motive to help his co-defendants to the detriment of his own legal interests. As the only juvenile among the co-defendants at the time of the offense, all of whom received life sentences, Early alone may have the opportunity for resentencing under *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny. Despite his youth at the time of the offense, Early's confession to being the sole perpetrator of the heinous rape and murder of a helpless elderly woman will markedly decrease any chance that a future court will deem him a good candidate for rehabilitation. Vaughn, on the other hand, had a motive to falsely confess at this guilty plea hearing: in doing so, he avoided any chance of receiving the death penalty.

- Early provided a cogent—if reprehensible—motive for the offense and described the circumstances that preceded and followed the offense. The trial testimony of Darrell Jenkins, to whom Early confessed shortly after the crime, is consistent with Early's confession. According to Jenkins, Early did not mention any of the co-defendants as having participated. While Jenkins' trial testimony was unsupported hearsay at the time, Early himself now confirms that testimony.

- Vaughn, on the other hand, described little about events preceding the alleged crime and had to be coached to include Early's name in the account. (R. 1042.) This lack of detail is stark in comparison to Early's detailed testimony. Vaughn claimed that after the offense he ran off by himself and immediately left town, and never discussed the offense with his co-defendants. (R. 1049), in contrast with the testimony of the State witnesses who claimed to have seen the four co-defendants before and together after the crime. Early's account and the corroborating evidence tells a coherent story; Vaughn's does not.

- The Attorney General cannot claim that Early is fabricating his confession of guilt; the Attorney General maintains he is guilty and deserves the sentence of life imprisonment that he is serving. (Doc. 58 at 23, 29.) To the extent Early has now "recanted" his trial testimony, he has done so in a way that comports much more with the State's theory of the case than his trial testimony did.

For the reasons noted above, in this extraordinary case, Jimerson has presented enough evidence to sustain a freestanding claim of actual innocence. Jimerson—along with two of her co-defendants—was wrongfully convicted. And Jimerson will die in prison for a murder she did not commit if she is not granted federal habeas relief.

## VI.    Equitable tolling applies here because, under the Magistrate Judge's approach, Jimerson could not have filed a timely, factually sufficient petition.

The Magistrate Judge recognized that equitable tolling is available to save an otherwise untimely petition when extraordinary circumstances beyond the petitioner's control render it impossible to file her petition on time. (Doc. 61 at 46, citing *Jihad v. Hvass*, 267 F.3d 803, 805 (8th Cir. 2001).) While Jimerson disagrees with the Magistrate Judge's conclusion that her filing was untimely, the District Judge should take note of the Magistrate Judge's observations about

the "trap" faced by habeas petitioners in deciding when to file a petition. Again, Jimerson deems it helpful to quote the Magistrate Judge at length:

> In *Jefferson v. United States*, 730 F.3d 537, 547 (6th Cir. 2013), the Sixth Circuit recognized, but declined to interpret, the legal quandary as to when the statute of limitations starts to run, noting that "[w]ithout a clear standard, it is likely that when a prisoner spends a tremendous amount of time establishing the validity of the facts, a court may find that the initial piece of uncorroborated information would be deemed a 'factual predicate' to start the statute-of-limitations period; if, however, a prisoner instead chooses to submit an application with the same piece of 'raw' information, it may fail the fact pleading requirement." *Jefferson v. United States*, 730 F.3d at 547-48. **This situation can "create a trap that renders litigation of a successful claim effectively impossible."** *Id.*; *see also Bing v. United States*, 2014 WL 4206193, at *3 n.2 (M.D. Fla., August 25, 2014) (trap potentially created where "the vital facts may be insufficient by themselves to satisfy the fact-pleading requirement").

(Doc. 61 at 31-32, emphasis added.)

Jimerson's petition surely would have faced dismissal based on insufficient facts had she filed her *Brady* and *Youngblood* claims based solely on the information she learned in January 2014, twenty-two years after her trial. The Magistrate Judge disavowed her *any* additional time to investigate whether the withheld evidence was exculpatory and material, and whether the destruction of evidence was in bad faith or merely inadvertent. Instead, the Magistrate Judge found her July 2015 filing untimely, exemplifying the "trap" described above. Because Jimerson could not have filed a factually sufficient petition at a time that would have satisfied the Magistrate Judge, circumstances outside her control prevented her from timely filing her claims.

