**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**TINA JIMERSON**                                          **PETITIONER**
**ADC #704449**

**v.**                          **CASE NO. 5:15-CV-00208 BSM**

**WENDY KELLEY, Director**
**Arkansas Department of Correction**                     **RESPONDENT**

## ORDER

Tina Jimerson's petition for writ of habeas corpus is granted as to her *Brady* and

*Youngblood* claims and denied as to her actual innocence claim; her convictions are vacated,

and she is ordered released from the Arkansas Department of Correction within thirty days.

Jimerson's motion to cite additional authority [Doc. No. 68] is granted, and her motion to

expand the record [Doc. No. 69] is denied.

## I. PROCEDURAL HISTORY

The factual findings, summary of the evidence, and summary of the procedural history

detailed by Magistrate Judge Jerome Kearney are adopted. *See* Proposed Findings and

Recommendations, Doc. No. 61.

Myrtle Holmes was raped and murdered at her home in Fordyce, Arkansas, on

September 22, 1988. *See* Record on Appeal, Resp.'s Ex. 11 ("R.") at 669–73. On March 16,

1991, Charlie Vaughn, John Brown, Jr., and Reginald Early were charged with her murder.

*See id.* at 1. A week later, Vaughn pleaded guilty to first degree murder and was sentenced

to life in prison. *See* R. 1051. Vaughn's testimony at his plea hearing implicated Brown,

Early, and Jimerson. Vaughn testified that Jimerson drove the men to Holmes's residence and stayed in the car while the men carried out the crime. *See* R. 1043, 1049.

Jimerson was charged as an accomplice and, over her objection, was jointly tried with Brown and Early for capital murder. DNA evidence connecting Early to Holmes's rape was presented, and the prosecution argued that Brown and Early committed the assault, rape, and murder, while Jimerson drove them and Vaughn to Holmes's residence. A mistrial was declared.

Brown, Early, and Jimerson were subsequently charged with first degree murder and aggravated robbery. R. 404, 510. The DNA evidence linking Early to the crime was not presented at the second trial, and Vaughn—whose testimony first implicated Jimerson—recanted his testimony, stating that he was told what to say and that he was afraid of being sentenced to death. *See* R. 1059–61, 1069. Nevertheless, his earlier testimony implicating Jimerson was read into evidence. *See* R. 1035–1055. Based on witness testimony, Brown, Early, and Jimerson were convicted by a jury and sentenced to life in prison on August 19, 1992. *See* R. 1263–64.

Jimerson timely appealed to the Arkansas Supreme Court, which affirmed her conviction in January 1994. *See Brown v. State*, 869 S.W.2d 9 (Ark. 1994). Jimerson has, however, steadfastly proclaimed her innocence. *See, e.g.*, R. 1264 (stating at her sentencing, "The only thing I can say is it's gonna be an innocent person put in prison because I'm not guilty of this crime."). Her habeas petition, under 28 U.S.C. section 2254, was filed on June 30, 2015, and is based on new material evidence that was not available at the time of her

direct appeal.  *See* Doc. No. 1.  On January 26, 2016, she amended her petition to include a

freestanding claim of actual innocence based on an affidavit executed by co-defendant Early

on December 21, 2015.  In that affidavit, Early states that he raped and murdered Holmes by

himself.  Doc. No.15-1 at 100–06.  Jimerson petitions for relief, asserting violations of her

due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Youngblood v. Arizona*,

488 U.S. 51 (1988), and because she is actually innocent.  In *Brady*, the Supreme Court held

that withholding evidence favorable to the defendant, where that evidence is material to the

defendant's guilt or punishment, violates due process.  In *Youngblood*, the Supreme Court

held that failing to preserve potentially useful evidence, when done in bad faith, denies the

defendant due process.

The proposed findings and recommendations submitted by Judge Kearney recommend

denying relief for all claims.  *See* Proposed Findings and Recommendations, Doc. No. 61 at

2, 47.

## II.  MOTIONS TO EXPAND RECORD AND
## TO CITE ADDITIONAL AUTHORITY

John Brown's habeas petition was granted on August 21, 2018.  *See Brown v. Kelley*,

No. 5:16-cv-00381, 2018 WL 3999705 (E.D. Ark. Aug. 21, 2018).  The order in that case

found that "the only direct evidence against . . . Brown," was "Vaughn's confession, the use

of which in . . . Brown's trial was the result of a glaring *Brady* violation."  *Id.* at 13.  On

August 30, 2018, Jimerson moved for permission to cite the order granting Brown's petition.