**VII.    Because, at minimum, the Magistrate Judge found a *Brady* violation in this case, Jimerson has made a substantial showing of the denial of a constitutional right, warranting a certificate of appealability if the District Judge dismisses Jimerson's amended habeas petition.**

A court's determination of whether to issue a certificate of appealability turns on whether the issue is procedural or on the merits. Jimerson should receive a certificate of appealability

under either analysis, and she objects to the Magistrate Judge's finding that she made no

substantial showing of a denial of a constitutional right. (Doc. 61 at 47-48.)

### A. Jurists of reason would find debatable a denial of Jimerson's *Brady* and *Youngblood* claims on procedural grounds.

To grant a certificate of appealability on a procedural issue, a district court must

determine "both 'that jurists of reason would find it debatable whether the petition states a valid

claim of the denial of a constitutional right, *and* that jurists of reason would find it debatable

whether the district court was correct in its procedural ruling.'" *Khaimov v. Crist*, 297 F.3d 783,

785 (8th Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)) (emphasis in

original). *Accord Ward v. Hobbs*, 738 F.3d 915, 916 (8th Cir. 2013). Thus, whether to issue a

certificate of appealability on a procedural issue has two considerations: the substantive

constitutional claims, and the procedural holding. *Slack,* 529 U.S. at 484-85.

The Magistrate Judge did not explain his reasoning for recommending that the District

Court not issue Jimerson a certificate of appealability. This lack of explanation suggests the

Magistrate Judge did not thoroughly consider that question in the manner outlined by the

Supreme Court. Jimerson requests that the District Judge undertake that analysis now.

As to substantive constitutional claims, a petitioner need not convince the judge that she

would prevail; rather, she need only show that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong. *Miller-El v. Cockrell*, 537 U.S. 322,

338 (2003). Therefore, to the extent the Magistrate Judge found Jimerson should be denied a

certificate of appealability because he did not believe she would *prevail* on the merits of her

claims, his determination was in error. (*See* Doc. 61 at 47-48 ("The Court finds no issue on

which Jimerson has made a substantial showing of a denial of a constitutional right.").) Applying

the correct standard, Jimerson stated a valid claim of the denial of her constitutional rights, and

indeed, the Magistrate Judge found a *Brady* violation. (Doc. 61 at 38.) Thus, the only remaining question is whether procedural default is clear. *See Khaimov*, 297 F.3d at 786 ("if the procedural default is not clear and the substantive constitutional claims are debatable among jurists of reason, the certificate should be granted.").

Reasonable jurists would find it debatable whether the Magistrate Judge is correct in ruling that Jimerson's procedural default is inexcusable. As the Magistrate Judge himself found, Jimerson faced a timeliness "trap" rendering it difficult if not impossible for her to timely file her claims. (Doc. 61 at 31-32.) Jimerson also demonstrated cause and prejudice, based at least on the Magistrate Judge's finding that the State withheld *Brady* evidence. (Doc. 61 at 37-38.) In addition, the fundamental miscarriage of justice exception applies here, where a third party credibly confessed to the crime for which Jimerson was convicted, demonstrating her actual innocence. Jimerson is not clearly procedurally defaulted, and she should receive a certificate of appealability.

## B.  Jimerson has shown the denial of a constitutional right in presenting her freestanding actual innocence claim.

In deciding whether to issue a certificate of appealability for a constitutional claim on the merits, a court must only make a threshold inquiry into whether the petitioner "debatably showed the denial of a constitutional right." *See Miller-El*, 537 U.S. at 342 ("Deciding the substance of an appeal in what should only be a threshold inquiry undermines the concept of a COA. The question is the debatability of the underlying constitutional claim, not the resolution of that debate.").

Jimerson more than debatably showed the violation of her Eighth and Fourteenth Amendment rights by presenting evidence of actual innocence. It is perhaps unfortunate that the District Judge was not present at the evidentiary hearing when Reginald Early gave a detailed,

bone-chilling account of committing unspeakable acts against the victim Myrtle Holmes—on the spur of the moment and alone. No one who was in the courtroom will quickly forget hearing that account, which even after twenty-eight years was remarkably consistent with the physical evidence in the case, and was definitely consistent with the DNA evidence that included Early but excluded Vaughn and Brown from the semen left in Holmes's body. The District Judge should carefully review Early's testimony in making its decisions on the procedural and substantive issues in this case, and—should it come to that—in determining whether to grant a certificate of appealability.