*See* Doc. Nos. 68, 76.  That motion is granted.  *See, e.g.*, *O'Connor v. Credit Prot. Ass'n LP*,

No. 4:11-cv-2187-SNLJ, 2013 WL 5340927, at *4 (E. D. Mo. Sept. 23, 2013) (granting a motion to cite an order "by a fellow district court involving the same defendant and considering the same issues").

Jimerson also moved on August 30, to expand the record [Doc. No. 69] to include testimony from Brown's evidentiary hearing. *See Brown*, No. 5:16-cv-00381, Doc. Nos. 37–38. That motion is denied. Jimerson had an opportunity to object to the magistrate judge's findings, including why the record was inadequate and why evidence she wished to include was not offered at the evidentiary hearing. She also received a two-month extension to file her objections. *See* Doc. Nos. 61, 63; Local Rule 72.1(VIII)(C–D) (providing fourteen days to file objections and submit additional evidence); *see also* Rules Governing Sec. 2254 Cases Rule 7 (explaining how the record may be expanded)).

Jimerson timely filed her objections to the magistrate judge's findings and recommendations, which was more than one month after Brown's evidentiary hearing and three weeks after the transcript of the hearing became available. *See* Doc. No. 64. Her objections, however, failed to request that evidence from Brown's hearing be included in the record. She is not excused from her lack of diligence in this regard.

III.  DISCUSSION

A.  <u>Timeliness and Due Diligence</u>

Jimerson must file her federal habeas petition under 28 U.S.C. section 2254 within one year of the date on which she could have discovered, through the exercise of due diligence, the factual predicate of, or "the vital facts underlying," her claims. 28 U.S.C.

§ 2244(d)(1)(D); *Earl v. Fabian*, 556 F.3d 717, 725 (8th Cir. 2009).

### *1. Timeliness of Jimerson's Actual Innocence Claim*

Jimerson's actual innocence claim is timely because it was filed one month and five days after Early executed the affidavit upon which Jimerson's claim of actual innocence is based—well within one year of discovering the vital facts underlying her claim. *See Earl*, 556 F.3d at 725. Early maintained his innocence until he confessed to his lawyer in November 2015, that he committed the crime by himself. Evid. Hr'g Tr. ("Tr."), Doc. No. 51, at 57, 65–68, 79. Jimerson could not have known of Early's confession until she became aware of his December 21, 2015, affidavit in which he swore out his confession. *See* Early Aff., Doc. No. 51, Pet. Ex. 1. Therefore, Jimerson timely discovered and pursued her actual innocence claim.

### *2. Timeliness of Jimerson's* Brady *Claim*

Jimerson's *Brady* and *Youngblood* claims are based on her discovery of the same set of facts. *See* Doc. No. 59 at 28. For Jimerson's *Brady* claim, she must show that, in the year preceding the filing of her petition, she discovered through the exercise of diligence, evidence that (1) the prosecution suppressed evidence (2) that was favorable to her in that it is exculpatory or impeaching and (3) was material to her guilt or punishment. *See United States v. Pendleton*, 832 F.3d 934, 940 (8th Cir. 2016). Favorable evidence "is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Whitehill*, 532 F.3d 746, 753 (8th Cir. 2008) (internal quotation marks omitted). "A reasonable probability of

a different result is shown when the government's failure to disclose [the favorable evidence] undermines confidence in the outcome of the trial." *United States v. Jeanpierre*, 636 F.3d 416, 423 (8th Cir. 2011) (citation omitted); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The first question is whether Jimerson diligently worked to prove her innocence before discovering the new evidence. *See Johnson v. United States*, 544 U.S. 295, 311 (2005). The magistrate judge found that she did not. *See* Proposed Findings and Recommendations, Doc. No. 61 at 39–40. Jimerson testified that since the Arkansas Supreme Court affirmed her conviction, she filed an application and an update with the Innocence Project; she paid a lawyer to file a habeas petition, but the lawyer did nothing and was later disbarred; she filed clemency petitions; and her brother wrote organizations on her behalf. *See* Tr., Doc. No. 51 at 139–47. Jimerson's efforts were rewarded when her case was finally accepted by her current counsel in 2013. *See id.* at 141–42. Given the prosecution's success in concealing and destroying useful evidence as described below, Jimerson's efforts as an incarcerated and indigent person were diligent.