## VIII.   The Magistrate Judge's proposed findings omit certain relevant facts and misstate others.

The Magistrate Judge's proposed findings include "[t]he applicable timeline related to the factual predicate for [the *Brady* and *Youngblood*] claims . . . ." (Doc. 61 at 34.) While the timeline is a helpful aid in analyzing the legal issues, it omits important facts supporting Jimerson's arguments, including that she exercised diligence in pursuing her constitutional claims. Jimerson has reproduced the timeline in full below, adding omitted facts and corresponding record citations in bold, and she requests that the District Judge consider these facts as well. Other factual omissions and errors, particularly relating to Jimerson's actual innocence claims, are noted following the timeline. The District Judge should likewise consider them in making his final ruling.

### A.   Jimerson objects to the Magistrate Judge's timeline regarding discovery of the factual predicate of her constitutional claims to the extent it omits important facts supporting her due diligence argument.

- 2013 - Jimerson's habeas counsel began working on Jimerson's case.

- January 7, 2014, hired private investigator Stimis traveled to Fordyce and

  noticed that Donny Ford, the sheriff of Dallas County at the time of Jimerson's

28

trial, was still in office.  Stimis asked to speak with Ford, and Ford agreed. **Stimis had not been assigned to speak with Ford. (Tr. 102.)** During the conversation with Ford, Stimis learned of an informant in the Holmes murder investigation. **Unprompted, Ford related that while he and another officer were driving a prisoner from Texas to Arkansas, Ford suggested the prisoner could help his own situation by getting one of the men in custody to provide information about the Holmes murder. (Tr. 103-05.)** According to Stimis, Ford mentioned that the informant was given a recording device to record conversations with co-defendant Vaughn. **Ford said the prisoner both recorded conversations and discussed the death penalty with Vaughn. (Tr. 105-06.)** Ford did not provide the name of the informant **or the other officer**, but he did relay to Stimis that the recordings no longer existed, having been either destroyed or lost. Ford indicated to Stimis that he thought the recorded conversations could not be used at trial. **After one subsequent telephone conversation on January 16, 2014, Ford stopped responding to Stimis's messages. (Tr. 107.)**

- January 27, 2014, Stimis submitted a Freedom of Information Act (FOIA) request to the Arkansas State Police (ASP) for their files on the Holmes investigation.

- February 18, 2014, the ASP provided Stimis with the file that contained over 210 pages of redacted documents. Included in the file was a one-page report stating that police had interviewed a man named Ronnie Edward Prescott on March 24, 1991. The report identified Prescott, not as an inmate, but as the owner/operator

of "TP-Tans U." (Doc. No. 44, Joint Stipulation 1) There was no indication from the report as to where the interview took place, what the interview was about, or what Prescott's relation was to the case. It indicated that a handwritten statement was taken from Prescott and was to be made part of the file. The statement was not included in the documents received as part of the FOIA request.

- June 2014, Jimerson's counsel located Prescott and reached him by phone at a federal prison in South Carolina.

- July 11, 2014, counsel traveled to the prison to meet Prescott, who executed an affidavit outlining his recollection of his participation in the Holmes investigation. **Prescott also recounted the dismissal of state drug charges against him in 1991. (Tr. 17-18, 20; Pet. Exh. 21 at 10-12.)**

- **Thomas Wynne, the prosecuting attorney at Jimerson's trial, was contacted about this case in 2014, but he could not locate his file. (Doc. No. 44, Joint Stip. 5.)**

- January 7, 2015, Jimerson's counsel met with Captain Steven Coppinger at ASP Headquarters. (Doc. No. 44, Joint Stipulation 2) It was there, and for the first time, that counsel saw a handwritten statement bearing Prescott's signature, dated March 24, 1991, and co-signed by Ronnie Poole and ASP Lieutenant Jerry Bradshaw, who is now deceased. **According to the statement, Vaughn said he thought he could get the death penalty. (Pet. Exh. 7 at 1.) The statement purported to describe what Vaughn said about the murder but did not mention any leniency offered to Prescott in exchange for obtaining the confession. (Pet. Exh. 7 at 2-3.)** The statement did not reference that Prescott

recorded any conversations with co-defendant Vaughn. At the evidentiary

hearing, Prescott did not recall signing the statement but acknowledged he may

have done so. (Tr. 16-17) Prescott noted that, in 1991, he would not have been

able to read that statement and that he could barely make out the writing on the

day of the evidentiary hearing. (Tr. 27)

- April 1, 2015, Stimis contacted Poole to find out more about the informant.