Once the legal clinic accepted Jimerson's case, it retained a private investigator named Greg Stimis, who spoke to Dallas County Sheriff Donny Ford in January 2014, and discovered *Brady* evidence. The newly discovered information included that:

- the investigators in the Holmes case used a jailhouse informant,

- the informant was being transported to the Dallas County Jail on another charge and was told, when he inquired, that he could improve his situation by obtaining information from Vaughn, Early, or Brown in the Dallas County Jail,

- the informant had conversations with Vaughn—Jimerson's co-defendant who first implicated her with his plea hearing testimony—that he recorded at Ford's request,

- the informant discussed the death penalty and other potential punishments with Vaughn,

- Vaughn confessed to killing Holmes and provided details about the crime,

- Ford believed the recording could not be used at trial, and

- the recording was lost or destroyed.

*See* Tr., Doc. No. 51 at 100–06; Stimis Aff., Doc. No. 1-2. Ford did not recall the informant's name or any other details, *see id.* at 97–98, and Stimis's further efforts to contact Ford after a follow-up telephone call were unsuccessful, *see id.* at 107.

Nevertheless, in January 2014, Jimerson knew the State suppressed evidence because, before her trial in 1992, her trial lawyer sent two separate sets of discovery requests to the prosecutor. *See* R. 94–97, 105–06. In response, Deputy Prosecuting Attorney Robin F. Wynne represented that the State had "no knowledge of any informant who led to or assisted in making the arrest in this matter," except for someone identified as "Sam," who was actually trial witness Taura Bryant. R. 156. Wynne also responded that the only cassette tapes the State possessed were of conversations with trial witnesses, brothers Kenny and Lee Parsons, and that the State "has made no offers of immunity, leniency, sentence or charge concessions, or other inducements that have been made to any Co-Defendant, potential witness or informant other than the offer made to Co-Defendant Charlie Vaughn," that is, his plea agreement. *See* R. 157–58. As the magistrate judge found, it is unreasonable to expect

Jimerson to have confirmed the veracity of the State's representations by reviewing the State's case files under the prosecutor's open-file policy, *see* R. 100, because it is presumed that prosecutors will fully discharge their official duties, *see* Proposed Findings and Recommendations, Doc. No. 61 at 36–37 (citing *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995)).

Importantly, Jimerson did not learn until April 26, 2015, that the evidence was not made available to counsel before trial and was suppressed by the prosecution. *See* Howard Aff., Doc. No. 51, Pet. Ex. 5. Jimerson's trial lawyer stated that he "did not learn at any point that law enforcement officials commissioned or encouraged a jailhouse informant, Ronnie Prescott, to question [Jimerson's] co-defendant, Charlie Vaughn, in or around March 1991 . . . [or] that a tape recording of such a conversation existed, or that Ronnie Prescott received a favorable outcome on a pending criminal charge in exchange for his assistance in obtaining a statement from Charlie Vaughn." *Id.*; Tr., Doc. No. 51 at 116.

Jimerson argues that April 26, 2015, is the date that began the clock for the one-year deadline to file her habeas petition, but this argument in unpersuasive. Jimerson knew when Stimis spoke with Ford that evidence was suppressed because the trial record—which showed that the State denied the use of an informant—was available to her and her counsel when Stimis spoke with Ford. Although her trial counsel's affidavit is supportive of her *Brady* claim, it was not a missing element.

Jimerson also knew when Stimis spoke with Ford that the evidence suppressed was favorable to her. Ford told Stimis that the informant discussed the death penalty and other

penalties with Vaughn and that Ford told the informant that he could better his situation by obtaining information about the murder. Jimerson thus knew that there was an informant who may have coerced the key witness against her into confessing by discussing penalties with him and that the State offered him an inducement in exchange for his work as an informant. She knew this information and the recording of the conversation with Vaughn could have been used to impeach Vaughn at trial. *See United States v. Pou*, 953 F.2d 363, 366 (8th Cir. 1992) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)) ("The obligation of disclosure . . . encompasses not only exculpatory evidence, but also evidence that might be valuable in impeaching government witnesses.").