  While Poole recalled being in the car with Ford and Prescott on Prescott's

  transport from Texas, he did not—**and indeed refused to**—meet with or discuss

  anything further with Stimis. (Tr. 109-110)

- April 26, 2015, Jimerson's trial counsel, William Howard signed a statement

  confirming that he knew nothing about a jailhouse informant or tape-recorded

  conversations.

- June 20, 2015, after receipt of this affidavit, Jimerson's habeas counsel filed her

  federal petition for writ of habeas corpus on this day.

**B. Jimerson objects to the Magistrate Judge's characterization of Vaughn's guilty plea hearing to the extent it omits important facts supporting both her gateway actual innocence claim, and her freestanding actual innocence claim.**

1. Charlie Vaughn, on being asked what happened the night of the murder, told

   Judge Graves that Jimerson and "John" picked him up, and that they were going

   to do a robbery. (R. 1042.) Vaughn did not give "John's" last name, and he did

   not say anyone else was present. Judge Graves, not Vaughn, inserted the name

   "John Brown," as well as the name "Reginald," into the record as people with

   whom he rode that night. (R. 1042.)

2.  Judge Graves asked whether Vaughn told something different to the police from the account he gave at his guilty plea hearing. Vaughn replied, "it's a little story." (R. 1050.) When Judge Graves asked whether there was any doubt in Vaughn's mind that he, Brown, and Early went into the home of Holmes intending to rob her, Vaughn said, "[t]hat's what we was supposed to had went and did was rob." (R. 1051.) Judge Graves never clarified either of those statements.

3.  Even though Vaughn initially said the defendants were specifically looking for Holmes's house (R. 1042), he also told the Judge that the defendants did not know Holmes and she did not know them. (R. 1043, 1048.) Vaughn then decided that was just the house they stopped at. (R. 1044.)

4.  Vaughn said he ran away immediately after the crime and left town. (R. 1049.) He said he did not return to the car Jimerson was driving and did not speak to Jimerson, Brown, or Early ever again. (R. 1048-49.)

5.  On January 28, 1991, shortly before Vaughn made these statements at his guilty plea hearing, his attorney had filed a plea of not guilty by reason of mental disease or defect, and a request for a mental examination. (Pet. Exh. 16.) The trial court granted that request, and on February 21, 1991, the court ordered that Vaughn be evaluated for mental disease or defect. (Pet. Exh. 17.) Vaughn apparently was evaluated by a Dr. Peal. (Pet. Exh. 21 at 34-35.) The results of that evaluation were never presented in court.

**C. Jimerson objects to the Magistrate Judge's account of the trials, to the extent his version omits important facts supporting both her gateway actual innocence claim and her freestanding actual innocence claim.**

**1.** In addition to the points that the Magistrate Judge mentioned, Chief of Police Ronnie Poole testified that the police found that the cord of the telephone in Holmes's house had been "jerked out of the wall." (R. 713.)

**2.** Charlie Vaughn recanted his confession at the second trial. He testified that he did not see Early, Jimerson, or Brown on September 21, 1988 or September 22, 1988. (R. 1030.) Vaughn said he was not telling the truth at his guilty plea hearing. (R. 1061.) Vaughn testified further that he confessed because he was scared and thought he was going to get the death penalty. (R. 1074.)

**3.** Lee and Kenny Parsons testified inconsistently regarding the sequence of events the night they allegedly saw Jimerson, Early, Vaughn, and Brown together. Lee testified that after arriving at the house, Brown left on his own, and Kenny stayed at home. (R. 936.) Kenny, on the other hand, testified that he and Brown left the house together and went drinking. (R. 948-49.)

**4.** Darrell Jenkins testified that Early did not tell him Brown, Vaughn, or Jimerson participated with him in the robbery. (R. 1001-02.) Jenkins testified that Early did tell him, however, that he entered Holmes's house through a door where the door was open, but the screen was closed. (R. 1002.)