The remaining element for Jimerson's *Brady* claim is whether the suppressed evidence was material to her guilt or punishment. The State argues Jimerson possessed the materiality element of her *Brady* claim when Stimis spoke with Ford. The problem with this argument is that Jimerson did not know from Stimis's conversation with Ford what Vaughn and the informant discussed other than the fact that they discussed punishment and that Vaughn participated in the crime. Whether the evidence was material to Jimerson's guilt or punishment was not known.

In February 2014, approximately one month after Stimis spoke with Ford, Stimis received the Arkansas State Police's case file pursuant to a Freedom of Information Act request. *See* Joint Stipulation 1, Doc. No. 44. The state police case file contained, among hundreds of other redacted pages, a one-page report stating that on March 24, 1991, police interviewed Ronnie Prescott, who was not identified as a prisoner. *See* Prescott Interview

Report, Doc. No. 51, Pet. Ex. 6. The report did not contain the substance of the interview or suggest that Prescott was an informant or even a prisoner. *See id.* Although the report referred to a handwritten statement signed by Prescott, that statement was not in the file and was not discovered by Jimerson's counsel until a meeting with the state police in January 2015. *See* Joint Stipulation 1, Doc. No. 44.

Jimerson's counsel reached Prescott by telephone on June 24, 2014, and subsequently traveled to meet with him in South Carolina, where he was incarcerated. *See* Prescott Telephone Call Notes, Doc. No. 64-1; Tr., Doc. No. 51 at 21–22; Prescott Aff., Doc. No. 51, Pet. Ex. 10 ¶ 10. On July 11, 2014, Prescott executed an affidavit in which he confirmed his participation as the informant in the Holmes investigation, including that his conversations with Vaughn were recorded, that he knew about the murder before those conversations, and that the charges against him were dismissed after his conversations with Vaughn. *See* Tr., Doc. No. 51 at 22; Prescott Aff., Doc. No. 51, Pet. Ex. 10 ¶¶ 4, 8, 10. He stated that Vaughn told him details of the murder, including that a co-defendant's girlfriend drove the men to and from the house where the murder occurred. *See* Prescott Aff., Doc. No. 51, Pet. Ex. 10 ¶ 6. Prescott further stated that he did not handwrite a statement, although he conceded he could have signed one. *See* Tr., Doc. No. 51 at 17; Prescott Aff., Doc. No. 51, Pet. Ex. 10 ¶¶ 6, 9.

Jimerson contends she did not know that Prescott was incentivized to obtain information from Vaughn until the conversation with Prescott, but her argument is unconvincing. Ford stated that he told Prescott he could improve his situation if he obtained

such information from one of Jimerson's co-defendants. Jimerson, therefore, knew that Prescott was promised leniency in exchanged for his informant work.

What Jimerson did find out on July 11, 2014, is that Vaughn told Prescott that a girlfriend drove the men to and from Holmes's residence, that Prescott's pending charges in a separate criminal matter were dismissed after he obtained the information from Vaughn, and that Prescott was told about the murder before his conversation with Vaughn. These details turn the impeachment evidence Jimerson became aware of on January 7, 2014, into material evidence for the third element of her *Brady* claim. In Prescott's affidavit, he identifies details of his conversation with Vaughn and of the deal Ford offered him. These details revealed the impact of Prescott's role as an informant and the missing recording on Vaughn's confession and implication of Jimerson. Jimerson therefore possessed support for the three elements for her *Brady* claim on July 11, 2014, the date Prescott executed his affidavit.

Additionally, as Jimerson points out, she discovered for the first time in the July 2014 conversation with Prescott that Vaughn referred to the woman driver as the girlfriend of one of Jimerson's co-defendants, exculpatory evidence that was not available to Jimerson when Stimis spoke with Ford. *See* Pet. Reply, Doc. No. 14 at 4. Jimerson testified that she was never romantically involved with any of her co-defendants. Tr., Doc. No. 51 at 125–26. The co-defendants' testimony was that Jimerson and Brown were friends; Jimerson, Vaughn, and Early were aware of each other but were not friends; and Early had never seen Brown before trial. *See id.* at 36–37, 126. Thus, at this time, she discovered evidence that was both

favorable to her as exculpatory evidence and material to her guilt and punishment. Jimerson's habeas petition asserting her *Brady* claim on June 15, 2015, was timely, and her efforts in discovering the facts underlying the claim were diligent.