**D. Jimerson objects to the Magistrate Judge's account of the testimony and other evidence at the evidentiary hearing, to the extent his version omits important facts supporting her diligence, her gateway actual innocence claim, and her freestanding actual innocence claim.**

**1.** In addition to the testimony noted by the Magistrate Judge, Early testified that neither Jimerson, Vaughn, nor Brown was involved in the rape and murder of

Holmes. (Tr. 65-66.) Early was never in Jimerson's car the night of the murder and he testified that he did not recall ever being in the car with her. (Tr. 69.)

2.  John Brown testified for the first time at Jimerson's evidentiary hearing, and stated that he did not participate in the murder or rape of Holmes. (Tr. 151.) He never helped move Holmes's body, and he never asked Jimerson to drop him off at Holmes's home. (Tr. 152.) Brown further testified that he did not know Levi Grandy, and he did not know anyone named Pineapple. (Tr. 153.) He only "knew of" Early. (Tr. 154.)

3.  Tina Jimerson testified at the evidentiary hearing, as she did at trial, that she had no involvement in the crimes was never in the company of Early, Vaughn, and Brown at the same time. Further, she had no knowledge of Reginald Early's guilt of the crime until her current counsel advised her of his affidavit. (Tr. 124-29.)

4.  The Magistrate Judge correctly stated that former police officer Ronnie Poole testified to having been told the recording made by the informant Ronnie Prescott had no evidentiary value. (Doc. 61 at 19.) The Magistrate Judge omitted that it was the "prosecuting attorney, deputy prosecuting attorney" who said that to Poole and former Sheriff Donny Ford. (R. 170.)

## CONCLUSION

As demonstrated above, there are myriad reasons why Jimerson should be permitted to proceed to a determination of the merits of her constitutional claims. She brought her claims in as timely a fashion as possible. Further, any timeliness issues, and her technical procedural default in failing to raise the issues in state court—an impossibility due to the absence of state court post-conviction remedies—are easily overcome because she has shown both cause and

prejudice and a fundamental miscarriage of justice. In addition, Jimerson presented credible evidence of her actual innocence, such that even if she could not proceed to a determination of the merits of her *Brady* and *Youngblood* claims, she nonetheless deserves federal habeas relief.

WHEREFORE, Tina Jimerson asks this Court to reject the Magistrate Judge's Proposed Findings and Recommendations, to find her claims timely under § 2254, to excuse her unavoidable procedural default, and to conclude that she is actually innocent of the crimes of which she was convicted. She further requests that this Court allow her to proceed with the constitutional claims in her amended habeas petition. Finally, if she is denied any of the above, Jimerson asks this Court to grant her a certificate of appealability on each of her pending claims.

Respectfully Submitted,

Tina Jimerson

BY:      /s/ Karen L. Daniel
KAREN L. DANIEL
Illinois Attorney No. 618015
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-3027
k-daniel@law.northwestern.edu

/s/ Andrea L. Lewis
ANDREA L. LEWIS
Illinois Attorney No. 6306438
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-1457
andrea.lewis@law.northwestern.edu

**ATTORNEYS FOR PETITIONER**

**LIST OF ATTACHED EXHIBITS**

Exhibit 1              Declaration of Attorney Karen L. Daniel

Exhibit 2              Article, *Fordyce News Advocate*, September 28, 1988

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

**TINA JIMERSON,**                                                                              **PETITIONER**
**ADC #704449**

**VS.**                                        **CASE NO. 5:15CV00208 BSM-JTK**

**WENDY KELLEY, Director,**
**Arkansas Department of Correction**                                    **RESPONDENT**

### NOTICE OF FILING AND CERTIFICATE OF SERVICE

I certify that on October 23, 2017, I electronically filed the foregoing with the Clerk of the Court

using the CM/ECF system, along with a copy of the Notice of Electronic Filing, which will send

notice to the following CM/ECF participants:

> Ms. Rachel Kemp
> Ms. Brooke Jackson Gasaway
> Office of the Attorney General
> 323 Center Street, Suite 200
> Little Rock, Arkansas 72201

/s/ Andrea L. Lewis

ANDREA L. LEWIS
Illinois Attorney No. 6306438
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-3027
andrea.lewis@law.northwestern.edu

# Exhibit 1

Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS, PINE BLUFF DIVISION

Tina JIMERSON, ADC #704449

                Petitioner,

v.

Wendy KELLEY, Director,

Arkansas Department of Correction,

                Respondent.