### 3. Timeliness of Jimerson's Youngblood *Claim*

Jimerson was also diligent in pursuing the facts supporting her *Youngblood* claim, which likewise is timely. She has shown that, in the year before filing her petition, she exercised diligence in discovering that the prosecution and investigating officers destroyed evidence, in bad faith, that was potentially useful to her. *See Briscoe v. Cty. of St. Louis, Missouri*, 690 F.3d 1004, 1013 (8th Cir. 2012) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)) (noting the duty to disclose or preserve exculpatory evidence extends to investigating officers). Bad faith depends on the prosecutors' and investigators' knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. *See id.*

As discussed, Jimerson's efforts to discover evidence supporting her claims were diligent. She discovered for the first time when her counsel received Prescott's affidavit on July 11, 2014, that Prescott's and Vaughn's conversations contained at least one piece of exculpatory evidence—that a girlfriend drove Jimerson's co-defendants to the Holmes home—as well as other helpful impeachment evidence, such as Prescott's receiving leniency on separate charges against him in exchange for his informant work.

Before that, on January 7, 2014, Jimerson learned, from Stimis's conversation with Ford, that an informant was used in the Holmes investigation and that the recording of their conversation had been lost or destroyed. Had she filed at this time, however, she would not

have had sufficient facts to support a claim of bad faith. This missing element is grounds for dismissal of habeas petitions. *See, e.g.*, *Tyler v. Purkett*, 413 F.3d 696, 702–03 (8th Cir. 2005). Therefore, Jimerson was reasonable to continue searching for evidence supporting the officers' bad faith in destroying the useful evidence.

Jimerson's counsel discovered in January 2015, when she met with Arkansas State Police in person, the handwritten statement referenced in the state police report regarding an interview with Prescott. The statement largely confirmed Prescott's affidavit as to his involvement and Vaughn's statements, but it omitted that Prescott had recorded their conversations at Ford's suggestion and that Prescott was promised leniency in exchange. *See* Prescott Handwritten Statement, Doc. No. 51, Pet. Ex. 7. The statement bore Chief of Fordyce Police Ronnie Poole's signature—the police officer who first arrived at the crime scene in 1988—and another officer who is now deceased. *See id.*; R. 670–73. Prescott testified at the evidentiary hearing that he would not have been able to read the statement at the time, that he did not write it but for his signature, and that he could "barely make out a lot of this stuff that's written here" at the evidentiary hearing. *See* Tr., Doc. No. 51 at 26–27.

This final handwritten statement, together with the other facts, provided sufficient evidence for Jimerson to make a *Youngblood* claim. Because of the successful efforts of the officers to conceal and destroy the recordings, Jimerson could not have discovered the existence of the informant and the recordings until January 7, 2015, when she received the handwritten statement signed by Prescott. Jimerson's *Youngblood* claim is also timely, and

she exercised diligence.

B. Exhaustion of State Court Remedies

Jimerson acknowledges that her claims are procedurally defaulted because they were not presented in state court proceedings and there are no remaining state court remedies. *See* 28 U.S.C. § 2254(b); Jimerson's Obj., Doc. No. 64 at 12. Nevertheless, Jimerson shows cause and prejudice excusing that default. *See, e.g.*, *Cornell v. Nix*, 119 F.3d 1329, 1334 (8th Cir. 1997). She does not, however, meet the actual innocence standard excusing her from default. As a result, her actual innocence claim is denied.

*1. Cause and Prejudice*

a. Cause for Jimerson's *Brady* and *Youngblood* Claims

Jimerson has shown cause for her *Brady* and *Youngblood* claims. For *Brady* claims, "a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Banks v. Dretke*, 540 U.S. 668, 691 (2004). In *Strickler v. Greene*, 527 U.S. 263, 282 (1999), the prosecution maintained an open file policy, like in this case, but the defendant in *Strickler* did not file pretrial motions for discovery of possible exculpatory evidence, instead relying exclusively on the open file. *See id.* at 276–79, 283–84. As a result, the *Strickler* petitioner did not discover the exculpatory evidence the prosecution withheld—investigator's notes of one major witness's doubts in her memory contradicting her later important testimony implicating the petitioner—until investigations in connection with his habeas corpus petition. *See id.* at 778–79. The Court held that the petitioner established cause because the

prosecution withheld exculpatory evidence, that it was reasonable to rely on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence, and that the state falsely confirmed the petitioner's reliance on the open file policy during habeas proceedings. *Id.* at 288–89.