Case Number:
**5:15CV00208 BSM-JTK**

**DECLARATION OF
ATTORNEY KAREN L.
DANIEL**

## DECLARATION OF ATTORNEY KAREN L. DANIEL

I, Karen L. Daniel, as an attorney admitted to the Bar of this Court, declare as follows: I am one of the attorneys for Petitioner in the above matter. On June 24, 2014, I spoke on the telephone with Ronnie Prescott, an inmate at FCI Edgefield who would later become a witness in this case. That was the first time I ever spoke with Ronnie Prescott. My notes from that conversation are attached to this Declaration. The next time I spoke with Ronnie Prescott was in person at FCI Edgefield on July 11, 2014.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 22, 2017

BY: _____

KAREN L. DANIEL
Illinois Attorney No. 618015
Center on Wrongful Convictions
Bluhm Legal Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-3027
k-daniel@law.northwestern.edu

## RONNIE PRESCOTT – FEDERAL PRISON (EDGEFIELD SC) – PHONE CONVERSATION (KLD)

June 24, 2014

Counselor Anderson returned my call re Ronnie Prescott. Office #: 803-637-1755; asked me to leave time and number to call, and he'll have Prescott on the phone. I left message for him to call me at 11am

Counselor Anderson called me back (early) and had Prescott in the room.


TCW Prescott:

I explained who I am – atty/law prof at NLaw legal clinic, CWC, representing a woman in a 1988 Arkansas murder case. I'm not a prosecutor or a police officer and I don't represent him.

He has been in custody since early 90s and only knows one person in IL, who's from Champaign

He knew exactly what I was talking about when I mentioned Fordyce. He was there in a cell until bond on his pending (Dallas County) charge was reinstated; charge was in small town (doesn't remember name); Bill Tieling was codefendant and lived in the middle of nowhere. Prescott had had a Texas parole violation based on this case; had paroled out of TDC and was driven back to Fordyce to face the county charge there.

Remembers the incident fairly well

Was in jail in Fordyce about a week

Bonded out on that charge, went to his house (living in Daisy AR), charge dismissed, his understanding is that the dismissal was based on what he did in relation to the Fordyce case

No one ever talked w/him about this case since then

Sheriff should have recording of it; pocket recording (he wasn't wired); he never heard it; the people in the cell didn't know he was recording; he recorded just the one person; gave it to the sheriff (not a big man, 170, 5'9" or 5'10", doesn't remember name, Donny Ford sounds right)

He (sheriff) talked to him about it on the way back to Fordyce, explained what it was (presumably the murder case), agreed if Prescott would do what was asked, they'd get rid of the other charge

Had 3-4 conversations with the guy; thinks he recorded all of it

They never knew anything about the girl until this

Same area with the one guy but not the others

He's willing to meet with me and the other attorney. I told him I'd be coming in 2-3 weeks.


TCW Counselor Anderson (who got on the line after I finished w/Prescott):

NOTARY AVAILABLE

The week of July 7 works except Tuesday morning

Between 8:00-2:30 is great

We're in the minimum security campus

Need to do background check before anyone comes

I can leave a message on his direct line with all of the information and he'll set it up

# Exhibit 2



allow for a larger clinic area. Total cost of the
is approximately $88,000 with $50,000 coming
IDC grant and the county matching it with

# Murder Case Still Intensive, P.D. Says

Law enforcement agencies are still conducting an intensive search into the murder of Mrs. Myrtle Brown Holmes, 78, of Fordyce whose body was found in the trunk of her car adjacent to her house last Thursday morning, State Police Criminal Investigator Lt. Jerry Bradshaw said.

Mrs. Brown had been stabbed, beaten and her throat had been cut when her nude body was found about 8 a.m. last Thursday by law enforcement officials. She had apparently also been raped, Bradshaw said.

He said as of yesterday, they were still awaiting results from the State Crime Laboratory on various findings and results of finger prints and other items such as kitchen knives and pots believed to have been used in the slaying that were found at the crime scene. He said they were also waiting on the autopsy report.

Fordyce Police Chief Ronnie Poole said today that no new leads had been uncovered but that officers were checking out all leads and listening to suggestions.

"We've had alot of calls from people with ideas on the case and appreciate it. Anyone who has anything to offer that might help solve the case is welcome to call us, even if they think it might be silly. You never know what the key might be to unlocking the case," Poole said.