In Jimerson's case, in addition to its open file policy, the prosecution responded to Jimerson's discovery that it had no informants, beyond Bryant, or audio recordings to disclose, beyond those of the Parsons brothers. The prosecution included in the open file the report of the interview with Prescott, who was not identified as a prisoner in the jail or as an informant. *See* Doc. No. 44, Joint Stipulation 1. Even if Prescott's handwritten statement was in the open file, it did not refer to any recordings or that Prescott's charges were dismissed as a result of his help with the case. Just as in *Strickler*, the prosecution withheld evidence useful to Jimerson, and it was reasonable for Jimerson to rely on the prosecution's representations that it had no further informant information or recordings. *See also Banks*, 540 U.S. at 698 (holding petitioner showed cause when prosecution withheld a key witness's "status as a paid informant'" because "disclosure of [the witness's] status would have been 'helpful to [the] defense'"). In short, Jimerson has shown cause as to her *Brady* claim.

Using the same reasoning, Jimerson has also shown cause as to her *Youngblood* claim. The prosecution destroyed the recording of useful evidence in bad faith, as discussed above, preventing her from asserting her claim in state court.

b. Prejudice, or The Merits of Jimerson's *Brady* Claim

Jimerson satisfies the prejudice prong of the cause and prejudice requirement if she

15

can show that the *Brady* evidence was material—that is, if she can prove her *Brady* claim. *Banks*, 540 U.S. at 691. Suppressed evidence is material "if there is a reasonable probability" that the result of the proceeding would have been different had the evidence been disclosed. *Whitehill*, 532 F.3d at 753. As the Supreme Court explained in *Kyles v. Whitley*, 514 U.S. at 434, and reiterated in *Strickler v. Greene*, 527 U.S. at 290, "[T]he adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [s]he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Jimerson thus is "entitled to a new trial only if she establis[hes] the prejudice necessary to satisfy the materiality inquiry." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (internal quotation marks omitted).

Vaughn's testimony at his plea hearing was crucial to the decision to charge Jimerson and in obtaining a conviction. His original confession to Prescott in the jail cell was the first time anyone connected Jimerson to the crime, and that confession was recorded. The prosecution subsequently failed to disclose this information to Jimerson's counsel. Had Jimerson possessed the recordings and the information regarding Prescott's informant status, the credibility of Vaughn's testimony would have been impaired. Vaughn's claims at trial that he "had nothing to say" and was "going by what y'all [his attorney] said" at the plea hearing, likewise, would have held more weight with the information that he, who could not read and had been enrolled in special education classes until he quit halfway through high school, had been targeted by an informant. R. 1024, 1057, 1060, 1065. If, then, the jury did

not believe Vaughn's plea hearing testimony, the only remaining evidence with which to convict Jimerson was circumstantial testimony placing her with the other defendants and near the crime. *See Turner*, 137 S. Ct. at 1893–94 (holding that materiality must be determined in light of the entire record).

That circumstantial testimony supporting Jimerson's role as an accomplice to the murder of Holmes included the following. Taura Bryant, who is now deceased, testified that she saw the four co-defendants together the night before Holmes's murder at a party at Levi Grandy's house, a half mile from Holmes's residence, where they came and went three times in three different vehicles. R. 963–66, 985. She further testified that she saw them twice the next day and overheard Vaughn saying that Early or Brown had stolen a ring and money from an old lady, that the old lady "was as big as an ocean and he could fit a light pole up her," and that Jimerson was crying and telling them to "shut up." R. 968. Bryant believed she saw blood on either Brown's or Early's pants the day after the murder. R. 983. On cross-examination, she admitted that she could not remember whether it was Early or Brown who had blood on his pants, which day she saw the stain, where she saw them, or what the vehicles she saw them in looked like. R. 977–83.