Poole said officers had spent two days investigating an individual in Camden and one day in Hot Springs talking to another subject. He said fingerprints did not match or there was not evidence. He said fingerprints of various individuals had been sent to Little Rock but that so far nothing had matched up.

A reward has been offered totaling slightly over $5,000 for information leading to the arrest and conviction. Poole said the Fordyce Crime Prevention Council had offered $1,000 and the Fordyce City Council had offered a $4,000 reward. He said some individuals had offered to add to the reward.

Bradshaw said Mrs. Brown was reported missing when her brother stopped by her home to check on her early Thursday morning. He said upon entering the house her brother found blood on the floors and called a brother-in-law and they notified police. He said the body was found a short time later in the trunk of her car by law enforcement officers.

According to authorities, Mrs. Brown had undergone surgery several months ago and was in the process of recovering but still in poor health. Bradshaw said he understood that she had never locked her home and that there was no sign of forced entry.

He said the house had been ransacked and that someone had been through various drawers in the home. He said Mrs. Brown had last talked to a relative by telephone about 10 p.m. Wednesday night. He said the murder occurred sometime between then and about 7:30 a.m. Thursday.

Officers from the Fordyce Police Department and Arkansas State Police spent the entire day at the crime scene Thursday in an attempt to gather evidence that may lead to an arrest. Bradshaw said they had also spent alot of time talking with neighbors and to others looking for clues. "No one apparently saw or heard anything," he said.

He said officers did not have a strong suspect but had checked out a number of leads and rumors. He said he hoped fingerprints from the scene may help in the investigation.

"We are assisting the Fordyce Police Department and looking at all possibilities. It is receiving top priority from them and the state police," he said.

The older neighborhood where Mrs. Brown lived includes alot of elderly residents and has created quite a scare throughout Fordyce, officers said.

## News-Advocate

s County and the Four-County Area Since 1884"

September 28, 1988, Fordyce, Arkansas 71742

One Insert

(USPS 204-380)

18 Pages — 25¢ Per Copy

# llments Remain Steady

2; first, 96; second,
ourth, 89; fifth, 113;
th, 110; eighth, 93;
1, 93; eleventh, 104

**PUBLIC SCHOOLS**
Don Cain reported
ase in enrollment in
more students this
year. Cain said the
cted about the same
its this year but also
e in kindergarten.

n had a total enroll-
dents this year. He
ornton Elementary
students while the
tary campus had
s.

by elementary
llows: Thornton —
; first, 20; second,
urth, 15; fifth, 16;
n — kindergarten,
ond, 53; third, 66;

fourth, 51; fifth, 55; sixth, 56.
Enrollment in the Bearden Junior High School is 180 while the senior high school has 176 students.

**KINGSLAND PUBLIC SCHOOLS**
Kingsland Supt. Gene Franklin said enrollment for the new school year was 429 students. He said last year's enrollment at this time was 412 students. Enrollment in elementary is 240 students while grades 7-12 are composed of 189 students.

A breakdown by grades is as follows: kindergarten, 36; first, 38; second, 40; third, 37; fourth, 32; fifth, 29; sixth, 28; seventh, 29; eighth, 35; ninth, 39; tenth, 26; eleventh, 32; twelfth, 26.

**SPARKMAN PUBLIC SCHOOLS**
Sparkman Supt. Jerry Moore reported that his district's enrollment was down by about 20 students over last year. He said total enrollment this fall was 389 students. Moore said he attributed part of the decline to the closing of several in-

dustries in the Arkadelphia area that had forced several families to move to seek other employment.

"We have shown some decline over the last several years. We have a smaller kindergarten than usual this year. We expect more next year," he said.

A breakdown by grades is: kindergarten, 18; first, 27; second, 30; third, 31; fourth, 31; fifth, 26; sixth, 26; seventh, 32; eighth, 31; ninth, 41; tenth, 39; eleventh, 33; twelfth, 24.

**CARTHAGE PUBLIC SCHOOLS**
Carthage Public Schools reported total enrollment of 183 students this fall. The total is down by eight students from the figure reported to the News-Advocate last fall.

A breakdown by grades is: kindergarten, 16; first, 20; second, 18; third, 19; fourth, 14; fifth, 13; sixth, 11; seventh, 11; eighth, 10; ninth, 10; tenth, 8; eleventh, 20; twelfth, 13.

Fordyce News-Advocate
Sept. 28, 1988