Lee and Kenny Parsons, brothers with whom Brown lived for some time before the murder, testified that Jimerson drove her three co-defendants to their house the night before they learned of Holmes's murder. R. 930, 933, 946–47. They testified that Brown's clothes appeared to have blood on the right side and that Brown went home to change clothes. R. 935, 949, 952. Brown told Kenny he had been in a fight with Sonny Tidwell. R. 948.

Lee testified he did not tell police sooner than two years after the murder because he did not want to get involved, *see* R. 937, and Kenny testified he told the police he knew nothing until 1991, when he became a "trusty" at the jail, *see* R. 953–54.

Benny Cox testified that he was with Jimerson on the day before Holmes was murdered, and that he loaned his car to her that night. R. 1086, 1089. Jimerson confirmed she had been with Cox, that she drove his car, and that Vaughn joined them in the car and wanted to go to a party. R. 1116–17.

Jimerson testified that she reported that she had been raped to the Calhoun County Sheriff's Department in 1989, and that the officer taking her report said, "You better be glad they didn't do you like they did Myrtle Holmes." R. 1106. The officer, Bill Setterman, testified that he interviewed Jimerson in connection with the reported rape and that, when he brought up the Holmes murder, Jimerson became nervous and said that people were talking about her being involved. R. 1010–11. He also took a statement from her in which she stated she had given Brown a ride to a stop sign a couple blocks behind the police station, *see* R. 1109—that is, near Holmes's home—which she testified was to the "South side" of Fordyce sometime in June or July, not September, R. 1113, 1116.

Against this circumstantial evidence, Jimerson testified that she was at home after 9:00 p.m. the night of the crime and was not with Early, Brown, or Vaughn. R. 1108. Jimerson's father confirmed she came home around 9:00 p.m. the night of the crime and was home the next morning when they first heard of Holmes's murder. R. 1124–26. Early testified, in addition to confessing that he committed the crime by himself (Tr., Doc. No. 51

18

at 35–55), that he knew Jimerson from childhood, but he had not seen her in more than ten years.  R. 1135–36.  At the evidentiary hearing, Brown testified that he was never at the Parsons' home with Jimerson or Early, that he did not know Levi Grandy, and that he had not been to a party at Grandy's house.  Tr., Doc. No. 51 at 153.  Vaughn testified at the evidentiary hearing that he pleaded guilty because he was "real young" then.  *Id.* at 158.

In the order vacating Brown's conviction, the district court found that beyond "the enticed, recanted confession of a mentally deficient co-defendant [Vaughn] . . . [,] the result of a *Brady* violation," was circumstantial evidence from four witnesses, three of whose testimony was called into question by new evidence."  *See Brown*, 2018 WL 3999705, at \*7. Although that order is not binding, it is persuasive.  The testimony linking Jimerson to the crime outside of Vaughn's illegally procured confession is tenuous.  There is not overwhelming evidence of Jimerson's guilt to save the State from its constitutional errors. *See Jeanpierre*, 636 F.3d at 424.  Jimerson has shown that the *Brady* violation undermined confidence in the verdict, such that she is excused from her failure to properly exhaust state remedies and her *Brady* claim succeeds.  *See Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) ("Even if the jury—armed with all of this new [*Brady*] evidence—*could* have voted to convict [the defendant], we have 'no confidence that it *would* have done so.'" (quoting *Smith v. Cain*, 565 U.S. 73, 76 (2012)).

c.  Prejudice, or The Merits for Jimerson's *Youngblood* Claim

The prejudice relating to Jimerson's *Youngblood* claim follows similar reasoning. Jimerson's right to due process is violated if the state destroyed potentially useful evidence

19

in bad faith. *See Youngblood*, 488 U.S. at 58. Jimerson has shown that the prosecution obtained a confession from Vaughn through the use of an undisclosed informant and failed to preserve or disclose the recording of the confession—but only after the deputy prosecutor reviewed the recording for evidentiary value. Tr., Doc. 51, at 170. Whether the State did so in bad faith is a more difficult question.

Whether bad faith exists depends on the knowledge of the officers and investigators at the time the evidence was lost or destroyed. *Briscoe*, 690 F.3d at 1013 (quoting *Youngblood*, 488 U.S. at 56). Although the contents of the recording is not entirely clear, *see* Tr., Doc. No. 51 at 22, 85–86, 91, what the recording did contain appears to be significant enough that the prosecution concealed it from the defense. Ford testified that he gave Prescott the recording device after Prescott told him that Vaughn "was telling him about a murder." *See* Tr., Doc. No. 51 at 83. Although the value of the recording is unclear, the determination as to its value must weigh in favor of Jimerson, because it was not produced to her. Moreover, the statement Prescott signed would not have been reviewed by him, as he did not write it and could not read it to confirm its accuracy. That statement, which Jimerson's trial counsel should have received in the open file, omitted the recording in the jail cell. The existence of the recording was also omitted from the state police report and Prescott was never identified as an informant.

The Supreme Court "has long recognized the serious questions of credibility informers pose." *Banks*, 540 U.S. at 701 (internal quotation marks omitted). Without the recording, Jimerson lost her ability to argue that Vaughn's confession was enticed by an informant. The

prosecution's destruction of the recording constitutes bad faith; therefore, Jimerson's *Youngblood* claim also succeeds.

## 2. Actual Innocence

In addition to cause and prejudice, miscarriage of justice also excuses a petitioner's procedural default when the petitioner shows "actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013). There are two types of actual innocence claims: gateway and freestanding. Jimerson asserts a claim of actual innocence based on her co-defendant Early's 2015 confession.

Jimerson has not shown that she is entitled to a gateway actual innocence exception for her otherwise barred constitutional claims to be considered on the merits. For a gateway actual innocence claim, Jimerson must show (1) new reliable evidence not available at trial, and (2) that, "in light of the new evidence, no juror, acting reasonably, would have voted to find [her] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995). "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *McQuiggin*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316).

Jimerson relies on the new evidence of Early's confession to show that she is actually innocent. The magistrate judge was skeptical of the reliability of Early's confession, noting that Early maintained his innocence from 1988 until the Innocence Project accepted his case and filed a motion for him for DNA testing in 2015. *See* Proposed Findings and

Recommendations, Doc. No. 61 at 44; Tr., Doc. No. 51, at 57, 65–68, 79. Whether Early committed the crime is not disputed. What is uncertain is whether he committed the crime alone. Nevertheless, in light of the State's *Brady* and *Youngblood* violations and the fact that the remaining circumstantial evidence only vaguely connects Jimerson to the co-defendants and the crime, Early's confession renders the trial stained by constitutional error such that it shakes the confidence in the outcome of trial. *See McQuiggin,* 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 329).

This is not to say, however, that Jimerson's evidence is so strong that "no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. This standard is higher than the standard for materiality under *Brady*. The *Brady* standard, again, is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [s]he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler v. Greene*, 527 U.S. at 290. Jimerson cannot meet the high bar for actual innocence. Circumstantial testimony placing Jimerson near the scene and with the co-defendants, Vaughn's recanted confession, and Early's confession, all come with their fair share of credibility issues. A reasonable juror could still believe the testimony placing Jimerson with the co-defendants and convict her even with the information that Vaughn's confession was obtained by an informant and that the State destroyed the recording. As a result, she is not excused from default based on actual innocence.

Jimerson cannot meet the gateway actual innocence standard; accordingly, her actual innocence claim fails. Because Jimerson cannot satisfy the lower threshold for gateway actual innocence, her freestanding actual innocence claim need not be addressed. *See Dansby v. Hobbs*, 766 F.3d 809, 816 (8th Cir. 2014) (noting the "extraordinarily high" standard that would exist for a freestanding actual innocence claim).

## IV. CERTIFICATE OF APPEALABILITY

A certificate of appealability may be granted only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Jimerson must show that the issues are debatable among reasonable jurists, that a court could resolve the issues differently, or that the issues deserve further proceedings. *Flieger v. Delo*, 16 F.3d 878, 882–83 (8th Cir.1994). Because several of these issues are close ones, and a reasonable jurist could resolve the issues differently, a certificate of appealability is granted as to all of Jimerson's claims.

## V. CONCLUSION

For these reasons, Tina Jimerson's petition for writ of habeas corpus is granted, her convictions are vacated, and she is ordered released from the Arkansas Department of Correction within thirty days of the entry of this order, subject to new charges being filed against her. Jimerson's motion to cite additional authority [Doc. No. 68] is granted, and her motion to expand the record [Doc. No. 69] is denied.

IT IS SO ORDERED this 28th day of September 2018.

UNITED STATES DISTRICT JUDGE